IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

UNITED STATES OF AMERICA . CASE NO. 5:19-CR-226-BO
. ELIZABETH CITY, NC
V. . AUGUST 29, 2022
.
SHAMEL NESBITT .
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE TERRENCE W. BOYLE
JUDGE, UNITED STATES DISTRICT COURT

APPEARANCES:

FOR THE UNITED STATES: CHARITY WILSON, ESQUIRE
BRANDON BOYKIN, ESQUIRE
ASSISTANT U.S. ATTORNEY
800 FEDERAL BUILDING
310 NEW BERN AVENUE
RALEIGH, NC 27601-1461

FOR THE DEFENDANT: RAYMOND C. TARLTON, ESQUIRE
TARLTON FIRM
P.O. BOX 91624
RALEIGH, NC 27675

COURT REPORTER: MS. SANDRA A. GRAHAM, CVR-CM

Proceedings recorded by stenomask, transcript produced from dictation.

I-N-D-E-X


PRELIMINARY JURY INSTRUCTIONS

EXAMINATION OF THE WITNESSES

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **CHRISTINA URBINA** | | | | |
| BY MS. WILSON | 15 | | | |
| BY MR. TARLTON | | 42 | | |
| **MICHAEL HORRALL** | | | | |
| BY MS. WILSON | 45 | | | |
| BY MR. TARLTON | | 62 | | |
| **JOSEPH ATKINSON** | | | | |
| BY MR. BOYKIN | 63 | | 76 | |
| BY MR. TARLTON | | 75 | | |
| **DAVID SHOLES** | | | | |
| BY MR. BOYKIN | 77 | | | |
| BY MR. TARLTON | | 85 | | |
| **CARLOS DIAZ** | | | | |
| BY MR. BOYKIN | 86 | | | |
| BY MR. TARLTON | | 94 | | |
| **NICHOLAS JOHNSON** | | | | |
| BY MS. WILSON | 96 | | 119 | |
| BY MR. TARLTON | | 117 | | 121 |
| **JEFFREY PERKINS** | | | | |
| BY MS. WILSON | 122 | | | |
| BY MR. TARLTON | | | | |
| **WILLIAM MODLIN** | | | | |
| BY MS. WILSON | 128 | | | |
| BY MR. TARLTON | | | | |
| **JASON THOMPSON** | | | | |
| BY MS. WILSON | 137 | | | |
| BY MR. TARLTON | | 153 | | |
| **JOEY WHEELER** | | | | |
| BY MS. WILSON | 153 | | | |
| BY MR. TARLTON | | | | |

PRELIMINARY INSTRUCTIONS

Ladies and gentlemen of the jury, now that you've been sworn I'll give you some preliminary instructions to help guide you in your participation during the trial. It will be your duty to find from the evidence what the facts are. You and you alone are the judge of the facts. You will then have to apply these facts to the law. I will give you the instructions on the law. You have to follow the law whether you agree with it or not. Nothing that I say or do during the course of the trial is intended to indicate nor should it be taken by you as indicating what your verdict should be. The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits and any facts that the lawyers agree or stipulate to or that the Court instructs you to find.

Certain things are not evidence and should not be considered as evidence by you. I will list some of these now. The statements, arguments and questions by the lawyers are not the evidence in the case. Objections to questions are not evidence. Lawyers have an obligation to their client to make an objection when they believe evidence is offered that is not admissible under the rules. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained,

ignore the question. If it's overruled, treat the answer as you would any other answer. If you are instructed that some item of evidence is received for a certain purpose only, you must follow that instruction. Now testimony that the Court excludes or tells you to disregard is not evidence and should not be considered. And, finally, anything that you have seen or heard outside of this courtroom is not evidence and should not be considered as such by you. You are to decide the case solely on the evidence presented here in court.

Generally speaking there are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you more instructions on these as well as other matters at the end of the case, but bear in mind that you may consider both kinds of evidence. It will be up to you to decide which witnesses you believe and which witnesses you may not believe and how much of any witness' testimony you accept or reject. I'll give you some guidance for determining the credibility of witnesses at the end of the case.

As you know, this is a criminal case. There are some basic rules in a criminal case that you have to bear in mind. First, a defendant is presumed innocent until proven

guilty. The indictment against the Defendant brought by the Government is only an accusation of crime, nothing more. It is not proof of guilt or of anything else. The Defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The Defendant has no burden to prove his innocence or to present any evidence or to testify. Since the Defendant has the right to remain silent, the law prohibits you in arriving at your verdict from considering that a defendant may not have testified.

Third, the Government must prove the Defendant's guilt beyond a reasonable doubt. I will give you further instructions on this at a later point, but bear in mind that in this respect the burden of proof in a criminal case is different from and higher than in a civil case.

As I said to you, the Defendant is charged in the indictment with knowingly and intentionally distributing a mixture containing fentanyl, a Schedule 1 controlled substance and serious bodily injury and death of a person resulting from the use of such fentanyl. That's what the Government has to prove.

During the trial you are not to discuss the case with anyone or permit anyone to discuss it with you. Until you retire to your jury room at the end of the case to deliberate on your verdict, you're not to talk about the

case. Don't read or listen to anything about the case in any way. If anyone tries to talk to you about it, bring it to the attention of one of the Marshals, and they'll bring it to my attention.

Do not do any research or make any investigation about the case on your own. Finally, try to keep an open mind and not form any conclusive opinions until all of the evidence has been received. If you wish you may take notes, but if you do they're for your own personal use, and you are to leave those in the jury room when you're away.

The trial will now begin. At the beginning the Government will make an opening statement, which is an outline to help you understand the evidence as it is received. The defense attorney may also make an opening statement but is not required to do so. Opening statements are not evidence nor are they arguments. Once the opening statements have been finished, the Government will present its witnesses and counsel for the Defendant may cross-examine any witnesses that the Government presents. Following the Government's case the Defendant may, if he wishes, present witnesses whom the Government may in turn cross-examine. After all the evidence is received the attorneys will present their closing arguments to summarize and interpret the evidence for you, and I will give you instructions on the rules of law. After that you will

retire to deliberate on your verdict.

That's a very quick summary of the different parts of a criminal Federal jury trial, but I think if you watch and experience it, you'll see that's how it will develop.

So the jury may now be with the United States for opening statement.

**MR. BOYKIN:** Thank you, Your Honor.

OPENING STATEMENT BY MR. BOYKIN

Good afternoon, ladies and gentlemen of the jury. My name is Brandon Boykin. And together with my co-counsel, Ms. Charity Wilson, we represent the United States of America. First and foremost, I want to thank you for being here. It was our 16th President Abraham Lincoln who said one of the highest acts of citizenship you can do in this country is jury service. And I know you won't take this decision lightly, and we appreciate that. The reason why we're here today, ladies and gentlemen, this young man right here. This is Lucas Urbina. Lucas Urbina was 20 years old. He was your typical young adult. He had friends. He had hobbies. He was the only child of Christina Urbina. You'll learn that throughout this case the facts and the evidence will show that on the evening of November 19th, 2017 going into the morning of November 20th, 2017, Lucas had a sickness. And that illness, ladies and gentlemen, is addiction. Lucas was unfortunately

addicted to heroin. You'll find that on the afternoon of November 19th, 2017 Lucas was hanging out with some friends and they decided to get high. You'll find through testimony of other witnesses that it is not uncommon for addicts to -- everybody seek a dealer, and the first person that responds is the person that they buy from. In this case, ladies and gentlemen, the facts and the evidence will show that Lucas Urbina's dealer was this man, Shamel Nesbitt, also known as Mista, also known as Chris Nesbitt. You'll find the evidence will show that on November the 19th, 2017 they met up at a Kangaroo Gas Station, and you'll see that. You'll see a video of them at the gas station. You'll see them meeting up with a black male that they know simply as Mista. You'll see the text messages exchanged. We expect that you'll see Facebook messages between this Defendant and his victim, Mr. Urbina. You'll learn, ladies and gentlemen, throughout the case that when they took the heroin they got from this Defendant all four of them passed out. Two of them came to on their own. And when they came to they noticed that two of their buddies were overdosed. You'll hear about how they put them in the back seat and they raced several blocks up the street to the hospital. One of them recovered, but unfortunately, ladies and gentlemen, Lucas never woke up. He died three days later, November 22nd, 2017.

Ladies and gentlemen, the worst part about this is that the facts will show that this wasn't the first time Lucas overdosed and more importantly it's not the first time that Lucas overdosed from drugs he bought from this Defendant, Chris Nesbitt. Again, we anticipate the evidence will show that just one month earlier on October 21st, 2017 Lucas again bought -- well, previously bought drugs from this Defendant and he again overdosed.

Ladies and gentlemen, this is the last time I will get to talk to you, but understand this, after we bring the witnesses that are on the stand, Lucas' friends. You'll hear from his mother, Christina, you'll hear from the officers, what they did when they arrived on the scene. You'll find out how they find out that this Defendant, Shamel Nesbitt, was his dealer. You'll find out how they did their investigation. And then when we finish with the officers and we finish with Lucas' friends and family, we'll bring you a series of experts, a DEA chemist to tell you exactly what was in the bags that was found and the bindles that was found in the car, that was found on the person of one of the people that overdosed. We'll bring to you a toxicologist, Dr. Sandra Bishop-Freeman who will tell you about the levels, the toxic levels of cyclopropylfentanyl that was in the bag mixed with the heroin. The evidence will show that Lucas didn't just get

heroin. He got heroin, cyclopropylfentanyl, benzoyl fentanyl, caffeine. We'll explain how all that was in his system. We'll explain what these things are. You'll hear words like analogues. We'll bring in experts to explain exactly what an analogue is. And, finally, we'll bring you Dr. Deborah Radisch, who is a Chief Medical Examiner, and she will speak to you about cause and manner of death and why she is the only person that can make the decision.

At the end of this case, my co-counsel, Ms. Charity Wilson, will come up here and she will recount all this evidence that you will hear. She will explain to you in scientific terms that you've heard. And she will tell you why this man, Shamel Nesbitt, is guilty of distributing heroin and cyclopropylfentanyl that ultimately ended this young man's life. I thank you for your attention, and I thank you for your service.

**THE COURT:** Mr. Tarlton, do you want to make an opening statement?

**MR. TARLTON:** Yes, Your Honor, I would like to make a statement.

OPENING STATEMENT BY MR. TARLTON

Without a doubt this is an emotionally charged case. Lucas Urbina's death is absolutely tragic. It's a loss to his community, In the aftermath of something that tragic seeking blame is an absolutely understandable and natural

human emotion. Here we are years later in the palm of the federal courtroom. And another tragic reality that will emerge through the evidence is that back in November of 2017 the people and the peers in Lucas' life, they were all running fast and loose in a world of drugs. They were them seeking out and doing what they could to get money to get these drugs, to use them, to distribute them. And ultimately of all the people that Lucas was around on November 19, 2017, that's the only day that Shamel Nesbitt is charged with committing a crime, he committing a crime in this courtroom. That's a key date, November 19, 2017. That's in the indictment that the Judge, the Court, has already read to you guys. He is charged with a drug fentanyl, a fentanyl analogue. And that's important for later. The Court will give you special instructions on the law, exactly what an analogue is and how you go about determining that. And it's important to focus on that throughout the evidence that is presented to you. But that's the drug and that's the date that he is on trial for in this courtroom. And under the beyond the reasonable doubt standard that the Court has already told you about, the highest burden of law. The evidence will not show that under that standard you can conclude that Shamel Nesbitt is the person who sold it compared to other people there involved in Lucas' life, the drug seeking behavior.

Exactly who did what to whom in terms of fentanyl on November 19 is something that you have to focus on under the beyond a reasonable doubt standard.

Second, another important component of what my client is actually charged with in this case, is that not -- he's not only distributing the fentanyl, a fentanyl analogue on November 19th, but that it resulted in death, and you'll hear legal instructions later on about actual cause/but for cause. That the Government has to prove under the highest standard of law that that was the cause of death. And you'll see in the toxicology reports presented to you that Lucas Urbina on the 19th of November in the hospital had multiple drugs in his system, clonazepam, morphine or heroin in addition to the fentanyl.

Not only will you hear from the Government's experts, you'll hear from the defense expert, Dr. William Meggs, toxicologist with East Carolina School of Medicine and the toxicologist in the Emergency Medicine Department at Vidant Hospital in Greenville. And that the fentanyl in Lucas' system was not independently a lethal amount, especially for someone who is an addict. But that any opiate combined with clonazepam something that Lucas apparently had a prescription for, and that could make an otherwise nonlethal amount lethal but also in his system was morphine or heroin and that heroin and clonazepam can independently

combine and become lethal.

Think about it. Listen carefully to all that evidence and think about the other aspects of this charge. It is essentially not just a drug sale or distribution charge. It's a drug homicide charge. That's what my client is on trial for here. It's a case that primarily rests on circumstantial evidence. You will hear things that you won't like about Shamel, especially back in this time period 2017 that he was selling marijuana. It's so important that you realize he's not charged with marijuana as far as he's not on trial for marijuana.

Circumstantial in this regard, there's no witness credibly coming in here to say that they knew Shamel Nesbitt and they saw him hand a bag on November 19th to Lucas Urbina. You don't have that kind of eyewitness testimony. You don't have DNA or fingerprints on any bag that's attributed -- that belonged to my client attributed to Lucas Urbina in the hospital or in his car. In fact, you'll see that Detective Wheeler and other law enforcement agents waited days, sometimes nearly a week before going out to collect and securing key evidence such as Lucas Urbina's flip phone. They waited days until trying to get video from the gas station, Kangaroo, where evidence suggested this transaction might have taken place. It's not an actual -- evidence will show it's not an actual copy

of the video from the store. Rather it's a detective using a video camera to record a screen that's separately playing video camera that's not complete. It doesn't even capture all the different nine screens that are going on. You'll see that other than Lucas' flip phone and Facebook Messenger records as well as my client's Facebook records, other than that, the social media records and phone records for other people believed to be there that night, Robert Pernicaro, Richie Rojas, Michael Horrall they were not collected or analyzed in this case. There were leads given from Lucas' ex-girlfriend on who his dealers might be. Her -- his ex-girlfriend's records were not analyzed for what information she might have. Don't just look at the evidence they present but also keep an open mind about the evidence you would expect them to try to gather and analyze to rule out other possibilities. That's a part about keeping an open mind throughout the presentation of the evidence.

And at the end of this case we're going to come back -- it's a lot my client is charged with -- and ask you to acquit him. Thank you

**THE COURT:** All right. Let's start with a witness before we go to lunch.

**MS. WILSON:** Yes, Your Honor, Christina Urbina.

**CHRISTINA URBINA, GOVERNMENT'S WITNESS, AFFIRMED**

DIRECT EXAMINATION BY MS. WILSON

Q. Ma'am, could you introduce yourself to the jury, please?
A. My name is Christina Urbina.
Q. And, Ms. Urbina, I'm going to need you to keep your voice up so that everybody can hear your testimony. Okay?
A. Okay.
Q. And, ma'am, where are you currently living?
A. Smithfield, North Carolina.
Q. And where do you work, ma'am?
A. Wake County Human Services.
Q. Is that the health department?
A. Yes.
Q. What do you do at the health department?
A. I'm a nurse.
Q. How long have you been with the Wake County Health Department?
A. Eight years.
Q. And before Wake County Health Department, where were you employed?
A. Johnston County Health Department.
Q. Working in the same capacity?
A. Yes, ma'am.
Q. How long did you work for Johnston County Health Department?

A. Sixteen years.
Q. During the time that you were with Johnston County Health Department were you also a medical examiner?
A. For three of those years.
Q. And was that for Johnston County as well?
A. Yes, ma'am.
Q. Did you go to Johnston County Nursing School?
A. Johnston Community College, yes, ma'am.
Q. And, ma'am, are you married or divorced?
A. Divorced.
Q. What's your ex-husband's name?
A. Efrain Alonzo Urbina.
Q. And how long have you all been divorced?
A. Nineteen years.
Q. Did you all have a child together?
A. Yes, ma'am.
Q. What was his name?
A. Lucas.
Q. And how old was Lucas when you all divorced?
A. Five.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Now, was Lucas your only child?
A. Yes.
Q. What was his date of birth?

A. 3/13/97.
Q. And when did he die?
A. The 22nd of November of 17, the day before Thanksgiving.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Ma'am, I'm showing you what's been marked as Government Exhibit 1. Do you recognize this?
A. Of course.
Q. Can you tell me what it is.
A. Lucas' 18th birthday dinner.
Q. So it's a photograph of your son. Is this how he looked on his 18th birthday?
A. Yes, ma'am.
Q. Would it help you in your testimony to be able to refer to this?
A. Yes.
**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 1.
**THE COURT:** It's received.
**MS. WILSON:** May I publish to the jury?
**THE COURT:** Yes.
Q. You said that was his 18th birthday?
A. Yes, ma'am.
Q. Where were you all at?

A. Ruth's Chris Steak House. That was his favorite.
Q. Were you there with any of his closest friends?
A. Nick.
Q. And what's Nick's full name?
A. Nick Johnson.
Q. When Lucas was living in 2017, where did he reside, or where was he living?
A. Between my house and his father's home.
Q. How far apart do you and your ex-husband live?
A. About two miles.
Q. Was he working in 2017, Lucas?
A. He worked two weeks at IGA one time.
Q. Was he going to school at all?
A. He was trying to. He filled out the paperwork.
Q. And when you say he was trying to, was he trying to get his GED?
A. Yes, ma'am, at the college.
Q. Did Lucas have a heroin addiction?
A. Yes, ma'am.
Q. Do you know when he started using heroin?
A. I'm assuming when he was 17, is when I found out.
Q. And how did you find out?
A. I found him one time in the bathroom with a syringe of something in his hand.
Q. Did he have an explanation for you?

A. Uhm, to the best that he could. But he wanted to hide it.
Q. Did it start with heroin, or did he have other drugs that he used before heroin, if you know?
A. Later on he told me that he had started with marijuana at a younger age.
Q. Do you know how young he was when he started smoking marijuana?
A. Somebody introduced it to him on the school bus at 12.
Q. And how old was he when you discovered that he was using heroin?
A. Seventeen.
Q. Did he ever go to rehab?
A. Yes, ma'am.
Q. Where did he go to rehab?
A. The house in Dunn. It's called, not the Houston House, but the --
Q. Is it the Harvest House?
A. Harvest House, yes, thank you. We didn't have any in Johnston County.
Q. When did he go to rehab?
A. About June of 2017.
Q. And was that an in-patient or a residential facility?
A. Yes, ma'am.
Q. How long was that program.

A. Forty-two days.

Q. Did he stay the whole time?

A. Yes, ma'am.

Q. He did not get kicked out for violating any rules, anything like that?

A. No. He gained his weight back.

Q. When did he get out of Harvest House?

A. June, July -- 42 days later, so maybe the middle of July or August, maybe. He might have started a little bit later. I'm not sure exactly of the dates.

Q. Was that the only rehab that Lucas went to?

A. Yes, ma'am.

Q. When he came home in August of 2017, do you know who he was hanging out with?

A. Nick Johnson, for sure.

Q. Did you know any of his other close friends?

A. Not really.

Q. Did he have a girlfriend?

A. Yes.

Q. What was his girlfriend's name?

A. Kim Fox.

Q. During the time that you knew he had a heroin addiction, did he ever overdose on heroin?

A. Several times.

Q. About how many?

A. Maybe eight to ten.
Q. Do you know what Narcan is?
A. Yes.
Q. What is Narcan?
A. It reverses the effect of heroin and makes them breathe again if they are not breathing after they take it.
Q. After you learned of Lucas' addiction, did you keep Narcan in your home?
A. Yes, ma'am, and in my car.
Q. What about Efrain, your ex-husband, did he also keep Narcan?
A. Yes. Yes, ma'am.
Q. Did Lucas ever have Narcan?
A. I'm not sure.
Q. You mentioned one of his friends a couple of times, Nick. How long had Lucas and Nick been friends?
A. Since age 11, fifth grade. They were like brothers.
Q. Do you know whether or not Nick also suffered from a heroin addiction?
A. I'm assuming.
Q. Did you ever have any conversations directly with Nick about it?
A. I had conversations with both of them, but of course they didn't want to reveal much, you know, to protect me.
Q. Do you know if Lucas had any prescriptions?

A. Yes, ma'am, he did.
Q. What did he have a prescription for?
A. Klonopin.
Q. Is that the -- is the off brand for that clonazepam?
A. Yes, ma'am.
Q. Do you know when he got that prescription?
A. It was when he was trying to get into rehab to try to curb the urges, so maybe before June of '17, so April or May maybe.
Q. So your understanding was that that was prescribed to help him get off drugs?
A. Right.
Q. Do you know how Luke would ingest heroin?
A. Injections, IV.
Q. And are you basing that on your conversations with Lucas or because you found him with a needle?
A. I caught him in the bathroom that time. It scared me to death.
Q. Over the years that Lucas was dealing with this addiction did you take certain steps to try to help him avoid the kind of drug crowd?
A. Yes.
Q. Can you tell the jury what, if anything, that you did with his phone?
A. We took away the smart phone hoping he couldn't

contact the same people that had provided drugs to him and bought him a flip phone hoping he wouldn't have internet service to get on like social media or whatever, however he could contact these people.

Q. Did you even have internet at your home?

A. No. That's why he liked to -- enjoyed spending more time at his dad's house because he could play his X-Box 360 and all with his internet, because I do not have that at my house.

Q. So your ex-husband had internet capabilities that you do not?

A. Exactly.

Q. Do you remember October 21st of 2017?

A. Yes, ma'am.

Q. And what happened that day that sticks out to you?

A. He and Nick overdosed at Wendy's at Selma.

Q. How did you become aware that there had been an overdose?

A. I got a phone call from Luke in jail the next day.

Q. And so he ended up being charged with some criminal offenses?

A. Yes.

Q. Do you know what he was charged with?

A. Possession, maybe. I'm not sure.

Q. But you believe it to be drug related?

A. Oh, yes.
Q. What happened to those charges, if you know?
A. They got rid of them because of a new law about for addicts if you catch them with under a certain amount then they offer them a different way to go and not to jail, like offer them rehab or go to therapy or -- I forget the law. There's a name for it.
Q. Are you talking about the Good Samaritan Law?
A. Yes, ma'am.
Q. For people that call 9-1-1 when somebody is overdosing?
A. Yes, ma'am.
Q. Did you bond him out of jail the day when you had that call from him?
A. No.
Q. When did he get out of jail, when the charges were dismissed?
A. Yes.
Q. And at that point did Lucas have a flip phone?
A. Yes, ma'am.
Q. At some point did you realize that phone was lost?
A. The flip phone?
Q. In October of 2017?
A. The flip phone or the smart phone?
Q. Well, at some point did you realize that a phone that

Lucas had had been lost?
A. Yes.
Q. And which phone was that?
A. That was the phone with all his songs on it. He wrote music.
Q. And was that the smart phone?
A. Yes, it was the smart phone.
Q. Did that phone have service?
A. I don't think so. I think he just used Wi-Fi, but I'm not sure.
Q. Did you end up going to the law enforcement agency that had responded to that overdose looking for it?
A. Yes, ma'am.
Q. Was it just you?
A. And Lucas.
Q. And what happened when you went to the police department?
A. The nice policeman that had responded to the overdosing at Wendy's that evening came and spoke with Luke and tried to encourage him to do better and be careful, you know, he might not have a second chance the next time.
Q. Was that in Selma?
A. Yes, in Selma, yes, ma'am.
Q. After that overdose did Lucas go back to rehab?
A. I don't believe so.

Q. And there was a plan for Lucas to go visit some family in Honduras; is that right?
A. Yes, to get away from this environment.
Q. When was that supposed to happen?
A. Right after that had happened, but he got a speeding ticket and court was not until January so we had to wait.
Q. So the plan was in January of 2018 for Lucas to go see his family in Honduras?
A. Right. But it was really before that until he got the speeding ticket.
Q. And was that your ex-husband, he planned that with his family?
A. Yes.
Q. Do you remember November 19 of 2017?
A. Very well.
Q. Where was Lucas living at that time?
A. Between my house and his father's home.
Q. And that was where he was living in October of 2017?
A. Ma'am?
Q. That was where he was living in October of 2017?
A. Yes.
Q. And you all were still pretty close in distance from one another; is that right?
A. Me and Luke or me and his dad?
Q. You and your ex-husband?

A. Oh, yes.
Q. And in November of 2017 was Lucas employed or going to school at that time?
A. He was filling out the paperwork to go to the community college to finish the GED.
Q. Did Lucas have a car that he used regularly?
A. Yes, ma'am.
Q. What car was that?
A. A red burgundy Ford Explorer.
Q. Do you remember how that day began for you?
A. He come over for lunch and I cooked him fried hotdogs and eggs scrambled like he liked them with cheese. And he came over to get his laundry. I would wash it for him and dry it, but I was not going to fold it. That was his responsibility. So he put it in a big black trash bag, and as he left he put it over his shoulder.
Q. Did he say anything to you before he left?
A. Oh, yes, ma'am, and he hugged me.
Q. What did he say to you?
A. He hugged me and told me, thank you, mama, I love you.
Q. Where was he going?
A. To his dad's, back to his dad's.
Q. So you believed he was going to be spending the night at your ex-husband's home?

A. Yes, ma'am.
Q. Did you know if he had any plans to go out anywhere that evening?
A. No, not really, but he had gotten a phone call or he had called -- I want to say it was Nick, and so I wasn't sure if he was up to something or what was going on, because we were trying to keep the kids separated, Nick and he since the Wendy's incident. And later on Nick told me that --
**MR. TARLTON:** Objection.
**THE COURT:** Overruled.
A. -- he could tell that Luke wanted to plan something, so he was trying to help Lucas, said, no, I can't get together with you, you know. I think he had left some shoes or something somewhere at one of his friend's house, Luke had.
Q. What time did Lucas leave your home?
A. About 1:30.
Q. Do you know a person by the name of Robert Pernicaro?
A. No, ma'am.
Q. Do you know Richard Rojas?
A. No.
Q. What about Michael Horrall? Do you know that gentleman?
A. Yes.

Q. How do you know Mr. Horrall?
A. I had met him with Luke before as one of his friends.
Q. How long do you think he knew Mr. Horrall?
A. Me or him?
Q. How long did you know Michael Horrall?
A. Probably about maybe four or five months, maybe.
Q. So he and Lucas were friends?
A. Yes.
Q. Did you have any knowledge about whether or not Mr. Horrall suffered from a heroin addiction as well?
A. Yes.
Q. Did you have some conversation with Mr. Horrall about it?
A. Yes, ma'am, I did. I tried to save him.
Q. What do you mean by that?
A. I offered him a train ticket to go to Charlotte and get away from the crowd he was in. I told him he deserved better. I tried to give him a pep talk that Jesus loved him and, you know, if he fought hard, if he wanted it he could beat it, but he had to want it. And I offered him a train ticket to Charlotte, and I bought the ticket, and we all went to -- Nick, Luke, he and I went to the train station in Raleigh for him to get on the train and go to some -- I want to say it was some friends or family in Charlotte just to get him away from that so he could try to

help himself with his own addiction.
Q. When Lucas left your home at 1:30 did you see him again that day?
A. Not until the hospital.
Q. At some point did you get a call from somebody about Lucas being in the hospital?
A. Yes, ma'am.
Q. Who called you?
A. One of my old school nursing buddies that worked in the ER, but she was not at work that night, Billie.
Q. So she had heard from somebody else that Lucas was in the hospital?
A. Lucas' nurse that got him coming in in the ER called her to let me know I needed to get up there, it was not a good situation.
Q. About what time did you get that phone call?
A. Maybe 9:45ish p.m..
Q. Were you at home that evening?
A. Yes, ma'am.
Q. You went to the hospital?
A. Yes.
Q. How did you get there?
A. I flew in my car. About eight minutes it took me to get there.
Q. Was anybody with you?

A. A friend of mine that had been at my house visiting?
Q. When your friend called you, did she say anything about Lucas' condition?
A. Yes. She said it didn't sound well.
Q. When you arrived at the hospital, who did you see?
A. The doctor, some of the nurses.
Q. Did you see any of Lucas' friends?
A. Yes. Mike was at the front doors.
Q. And describe how he appeared to you.
A. Very upset. He was pacing and smoking saying this wasn't supposed to happen, this wasn't supposed to happen. And I asked him, what happened, just tell me what happened.
Q. How did he respond to you?
A. Just it wasn't supposed to happen, and he was crying.
Q. At some point did you interact with the security guard at the hospital?
A. Yes, ma'am.
Q. Tell me about that interaction.
A. As I was seeing Luke in his room with the curtain pulled, the security man came and offered me the keys that had been to the Explorer. And he said, these are the keys. The other guy that had come in with Luke wanted to go back out to the Explorer, did I mind if he gave him the keys to go back to the Explorer. And I said, no, he may not have the keys or go back in that car.

Q. Do you think this was before or after you got to see Lucas?
A. It was after I saw Lucas. I was standing at the curtain there.
Q. Did you get an opportunity to interact with the doctor before you saw Lucas?
A. Yes, in the family room.
Q. What information did the doctors provide to you?
A. They said they weren't sure how long he had been down without oxygen and they had to intubate him because he was unable to breathe on his own. And he was in the -- I forget the name of the position, but it's when the brain is dead. You have like frog legs and your hands are out like this, and his pupils were fixed and dilated?
Q. Did that mean anything to you?
A. It did to me as a nurse.
Q. What did you believe --
A. It shows brain death in a patient with these symptoms. There's no brain activity.
Q. And that was before you got to see Lucas?
A. Yes. That was in the family room.
**THE COURT:** All right. We're trying to manage the scheduling here, and I'm sure you need a lunch break, so we'll take our lunch break now and resume with this witness. We'll be in recess until ten minutes after two.

(Off the record 1:00 - 2:11 p.m.)
**THE COURT:** Good afternoon. You can resume your Direct Examination.
**MS. WILSON:** Thank you, Your Honor.
Q. Ms. Urbina, I think when we left off we were talking about when you saw Lucas on the evening of November 19, 2017. After you spoke to the doctors were you able to go see Lucas?
A. Yes, ma'am.
Q. And do you think that was when the security guard came to give you your keys?
A. Yes.
Q. Now you had an entire conversation with the security guard about whether or not somebody could go into the Ford Explorer. Do you remember that.
A. That was when he came to bring me the keys. He had asked me that the other fellow that had come in with Luke was signing out, and he would like to go back into the car, could he use my keys.
Q. And you said, no.
A. I said, no.
Q. Now did you ever go out to the parking lot to check on the explorer?
A. No, ma'am.
Q. When was the next time you saw that Ford Explorer?

A. The next morning his dad had come and picked it up and took it home, had to put gas in it.
Q. Was there any damage to the Ford Explorer that had not previously been there?
A. Yes. The back door, the window to the back hatch door was all jammed out, and it wouldn't -- the piece was missing like somebody had broken into it.
Q. Prior to when the car was in the parking lot at the hospital, when was the most recent time you had seen the Ford Explorer?
A. At the front door to the ER with the doors open where they had pulled Luke out to get him in the ER.
Q. And did you notice anything amiss with that back hatch?
A. No, ma'am.
Q. Was Lucas driving that car earlier when he came to see you in the afternoon?
A. Yes, ma'am.
Q. Did you see the car at that point?
A. Yes.
Q. Was there any damage to that back glass at that point?
A. No, ma'am, it was normal.
Q. Now that evening did you leave the hospital, or did you stay there?
A. I stayed there.

Q. And did you stay the entire time that Lucas was in the hospital?
A. Except to go home and shower and come right back.
Q. So in the days that followed you met with a number of people; is that fair to say?
A. Yes.
Q. Do you remember speaking to Detective Wheeler with the Smithfield Police Department?
A. Yes, ma'am.
Q. Did he come to Lucas' room to have a conversation with you?
A. Yes. He came looking for me, and we sat in the like family waiting room near the ICU.
Q. Was he asking you about any information you had about how Lucas had been brought to the hospital?
A. Yes, ma'am.
Q. Did he ask you about Lucas' addiction?
A. Yes.
Q. During that conversation did you relate to him what Michael Horrall had told you?
A. Yes.
Q. And did you have a conversation with him about Lucas' struggles?
A. Yes.
Q. You also met with a number of doctors and nurses

over the next few days; is that right?
A. Yes, and pastors.
Q. When was it that you really realized that Lucas' situation was dire?
A. The night he came in.
Q. Did your opinion based on what the doctors were telling you, did that ever change during the course of Lucas' hospital stay?
A. My opinion of what?
Q. Of the situation, of the direness of the situation?
A. I already knew.
Q. To your understanding was there ever any point where Lucas got any better?
A. No, ma'am.
Q. Did you know how Lucas presented to the ER, meaning was he breathing on his own when he came to the ER?
A. No, ma'am, he was not.
Q. At some point did you and your family decide to take Lucas off life support?
A. His father and I.
Q. When did you and Efrain have that conversation?
A. The 22nd, the day before Thanksgiving.
Q. Did you have -- did you wait until family had an opportunity to come and see him?
A. That's the only reason I left him on, for his dad to

say goodbye from my mom's side and his father's side, because I already knew he was gone when he came in on Sunday evening, and I wasn't putting him through all that, you know, this test, that test. If he was gone his body was not going to lay there and go through all that.

Q. The doctors did a number of tests to determine his expectancy; is that right?

A. Yes. And a brain scan.

Q. And what was your understanding of what those tests showed?

A. There was no brain activity at all.

Q. Was Lucas removed from life support on November 22nd, 2017?

A. Yes, ma'am.

Q. Did he die shortly thereafter?

A. Yeah, he didn't breathe on his own.

Q. When was Lucas' funeral?

A. That Sunday after.

Q. Was that the 26th of November?

A. Yes, ma'am.

Q. Now at some point you went through the Ford Explorer; is that right?

A. Yes, ma'am.

Q. What, if anything, -- well, let me ask you this.

At some point while Lucas was still in the hospital

did your husband bring something to the hospital that had been in the Explorer?
A. Yes.
Q. Do you remember what it was?
A. Luke's phone.
Q. And was there a Walgreens receipt that was found in the Ford Explorer?
A. Yes, ma'am.
Q. And did he say he found that?
A. Yes, he told me he found it.
Q. Did you give it over to Detective Wheeler?
A. His daddy did.
Q. And were you in the room when all that happened?
A. Yes.
Q. Do you know what the receipt was for?
A. IV syringes from Walgreens.
Q. When you found Lucas' phone, did you ultimately give it to law enforcement?
A. Yes, Detective Wheeler.
Q. Was that after the funeral that you gave it to Detective Wheeler?
A. Yes, ma'am.
Q. Why did you give it to law enforcement?
A. They requested it, and I wanted them to find anything they could to see who was at the root of -- that killed my

child.
Q. And you gave them permission to look inside Lucas' phone?
A. Yes, ma'am.
Q. What kind of a phone was it?
A. It's a flip phone, kind of Navyish blue.
Q. And the flip phone was what Lucas had had for awhile instead of a smart phone?
A. Yes, because we didn't want him on social media contacting the people that would supply drugs.
Q. Did you have a conversation with law enforcement about any of Lucas' social media accounts.
A. Yes. They were free to do whatever they needed to do to find any information.
Q. What social media accounts do you believe Lucas had?
A. Facebook, Facebook Messenger, and I found out later he had Instagram, but I didn't know that before he died.
Q. Did you have Lucas' user name and password for his Facebook account?
A. Yes.
Q. And how did you get that?
A. From Nick and Johntazia.
Q. Who is Johntazia?
A. Johntazia is Nick's partner, fiance now, and mother of his child.

Q. And they knew Lucas' user name and password?
A. Nick and Luke did and then obviously Johntazia.
Q. Did you pass that along to law enforcement so they could see his messages or posts or anything?
A. Yes, ma'am, I had nothing to hide.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Ma'am, I'm showing you what's been marked Government's Exhibit 18 for identification purposes. Do you recognize what's in this bag?
A. Yes, ma'am.
Q. Can you tell me what it is?
A. Luke's phone.
Q. And you're sure that that's Luke's phone?
A. Uh-huh.
Q. That's the one you gave to Detective Wheeler on the 27th of November?
A. Yes, ma'am.
Q. Ma'am, before November of 2017 had you ever heard the name Shamel Nesbitt before?
A. No, ma'am.
Q. While Lucas was in the hospital did you take some pictures of him?
A. Yes, ma'am.
**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Ma'am, I'm showing you what's been marked for identification purposes as Government's Exhibit 2. Do you recognize this photo?

A. Yes.

Q. Can you tell me who is in this photo?

A. My child, Lucas.

Q. That's Lucas. And is that how he appeared his entire hospital stay?

A. Yes.

Q. Would it aid you in your testimony to be able to refer to this?

A. (Nod head up and down)

**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 2.

**THE COURT:** It will be received.

**MS. WILSON:** Sir, may I publish?

**THE COURT:** Yes.

Q. Is this how Lucas looked from the time that you saw him until the time that he died?

A. Yeah, he came in like that.

Q. Thank you.

**MS. WILSON:** Judge, that's all I have.

**THE COURT:** That's all your questions?

**MS. WILSON:** Yes, sir.

**THE COURT:** Any cross?

**MR. TARLTON:** Just briefly, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Ma'am, when you met Detective Wheeler, I believe it was on November 27th of 2018. Does that sound right?

A. Yes, sir.

**THE COURT:** 2017.

Q. 2017. Does that sound right?

A. The first time I met with him?

Q. The second.

A. Oh, yeah, it was the Monday after the funeral.

Q. And that's when you gave him Lucas' flip phone; is that right?

A. Yes, sir.

Q. And the purpose of you getting Lucas that flip phone was so he couldn't get on social media like Facebook; is that right?

A. Yes. It would be harder for him to have access.

Q. You were trying to help the detectives find leads on anything that might be connected with what happened to Lucas; is that right?

A. Yes.

Q. And the name you gave them, one name you gave them was Danielle Reed, one of Lucas' ex-girlfriends?

A. They asked who he was, who his girlfriend was.

Q. You said that she would know everything; isn't that right?
A. I don't remember exactly what I told them, but I know she would know like who he was hanging around with, because they spent a lot of time together, he and her.
Q. Do you remember that Detective Wheeler audio recorded the interview with you?
A. I'm sorry, say that again.
Q. Do you remember that Detective Wheeler audio recorded this interview with you?
A. Yes.
Q. And you also gave information on a gentleman named Jordan; is that right?
A. That I had heard, yes.
Q. And based on looking at Lucas' phone; is that correct?
A. I'm not sure if it was Lucas' phone or what I had heard from Lucas' friends.
Q. You had gone through the phone in an effort to try to help the detective identify people to talk to; is that right?
A. Well, I checked his texts to see what time was his last text, and I know about what time he died.
Q. Yes, ma'am. The red Ford Explorer that Lucas was driving that night on November 19th, that's an SUV that you own; is that correct?

A. Yes, sir.
Q. I believe you testified earlier that it was broken into; is that correct?
A. Yes, sir.
Q. And you know that Robert Pernicaro was arrested in connection with the breaking and entering of your car; is that right?
A. I'm assuming that's his name. The security guard came and told me what had happened and that the local police had arrested the boy that did it.
Q. And that's while you were in the hospital with your son Lucas; is that correct?
A. What do you mean, why I was in the hospital.
Q. When your car was broken into.
A. I was there to see him, my son. When it happened you mean?
Q. Yes, ma'am.
A. Oh, yes, uh-huh.
**MR. TARLTON:** No further questions, Your Honor.
**THE COURT:** Do you have anything else for this witness?
**MS. WILSON:** No, sir.
**THE COURT:** Thank you, ma'am, you're excused. Next witness.
**MS. WILSON:** Michael Horrall.

**MICHAEL HORRALL, GOVERNMENT'S WITNESS, SWORN**

**MS. WILSON:** May I proceed, Your Honor.

**THE COURT:** Yes.

**MS. WILSON:** Thank you.

DIRECT EXAMINATION BY MS. WILSON

Q. Sir, will you introduce yourself to the jury, please.

A. My name is Mike Horrall.

Q. Sir, you're going to need to keep your voice up. There are no microphones in this courtroom. Okay?

A. Yes.

Q. Sir, where are you working right now?

A. The Redneck Barbeque Lab.

Q. What do you do there?

A. I run the pits.

Q. What does that mean?

A. I do all the meat trimming, seasoning, et cetera, putting meat on, taking meat off the smokers.

Q. What city do you live in?

A. I live in Clayton.

Q. And how old are you, sir?

A. I'm 27.

Q. Sir, did you know Lucas Urbina?

A. I did.

Q. How did you know Lucas?

A. He was a friend of mine, a good friend of mine.

Q. Before he passed how long had you known him?

A. A couple of years at least, three or four.
Q. How did you all meet?
A. I can't call it.
Q. When you say, I can't call it, does that mean you can't remember?
A. That's correct.
Q. Did you call him Lucas or Luke or something different?
A. Just I think Lucas.
Q. Sir, do you struggle with a heroin addiction?
A. Not currently.
Q. What do you currently struggle with?
A. Nothing in particular.
Q. So when you say nothing in particular does that mean that you are drug free at this point or that --
A. No. I just jump around.
Q. So when you say you jump around, what's the latest drug that you are using?
A. Probably alcohol.
Q. What else?
A. That's all.
Q. When did you start using heroin?
A. I'd say around about 18, 19, maybe.
Q. When you were 17 or 18, were you using it habitually?
A. I never did start habitually using until I'd say I was about 19 years old.

Q. How long was it that you were using it on a regular basis?
A. Like how long was I habitually addicted to heroin?
Q. Yes, sir.
A. I'd say maybe two, three years.
Q. Were drugs something that you grew up around?
A. Yeah, I'd say.
Q. When you started using heroin, how did you first start ingesting heroin?
A. I started by insulfilating it, like snorting it.
Q. And then at some point did you go on to injecting it?
A. Yeah, I did.
Q. Why did you make the switch?
A. It was more efficient. It had a higher bioavailability. It just got you higher.
Q. Did you ever overdose on heroin before?
A. Yeah, I have.
Q. About how many times?
A. Maybe four, five.
Q. When was the last time that you overdosed on heroin?
A. I'm going to say like two years ago.
Q. Has it been for about two years that you have managed to avoid heroin?
A. Not completely, but for the most part, yeah.
Q. Not habitual use?

A. Correct.
Q. Do you remember November 19th of 2017?
A. Not really. I remember just varied bits and pieces.
Q. Who were you with that day?
A. So originally it was just me and Rob, my buddy, Rob came over. And then Lucas came by after that.
Q. What's Rob's last name?
A. Pernicaro.
Q. Do you know where Rob is today?
A. He hung himself in jail in January.
Q. He committed suicide?
A. Correct.
Q. So initially it was you and Rob. Where were you all?
A. At my house.
Q. What were you all doing?
A. We were playing cards and drinking and then we took some Klonopin.
Q. Where did you get the Klonopin?
A. Lucas had it with him.
Q. So when Lucas came over, is that when he brought the Klonopin, or had you previously got it from Lucas?
A. No, he brought it with him.
Q. At some point did the conversation turn towards getting some heroin?
A. Yeah, but it wasn't that. It was between Lucas and

Rob.

Q. And you weren't a part of that conversation?

A. Correct.

Q. How come?

A. I didn't have any money and some turn of events that had occurred previously had kind of like, I just didn't, for whatever reason, one reason or another, I just didn't feel like participating in the obtaining of heroin at that point.

Q. What circumstances are you talking about that made you not want to talk about getting heroin?

A. Probably the previous overdose and death of a good friend of mine.

Q. Was that something that happened in March of 2017?

A. Yes, it was a couple of months before this.

Q. What was your friend's name that overdosed and died?

A. Dakota James Taylor.

Q. And, Dakota, that was a man?

A. Yeah, correct.

Q. How did he overdose? In that particular overdose, were you involved with Dakota when he overdosed?

A. Yeah, that's correct.

Q. Did you take Dakota to the hospital?

A. Correct.

Q. Tell me what you were doing on the way to the hospital

when you had Dakota with you?
A. I was giving him CPR.
Q. Did he ever regain consciousness as far as you know?
A. No, he was dead the whole time.
Q. So at some point Rob and Lucas start talking about getting some heroin. What did you all do then?
A. They said they were going to go out riding and I didn't want to stay at home and be alone. I wanted to go for the ride just to hang out with my friends.
Q. Did you go with them?
A. Yeah, correct.
Q. Where did you all go?
A. I don't really remember. At some point we went and picked up our buddy, Richie. I don't remember where we picked him up from exactly. It just isn't my current recollection. I just don't remember. And eventually we ended up at a gas station in Smithfield. I think it was a Kangaroo.
Q. What's Richie's last name?
A. Rojas.
Q. Do you still talk to him?
A. I've spoken with him once before in like the past couple of months, but that was only like a brief, kind of like a messaging him.
Q. Were you friends with him before this?

A. Yeah.
Q. On the way from your house where you ultimately end up at the gas station, were there phone calls that were happening trying to get in touch with someone?
A. I don't know if there were phone calls he made or if there's just a text he made or what, to be honest with you. I just don't recall, but I would imagine, yeah, they were using their phones to try to get some dope.
Q. Were you trying to call anybody to get dope?
A. No, ma'am.
Q. Were you texting anybody to get dope?
A. No, ma'am.
Q. What about Richie, do you know if he was texting anybody to get dope?
A. I'm not sure.
Q. What about Lucas? Was he calling people to get dope?
A. I'm not sure who was. I honestly just don't remember if it was one person or if they were both doing it.
Q. It wouldn't be uncommon for everybody to be calling everyone they knew that would sell heroin; is that right?
A. I would agree.
Q. So you ended up going to the Kangaroo Gas Station; is that what you testified to?
A. I believe, if I remember correctly, yes, ma'am.
Q. Where is that Kangaroo Gas Station?

A. I know it's near the Walmart. I want to say it's Brightleaf Boulevard.
Q. Is that in Smithfield?
A. That's correct.
Q. Why did you go there?
A. I don't recall. I wasn't part of that conversation.
Q. Who was driving?
A. Lucas.
Q. And what car were you all in?
A. A Ford Explorer. It was like red in color.
Q. Was that Lucas' car?
A. It used to be, yes, ma'am.
Q. Where were you sitting in the car?
A. In the back right-hand side behind the passenger. Rob was sitting in front of me in the passenger seat. Lucas was driving, and Richie was sitting in the left-hand side.
Q. When you got to the gas station, what happened?
A. I went inside and I got some alcohol. And then I came back to the car, and that's when I had been informed that they were going to give me some heroin to do and so we pulled forward, and we put all the heroin in one spoon, and we each drew equal amounts. And then I administered the dope, and again I was up on a lot of Klonopin, so I remembered kind of being shooken awake by Richie. And my initial reaction, I didn't know what was going on, but then

I look up and I see Rob slumped on the center console and then Lucas slumped over Rob. And I just had like a -- I had like a panic attack. I kicked in just from having my previous experience with Dakota, and so I moved Lucas out of the driver's seat and then proceeded to drive as fast as I could to Johnston Memorial.

Q. When you came to and saw Lucas and Rob, did you have any idea about how bad it was?

A. No. I didn't even check them or nothing. I just knew something was wrong. They could have been -- they might have been already dead. I know ever since my first experience with somebody dying I've never taken the time to try to play around with situations that involve anybody that's overdosing heroin. It's just immediately drive them to the hospital. Then otherwise I would get 9-1-1 on the phone immediately before I do anything else.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 14. Do you recognize this?

A. It looks -- yeah, it's similar to the gas station we were at.

Q. And in this photograph that says Circle K, did it used to be a Kangaroo?

A. I think so, yeah.
Q. And is it a fair and accurate representation of like where the gas pumps were?
A. Yes.
Q. And I'm showing you what's also been marked as Government's Exhibit 16 for identification purposes. Do you see the gas station in this photograph?
A. Yeah, the dumpsters.
Q. And is 16 an overhead kind of aerial shot of that gas station?
A. It looks like it.
Q. Is that what it looked like when you guys were there on the evening of November 19th of 2017?
A. Other than the Circle K part, yeah, I guess.
Q. Would they be helpful in your testimony to be able to refer to these?
A. I guess.
**MS. WILSON:** Judge, we would seek the admission of Government's Exhibit 14 and 16.
**THE COURT:** They're received.
**MS. WILSON:** May I publish?
**THE COURT:** You may.
Q. I'm publishing on the screen Government's Exhibit 14. Can you see that from where you're sitting?
A. Correct.

Q. And is that the side of the Circle K that you all pulled up to?
A. I believe so.
Q. When you all pulled up to the gas pumps who all went inside the gas station?
A. I only remember myself going in to go get some alcohol and then come back out.
Q. You don't remember anybody else that walked inside?
A. No.
Q. I'm publishing Government's Exhibit 16.
Sir, may I have him step down so he can show the jury where he went.
**THE COURT:** All right.
Q. Sir, if you can come down.
Sir, right in the middle of the picture is this the gas station?
A. That looks like it.
Q. And what side were you on, if you know?
A. The left side.
Q. So you were over here?
A. Yes.
Q. And then after you came back to the car and there was heroin in the car, where did you guys pull up to?
A. At the dumpsters, right back in there (indicating).
Q. So your talking about this right back here? And is

that where you all ingested heroin?
A. (Nod head up and down).
Q. Before you went inside the gas station, to your knowledge was there any heroin in the car?
A. No, not that I was aware of.
Q. You didn't see anybody using any heroin? You have to answer outloud.
A. No, ma'am.
Q. And when you came back out from the gas station, who was it that had the heroin?
A. I don't recall.
Q. When you got back in, you said somebody told you that they were going to give you some heroin. Do you remember who it was that told you they were going to give you heroin?
A. No, ma'am, it was either Robert or Lucas.
Q. When you went to use the heroin, can you describe how it -- well, let me ask you this. Did you see how it was packaged?
A. If I did, I just don't recall, if I did.
Q. And do you know how it got from however it was packaged to your syringe.
A. I know that the dope got put into a spoon and somebody used their syringe to measure out, I would imagine, either 30 units or 60 units of water for us to split into either

three separate shots of 10 units or three separate shots of 20 units.

Q. Were all four of you in the car using?

A. No, ma'am. Just myself, Robert and Lucas.

Q. Richie was not using heroin?

A. That's correct.

Q. At some point you injected yourself with heroin; is that right?

A. Correct.

Q. Did you see whether or not Lucas and Rob injected themselves as well?

A. I wasn't paying attention.

Q. Do you know how long you had been passed out?

A. No, ma'am.

Q. But at some point how did you wake up?

A. Richie had woken me up. He had told me that he had watched them, Robert and Lucas fall out and like something about that alarmed him enough to attempt to wake me up. I don't know why I woke up.

Q. And is that when you saw Lucas and Rob?

A. That's correct.

Q. And you and Richie were both in the back seat; is that right?

A. That's correct.

Q. So when you saw Lucas and Rob, what did you do?

A. I moved him, I want to say I moved him to the backseat and helped Richie -- I don't know how -- I want to say Richie and I both ended up in the front seat and moved them to the backseat, but I just don't remember exactly how that occurred. I just remember being in the car and driving as fast as I could to the hospital after that.
Q. At that point did you still have a needle to inject?
A. I can't call it?
Q. And that just means you can't remember?
A. That's correct.
Q. Did you have your own needle?
A. I believe so.
Q. Do you know where you got it?
A. No, ma'am.
Q. Were you the one that started driving the Ford Explorer after Lucas and Rob were unconscious?
A. Yes, ma'am.
Q. Where did you drive to?
A. To Johnston Memorial Hospital in Smithfield.
Q. Was the gas station close to that hospital?
A. Yeah, it's pretty close.
Q. How long did it take you to get there, if you remember?
A. I don't remember. I want to say maybe five minutes.
Q. When you got to the hospital what happened?

A. I want to say -- I don't know who got the -- who got anybody's attention or what happened exactly. I remember them bringing out gurneys and Lucas and Rob being taken away. And then I remember I went in because Rob had woken up, and I went in and seen Rob. I didn't know where they had brought Lucas at the time. I was like, come on, man, let's go. Let's get out of here. And so he and I tried to leave and then somebody seen him and said he wasn't allowed to leave, and they brought him back.
Q. Did you end up leaving the hospital?
A. Eventually at some point. Then we come back to get Rob but Rob had gotten locked up I guess.
Q. Before you left the hospital did you see Ms. Urbina?
A. Yeah, from what I've been told. I don't really recall. I remember seeing Lucas' father.
Q. But you don't remember any conversation that you had with him?
A. Unfortunately I do not remember.
Q. When you left, how did you leave the hospital?
A. My mom came and got me.
Q. And when you left was Rob still in the hospital?
A. That's correct.
Q. When you were using heroin, what would you call it?
A. Heroin, dope, boy, good, dicetyl morphine.
Q. Those were the things that you would normally call it?

A. I wouldn't say it wouldn't be normal to any particular -- I don't really necessarily refer to it as just one specific thing.
Q. But you're not normally calling it heroin?
A. Correct.
Q. There are other words that you would use, including boy and food?
A. That is correct.
Q. How would you buy it specifically?
A. Money I guess. I mean like you go to find somebody with some heroin and give them some money for some heroin I guess.
Q. How much would you typically buy at one time?
A. There's no typical amount.
Q. How was it packaged when you would buy it?
A. There's no typical necessarily. There's all different kinds of ways it comes. It depends on how you buy it.
Q. Have you ever heard of anything called tickets?
A. I have.
Q. What's a ticket?
A. It's like a little wax piece of paper that's full of dope.
Q. What's it used for?
A. To package dope.
Q. Specifically what kind of dope?

A. Heroin.
Q. Have you ever gotten any other type of drug in those wax bags or tickets?
A. I mean I'm sure I have, but it's just normally a heroin thing.
Q. It's not normally how you would get marijuana; is that right?
A. Correct.
Q. It's not normally how you would get cocaine?
A. Correct.
Q. It's not normally how you would get methamphetamine?
A. Correct.
**MR. TARLTON:** Objection to the leading, Your Honor.
**THE COURT:** Overruled.
Q. How would you get those other drugs, like how would they be packaged: marijuana, cocaine, methamphetamine.
A. Usually it comes in like some kind of a bag of some sort.
Q. A plastic bag or some other substance?
A. Typically I guess in a plastic bag.
Q. You have testified about what a ticket was. Is that the same thing as a bindle?
A. A bindle I think is like ten tickets.
Q. I'm sorry?
A. I think it's like ten tickets.

**MS. WILSON:** Your Honor, may I have just one moment?
**THE COURT:** Yes.
**MS. WILSON:** Thank you, Your Honor. That's all the questions I have.
**THE COURT:** Do you have any questions?
**MR. TARLTON:** Yes, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Mr. Horrall, when you talked to the police in this matter they never got your cell phone from you or asked for access to your social media accounts; is that fair to say?
A. That's correct.
Q. You said that also with you that night, November the 19th it was Lucas Urbina, correct?
A. Correct.
Q. Another friend, Robert?
A. Yeah, Robert Pernicaro, me, Lucas, and Richie Rojas.
Q. Richie Rojas. Richie was a friend of you guys that you went out and picked up; is that right?
A. That's correct.
Q. Now, he didn't come to the hospital that night, right?
A. I don't believe so.
Q. Okay. Did he tell you why he was leaving and not sticking around?
A. He just didn't want to be in that situation at the time.

Q. Were you aware he was on felony probation?
A. It wouldn't be surprising.
Q. Okay. And, sir, in the last ten years you've been convicted in state court of some felonies; is that right?
A. That's correct.
Q. And back on December 4th of 2014 you were convicted of a Class H felony, larceny of a firearm in Johnston County?
A. That's correct.
Q. And then earlier this year, back on February 10th this year, 2022, you were convicted of a Class I felony, possession of methamphetamine?
A. That's correct.
**MR. TARLTON:** I have no further questions, Your Honor.
**THE COURT:** Do you have anything further for this witness?
**MS. WILSON:** No, sir.
**THE COURT:** All right. You're excused.
**MS. WILSON:** Your Honor, may he be released from his subpoena?
**THE COURT:** Yes. Next witness.
**MS. WILSON:** Your Honor, we would call Joseph Atkinson.

**JOSEPH ATKINSON, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. BOYKIN

Q. Good afternoon, Officer Atkinson. Would you please tell the jury where you work.
A. I work with the Smithfield Police Department here in

North Carolina.
Q. How long have you worked there?
A. A little over five years.
Q. Do you have any prior law enforcement experience?
A. Yes. I have a little over two years with the Whiteville Police Department here in North Carolina. Then prior to that I worked for the Robeson County Sheriff's Office for a little over four years.
Q. What do you currently do for the Smithfield PD?
A. I'm currently assigned to our trafficking enforcement unit.
Q. Okay. Were you working for Smithfield PD back on November 19 and November 20, 2017?
A. Yes, I was.
Q. Were you on duty?
A. Yes, I was.
Q. On what shift were you working?
A. I was on night shift.
Q. Typically what hours are night shift?
A. Smithfield Police Department our night shift is from 5:30 p.m. to 5:45 a.m..
Q. Do you recall being dispatched to Johnston Medical Center?
A. Yes, sir.
Q. Where is Johnston Medical Center located?

A. It's on 509 North Brightleaf Boulevard, Smithfield, North Carolina.
Q. Do you recall the reason why you were called there?
A. We were dispatched to a breaking and entering of a motor vehicle in the parking lot.
Q. What, if anything, happened when you arrived?
A. When I arrived I made contact with Captain Jeffrey Perkins of the security team for the hospital. He explained to me that there was two individuals that were brought to the hospital that evening. Both of the individuals were brought under overdose circumstances. One individual was currently in ICU not doing well. The other individual, the overdose symptoms were reversed. He came to. He had refused medical treatment at the hospital. They call it leaving AMA, against medical advice. And he essentially had left the hospital but had returned, and Captain Perkins had observed him on the hospital security cameras messing with the actual vehicle that they had arrived in.
Q. What type of vehicle are we talking about?
A. It was an older model Ford Explorer.
Q. Were you the only officer that arrived, or did you have backup?
A. Myself and Officer Sholes arrived. I'm not sure if we arrived at the same time, but a couple of second afterwards

we were.
Q. But you didn't arrive together?
A. No, sir, we did not drive in the same car together.
Q. So as you were speaking with Captain Perkins, did you see the individual that had been involved in the breaking and entering?
A. Yes, sir, I did.
Q. And where did you see him?
A. He was about, probably about ten yards from me. His name was Robert. I found out that his name was Robert. Officer Sholes was talking with him, dealing with him while I was talking to Captain Perkins.
Q. So where was this entire, I guess, interaction taking place.
A. In the parking lot that's the front entrance area to the emergency department.
Q. And after you finished speaking with Captain Perkins, what, if anything, did you do next?
A. Once I spoke with Captain Perkins, I walked over to Officer Sholes. I had noticed while I was talking to Captain Perkins Officer Sholes was searching Robert, and he had taken some items off of Robert's person and placed them on the ground. So I walked over to Officer Sholes, talked with him to see what all he had going on with Robert.
Q. What, if anything did you find at that time?

A. At that time I found out that Officer Sholes had discovered that Robert was in possession of some small bindles of -- small wax paper pieces. I could identify them due to my training and experience as being what they use -- users use to hold bindles of heroin in. There was three of them and then there was two syringes also, hypodermic needle syringes that Officer Sholes had taken off Robert and there was also a medicine bottle.
Q. You said bindles originally and then you said wax papers, that means the same thing?
A. Yes, sir, I'm sorry, wax paper bindles.
Q. Okay. And from your training and experience what are they typically used for?
A. The wax paper bindles are used to store small amounts of heroin or normally like it would be a type of drug.
Q. And in your training and experience have you seen other types of drugs in these waxed paper bindles?
A. No, sir.
**MR. BOYKIN:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Now, Officer Atkinson, I'm going to show you what's been premarked as Government's Exhibits 5, 6 -- this is Government's Exhibit Number 4 and this is Government's Exhibit Number 9.
Do you recognize first Government's Exhibit Number 4?

All right. So first, do you recognize Government's Exhibit Number 4?
A. Yes, sir.
Q. What does that appear to be?
A. This is evidence that I packaged on the night of the incident.
Q. Okay. What about Government's Exhibits 5 and 6?
A. Five and six, these are photos of essentially Government Exhibit Number 4.
Q. And you recognize those as well?
A. Yes, sir.
Q. Do they appear to be photographs of Government's Exhibit 4?
A. Yes, sir.
Q. And do they fairly and accurately depict the pill bottle that you seized that night?
A. Yes, sir.
Q. Does it appear to have been altered in any way?
A. Pardon me?
Q. Does it appear to have been altered in any way?
A. Uhm, from what I can tell the only thing that's different from when I packaged it is this one label here.
Q. But the pill bottle itself appears to be the same?
A. Yes, sir.
**MR. BOYKIN:** Your Honor, at this time I would move to admit

Government's Exhibits 4, 5, and 6.

**THE COURT:** They're received.

**MR. BOYKIN:** Permission to publish.

**THE COURT:** You can publish them.

Q. So Government's Exhibit Number 5, can you read the name to the jury on that pill bottle?

A. Lucas Urbina.

Q. Can you tell what type of pills these are?

A. From just the picture?

Q. Yes.

A. Well, I can't see the pills from the picture, but I can just read what's on the bottle.

Q. Sure.

A. It says 30 clonazepam one milligram tablets, generic for Klonopin one milligram.

Q. So it's clonazepam, a clonazepam bottle.

A. Yes, sir.

Q. And this is what you got you said off of Robert Pernicaro?

A. Yes, sir. This is what Officer Sholes found on him, yes.

Q. And you also mentioned that in addition to the pill bottle and syringes they also found wax bindle paper that contained suspected heroin?

A. One of the bindles still had suspected heroin inside

it.
Q. Is that what you have in front of you as Government's Exhibit 18?
A. You said exhibit what?
Q. I'm sorry, Government's Exhibit 9. What's the exhibit number?
A. Exhibit 9.
Q. Government's Exhibit 9, excuse me. Is that what you have there?
A. This is not how I packaged it.
Q. Are you aware of why it's packaged like that?
A. I know it was sent to the DA's crime lab. They package things a little differently.
Q. The DA or the DEA?
A. DEA, I'm sorry, DEA. I apologize.
Q. And that's the Drug Enforcement Administration?
A. Yes, sir, I'm sorry.
Q. You said it was sent there and that's how they packaged it?
A. Yes, sir.
Q. In terms of Government's Exhibit Number 4, are there any pills in that bottle?
A. Yes, sir.
Q. Now does your department have any policies in terms of dealing with suspected heroin and fentanyl?

A. Yes, we do.
Q. Can you tell the jury what those policies are?
A. If fentanyl is suspected as being in any type of drug really, not just heroin, because it is said to be in cocaine, whatever, marijuana, whatever, we normally double seal it. Then we also place a biohazard sticker on that bag as well.
Q. So how Government's Exhibit 9 is packaged, would you believe that to be for safety?
A. Yes, sir, it would be.
Q. And in addition to Officer Sholes searching Robert, did you actually search the red Explorer yourself?
A. Yes, sir, we did.
Q. What, if anything, did you find in the Explorer.
A. I'm sorry.
Q. What did you find in the Explorer?
A. In the Explorer before I searched it I actually looked inside of it as well. I could see a used hypodermic needle syringe in the rear passenger seat. It did not have a cap on it, so the needle was visible. In the glove box of the vehicle were other unused hypodermic needle syringes inside the glove box as well.
Q. Did you find anything else inside the glove box, inside the vehicle, I'm sorry?
A. As far as in terms of contraband, no, we did not.

**MR. BOYKIN:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. I'm also handing you what's been marked as Government's Exhibit Number 7 and Government's Exhibit Number 8. Do you recognize those?
A. Yes, I do.
Q. What does Government's Exhibit Number 7 appear to be to you?
A. Number 7 is going to be how I packaged the needle that had the, the hypodermic syringe needle that had the needle exposed, did not have a cap on it.
Q. So it would be what appeared to be a used syringe?
A. Yes, used, yes.
Q. What does Government's Exhibit Number 8 appear to be?
A. These are the syringes that I seized, seven of them. So there were two unused syringes that were found on Robert and there were five that I found in the glove box, so these are all the unused syringes that we recovered from the investigation.
Q. And they came out of the red Explorer?
A. Two of them came from Robert himself and then two came from the Explorer, yes.
Q. And do they fairly and accurately depict what you found on the night in question of November 20, 2017?
A. Yes, sir.

Q. They don't appear to be altered in any way?
A. No, sir, besides just the stickers from our packaging.
Q. They have the stickers, but the needles themselves do not appear to be altered?
A. No, sir.
**MR. BOYKIN:** Your Honor, at this time I would move to admit and publish Government's Exhibits 7 and 8.
**THE COURT:** They're received. You can publish them.
Q. After you finished searching the vehicle, what was your next involvement in this case?
A. I took over the investigation. It was my side of town. All the evidence was collected as you see, and then I placed Robert under arrest for the possession of heroin, possession of a Schedule IV controlled substance based on the Klonopin being a -- I'm sorry, clonazepam being a Schedule IV controlled substance at the time and placed him under arrest and transported him to the police department. I also charged him with possession of heroin.
Q. So you transported him to the police department at that time?
A. Yes, sir.
Q. Did you ever go back to Johnston Medical at that time?
A. I did not, no.
Q. Did you have any further involvement in this case?
A. No, sir.

Q. In addition to charging Robert with possession of heroin, did you also charge him with misdemeanor breaking and entering?

A. I charged him with tampering with a motor vehicle.

Q. And was that for the Ford Explorer, for entering the Ford Explorer?

A. Yes, sir.

**MR. BOYKIN:** One moment, Your Honor. Your Honor, may I approach?

**THE COURT:** Yes.

Q. Officer Atkinson, I'm going to re-approach with Government's Exhibit 9. Can you see these things on the side?

A. Yes.

Q. What do they appear to be to you?

A. The wax paper bindles that I seized that night.

Q. And is that the wax paper bindles that you have been referring to that are commonly used to contain heroin?

A. Yes, sir.

Q. And what about those empty vials?

A. The empty vials, I'm not familiar with the empty vials.

Q. You said they might have been something that wasn't a part of your investigation?

A. No, sir.

Q. Okay. But the empty wax bindles were?
A. Yes, sir.
Q. And you said in your training and experience that's what heroin is typically packaged in?
A. Yes, sir.
Q. And that would be consistent with what you found on the night in question?
A. Yes, sir.
**MR. BOYKIN:** Your Honor, those are my questions. Thank you.
**THE COURT:** Do you have any questions?
**MR. TARLTON:** Yes, Your Honor, thank you.

CROSS-EXAMINATION BY MR. TARLTON

Q. Officer Atkinson, I think you said that the bindles and the wax paper were found on Robert himself; is that right?
A. Correct.
Q. And you searched the red Explorer yourself and in that what you found were additional unused syringes?
A. I found one -- I found five unused syringes, yes.
Q. You did not locate any other contraband inside the vehicle; is that right?
A. Other than the syringes.
Q. Right. And after Robert was arrested, this red Explorer was not seized by crime scene techs or anything

like that or otherwise secured; is that right, by the police?

A. No, sir.

Q. Okay.

**MR. TARLTON:** No further questions, Your Honor.

**THE COURT:** Thank you. You can step down.

**MR. BOYKIN:** May I follow up briefly?

**THE COURT:** What?

**MR. BOYKIN:** Very brief redirect.

**THE COURT:** Do you have something?

**MR. BOYKIN:** Yes, sir.

REDIRECT EXAMINATION BY MR. BOYKIN

Q. Just to be clear, Officer Atkinson, when you responded to Johnston Memorial, what were you investigating?

A. A breaking and entering of a motor vehicle is what we initially got called there for.

Q. Okay. That's why you were not doing any type of investigation into a drug distribution?

A. Not at my first arrival, no.

**MR. BOYKIN:** Thank you. Nothing further.

**THE COURT:** Thank you. You're excused. Call your next witness.

**MR. BOYKIN:** Your Honor, we would call -- Your Honor, may he be released from his subpoena?

**THE COURT:** He's released.

**MR. BOYKIN:** Your Honor, we would call Officer Sholes to the stand.

**DAVID SHOLES, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. BOYKIN

Q. Good afternoon, Officer Sholes. Please tell the jury where you work.

A. I work for the Smithfield Police Department.

Q. How long have you worked there?

A. Approximately eight years.

Q. Have you had any prior law enforcement experience?

A. Not prior to Smithfield Police Department.

Q. Have you had any prior military experience?

A. Yes. I was in the Marine Corps for four years before I became a police officer.

Q. What is your current role in the Smithfield Police Department?

A. I'm a detective.

Q. And prior to that what were you doing?

A. I worked as a patrolman.

Q. On November 20th, 2017, were you a detective or a patrolman?

A. I was a patrol officer.

Q. Okay. And were you working that day?

A. I was that night, yes, sir.

Q. That night?

A. Yes, sir.
Q. So you were on night shift?
A. Yes, sir.
Q. Do you recall being dispatched to 509 North Brightleaf Boulevard?
A. Yes, I do.
Q. What's located there?
A. It's the hospital at Smithfield, Johnston County/Smithfield.
Q. Why were you dispatched to this location?
A. For a breaking and entering of a motor vehicle.
Q. Did you respond there by yourself or did you have a partner?
A. Officer Atkinson responded as well.
Q. Did you all arrive separately?
A. We had separate vehicles, yes, sir.
Q. When you arrived to the Johnston Medical Center, where did you first report to?
A. I was in the parking lot originally, the emergency room parking lot. It's on the main street on the side of the hospital.
Q. And what, if anything, happened once you arrived to this parking lot?
A. We encountered security as well as another individual in the parking lot who was reportedly breaking into a

vehicle.
Q. And did you -- at that point did you come across the suspected suspect for the breaking and entering?
A. Yes, I did.
Q. Where was he?
A. He was still in the parking lot.
Q. And this was Robert Pernicaro?
A. That's correct.
Q. And did you then interact with him?
A. Yes, I did.
Q. What, if anything, happened during this interaction?
A. I asked him about what was going on with the vehicle.
Q. He told me he was going to the vehicle to get his phone, that he had -- he was in the vehicle originally with Lucas and --
**MR. TARLTON:** Objection to hearsay, Your Honor.
**THE COURT:** Overruled.
**MR. TARLTON:** Your Honor, (inaudible).
**THE COURT:** Overruled.
Q. I'm sorry, you said he had been in the vehicle originally with Lucas?
A. And two other unidentified individuals.
Q. And what, if anything, did you learn next?
A. I learned that they had come to the hospital due to an overdose that he and Lucas had?

Q. And he being Robert Pernicaro?
A. Yes, sir.
Q. So Robert -- so according to him, Robert and Lucas overdosed?
A. Yes, sir.
Q. And now obviously you're interacting with him in the parking lot?
A. Yes. I interacted with Robert. He had been provided the Narcan, came back, and he had left the hospital.
Q. Did he admit to breaking into the car?
A. He said he went into the car to get his phone.
Q. So how did that, if any, in what way did that impact your investigation?
A. Well, we had not yet spoken to the owner of the vehicle at that time, but upon learning why they had responded to the hospital, I followed up on that.
Q. So did you then have another conversation with Robert?
A. Yes, I did.
Q. At some point did you have a conversation with him about drugs?
A. Yes, I did.
Q. What, if anything, did Robert tell you?
A. I asked him if he had any drugs on his person, and he dug into his pocket and handed me several items, including some bindles, a syringe and a bottle.

Q. Let's just take them one at a time. So first he gave you some bindles. What are bindles?
A. They're -- it's like a waxed type paper that is sealed on one end and can be opened on the other end, commonly used to store narcotics such as heroin or fentanyl.
**THE COURT:** I couldn't hear you. I couldn't hear you. Raise your voice.
A. Yes, sir. It's a wax style paper, sealed on one end and open on the other end. It's commonly used to store narcotics such as heroin and fentanyl.
**THE COURT:** Is it a dosage unit or multi-dosage units? Is it sold for $20?
A. It's sold by -- it's sold by weight, but typically from my experience the bindles have a set weight inside them.
**THE COURT:** Like what?
A. In my experience, from what I understand, about a tenth of a gram or so.
**THE COURT:** So it's a dosage unit?
A. Yes, sir. I believe it could be measured in a dosage unit, yes, sir.
Q. So you say these wax bindles usually come in a tenth of a gram. And is it common to see multiple of those dosage units?
A. Yes, sir.

Q. In this case did you actually see multiple dosage units?
A. I was handed multiple bindles, so, yes, sir.
Q. Okay. I guess when you were handed -- so you were handed bindles and a syringe?
A. And a syringe, yes.
Q. And did you take it in your hand?
A. Originally, yes. Robert reached in his pocket and grabbed it and reached out and handed it straight to me, and just out of reaction, I grabbed it from him and took it from him.
Q. And did you realize what you were doing?
A. Yes. He told me there was heroin or fentanyl in the bindles.
**MR. TARLTON:** Objection, Your Honor, hearsay?
**THE COURT:** Overruled.
A. He told me there was heroin and fentanyl in the bindles. At that point in time I immediately reached down and set it down on the -- just right there on the side in the parking lot right there near me.
Q. Why did you react like that?
A. Because heroin and fentanyl is transdermal drugs. That means it can go into your system through your skin, and I was afraid that by handling it I could potentially go into an overdose by holding it in my hands.

Q. Now these wax bindles that you have testified about, have you ever seen any other type of narcotics packaged in these bindles?
A. No, I have not.
Q. So in your training and experience is it the common packaging for heroin?
A. Yes.
Q. After he handed you the wax bindles and a syringe, did you still search his person?
A. Yes, I did.
Q. What, if anything, did you find?
A. There was an additional syringe on his person.
Q. And had that been used, to your knowledge?
A. Not that I can recall.
Q. What did you do with all these things that you got from Robert?
A. The items were turned over to Officer Atkinson who was the primary officer at the incident.
Q. So he actually took, I guess, custody of the evidence?
A. Yes, sir.
Q. One moment, Your Honor.
After you handed over the evidence to Officer Atkinson do you recall having a conversation with Christina Urbina?
A. Yes, I do.
Q. Where did this conversation take place?

A. ICU holding area.
Q. What do you remember about that conversation?
A. Well, initially we were speaking about the vehicle. I explained to her the vehicle belonged to her as far as what had occurred as far as Robert breaking into the vehicle to get his phone out of it, his personal phone out of it and explained just what he was going to be charged with in terms of the vehicle incident.
Q. Do you remember Christina's demeanor at that time?
A. Yes. She was very distraught.
Q. Did you all have any conversation about Lucas?
A. Very briefly. We spoke kind of to say he wasn't in very good shape. That was the extent.
Q. Do you recall her telling you something about him being possibly brain dead?
A. Yes. He was in the ICU and that they had him on life support.
Q. Did you know Christina prior to meeting her at the hospital?
A. Yes, sir.
Q. How did you know her?
A. She was a Medical Examiner for the County so through work we encountered her several times.
Q. After you finished speaking with Christina, did you have any other involvement in this case?

A. No, sir.

**MR. BOYKIN:** Your Honor, thank you. Those are all my questions.

**THE COURT:** Do you have any questions?

**MR. TARLTON:** Yes, Your Honor, thank you.

CROSS-EXAMINATION BY MR. TARLTON

Q. Officer Sholes, you said you were there to assist Officer Atkinson; is that correct?

A. Yes, sir.

Q. And he was the primary officer dealing with Robert Pernicaro and the breaking in of the Ford Explorer out in the parking lot?

A. Yes, sir.

Q. And you are aware that Robert was connected with an overdose inside the hospital, correct?

A. I became aware of it during that investigation, yes, sir.

Q. And in fact you went in and saw Christina Urbina, correct?

A. I did, yes, sir.

Q. You said that you did ultimately seize Robert's cell phone; is that right?

A. I didn't seize Robert's cell phone.

Q. Okay. What happened to it?

A. I don't recall.

**MR. TARLTON:** No further questions, Your Honor.

**THE COURT:** Thank you. You're excused. Call your next witness.

**MR. BOYKIN:** Your Honor, is he excused from his subpoena?

**THE COURT:** He is excused all the way.

**MR. BOYKIN:** Thank you, Your Honor. We would call Carlos Diaz to the stand, Your Honor.

**CARLOS DIAZ, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. BOYKIN

Q. Good afternoon, sir. Who do you work for?
A. I work for the Drug Enforcement Administration Southeast Laboratory in Miami, Florida.
Q. You say Miami, Florida?
A. Correct.
Q. How long have you worked for the DEA lab?
A. Almost 19 years.
Q. And what do you do for them currently?
A. I am a senior forensic chemist.
Q. How long have you been employed as a forensic chemist?
A. Approximately 19 years.
Q. All nineteen years?
A. Correct.
Q. Have you ever served in another role?
A. No.
Q. What are some of your duties as a forensic chemist?

A. The duties of a forensic chemist include the analysis of evidence submitted into the lab for the presence of controlled substances, testifying in court as to those findings and assisting law enforcement in the seizure of clandestine labs.
Q. Can you describe for the jury your educational background, how you became a forensic chemist?
A. I have a Bachelor of Science Degree in Criminal Justice and a Bachelor of Science Degree in Chemistry.
Q. What type of training have you been through to prepare you to become a forensic chemist?
A. I completed an indepth training for the Southeast Lab, which included standard laboratory operating procedures, instrumentation and analysis of controlled and non-controlled substances.
Q. Do you routinely perform testing to detect and identify the presence of heroin and fentanyl?
A. Yes.
Q. And have you also had an occasion to testify as an expert witness?
A. Yes.
Q. Approximately how many times?
A. Approximately 55 times.
Q. And the majority of these, is that in Federal court or State court?

A. The majority have been in Federal court.
Q. And over the course of your career how many pieces of evidence would you say you have previously examined?
A. A very rough approximation I would say about between 3,500 and 4,000.
Q. So somewhere between 3,500 and 4,000 pieces of evidence?
A. Correct.
Q. And analysis is a direct part of your responsibilities as a chemist?
A. Yes.
Q. And do you do these testings in accordance with methods that are accepted in the forensic chemistry field?
A. Yes.
**MR. BOYKIN:** Your Honor, at this time I would move to tender Mr. Diaz as an expert in forensic chemistry.
**THE COURT:** The witness will be accepted as an expert in the field of forensic chemistry and allowed to express his opinions to the jury.
**MR. BOYKIN:** Thank you, Your Honor.
May I approach the witness, Your Honor.
**THE COURT:** Yes.
Q. Now, Mr. Diaz, I am going to show you what has previously been marked as Government's Exhibit 9 and also Government's Exhibit 10. Looking at Government's Exhibit

Number 9, do you recognize that?
A. Yes, I do.
Q. What is that?
A. It is a self-sealing evidence envelope with my seal at the bottom and my information here in the middle.
Q. So you're actually the person who sealed it?
A. Correct.
Q. Okay. Can you tell the jury why it is packaged like that?
A. This is the packaging it came in, and this is the stuff that I analyzed, so everything is in a Ziploc.
Q. Now, I wanted to ask you to open that, but would that be a good idea?
A. No, it would not.
Q. Why not?
A. Because we're not in a -- this is not a controlled environment. I don't have any gloves, any mask, so I would advise against that.
Q. And that would be because it contains what?
A. This one particularly contains heroin, but I would do that for any exhibit. I would not open anything here in the courtroom.
Q. So is it fair to say there would be some type of heroin danger for you, the jury and everyone in here?
A. Correct.

Q. Now you said you did do the testing in this case. Can you describe to the jury how the case is assigned to you as the forensic chemist.

A. Evidence is submitted into the lab via Federal Express hand delivered or certified mail. Once it arrives at the lab it is put it into a computerized tracking system and stored in the vault. The case, the exhibit is assigned to a chemist. The chemist retrieves it from the vault and has possession of it and then begins the analysis.

Q. Okay. And when did you take possession of these substances?

A. April 12, 2019.

Q. And what type of testing did you do on the substances?

A. I conducted several tests: gas chromatography, gas chromatography/infrared detection, gas chromatography/mass spectrometry.

Q. What are all these tests designed to do?

A. This allowed me to make a determination to conclude what is contained in that substance.

Q. Do you recall when you first got these substances how the heroin and fentanyl was packaged?

A. The substance was -- there was a plastic bottle, outer bottle and there was another plastic bottle. There was a large Ziploc bag. Inside there was a smaller Ziploc bag and then they had the glassine little bags.

Q. And these glassine little bags, in your training and experience is that a common way to package heroin and fentanyl?

A. I've seen heroin and related products in the glassine bags, yes.

Q. Okay. As part of your responsibilities, did you also prepare a report of what you found in those substances?

A. Yes, I did.

Q. Is that Government's Exhibit Number 10?

A. Yes, it is.

Q. Is that the report that you, yourself, prepared?

A. Yes, it is.

Q. Does it fairly and accurately depict what was found when you did your testing?

A. Yes, it does.

Q. Does it appear to have been altered in any way?

A. No, it does not.

**MR. BOYKIN:** Your Honor, at this time I would move to admit Government's Exhibit Number 9 and Government's Exhibit 10 and permission to publish Exhibit 10.

**THE COURT:** They will be received. You can publish it.

Q. Mr. Diaz, can you see that on the screen up here?

A. Yes.

Q. Can you read for the jury the results of your testing? What was in Government's Exhibit 10?

A. Government's Exhibit 10 contains heroin, cyclopropylfentanyl, benzoyl fentanyl and caffeine.
Q. And over there to the right it says a net weight.
A. It has a net weight of 0.0211 grams.
Q. Did you also determine that net weight?
A. Yes, I did.
Q. Are you able to on a very brief and high level explain to the jury what cyclopropylfentanyl is.
A. Well, cyclopropylfentanyl is a Schedule I controlled substance.
Q. And have you had occasion to -- well, first of all is there a difference between cyclopropylfentanyl and fentanyl?
A. Yes.
Q. Have you had occasion to look at the chemical structures of the two?
A. Yes.
Q. And what are you able to tell us, if anything, about those constructions?
A. This is not in my area but the chemical structures to me are similar.
Q. So cyclopropylfentanyl has a chemical structure that's similar to fentanyl.
A. Correct. That is my observation.
Q. So molecularly they look the same almost?

A. They have the same structure. They appear to have a similar structure.
Q. Okay. And in 2017 do you know whether or not cyclopropylfentanyl was actually a schedule controlled substance?
A. I believe it was not.
Q. Okay. So at that time it would have been -- are you familiar with the term analogue?
A. Yes.
Q. Can you explain to the jury what an analogue is?
A. An analogue is a substance that has a similar structure to the other substance, has the same pharmacological effects as a substance and is intended for the same intention as the other substance.
Q. And in 2017 is it your professional opinion that cyclopropylfentanyl was an analogue fentanyl?
A. I cannot say that because I do not know the pharmacological effects on the drug.
Q. But you can say that they were at least molecularly similar?
A. The structures are similar.
Q. And you can say at the time cyclopropylfentanyl was not a scheduled controlled substance?
A. Correct.
Q. Do you know what fentanyl is commonly used for?

A. I do not. I know that some doctors use it as a patch for pain relief.

Q. It's a patch for pain relief?

A. Correct.

Q. Okay. And I guess in relation to I guess another pain reliever like morphine, is one stronger than the other?

A. That is outside of my area, and I would not be able to comment on that.

Q. Fair enough.

**MR. BOYKIN:** Your Honor, those are my questions. Thank you.

**THE COURT:** Do you have any questions?

**MR. TARLTON:** Yes, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Is it Dr. Diaz?

A. No.

Q. You're a forensic chemist though, correct?

A. Correct.

Q. And with the DEA; is that right?

A. Correct.

Q. I think you agreed in your direct testimony that this cyclopropylfentanyl that you analyzed was not in fact on the DEA's list for controlled substances back in 2017; is that right?

A. The cyclopropylfentanyl, that is correct.

Q. Okay. Now it was put on a temporary list I think later on, around January of 2018?
A. I'm not sure of the date.
Q. What we're saying about that is we're not talking about actual fentanyl, which is a Schedule II controlled substance; is that right?
A. Correct. It is not fentanyl.
Q. Because actual fentanyl as a Schedule II has a medical use. It's used by anesthesiologists and other doctors; is that right?
A. I believe so.
Q. I think you candidly shared with us that this is not in your area whether a given substance that you're analyzing would have a stimulant, depressant, hallucinogenic effect on the central nervous system or anything of that nature. Is that right?
A. Can you repeat the question?
Q. You said it was -- the effect of cyclopropylfentanyl has on the human body, you said that that's not really in your area; is that right?
A. Correct.
Q. That's a, you said a pharmacologist?
A. Possibly. I'm not sure.
Q. That's not your role; is that right?
A. Correct.

Q. Thank you.

**MR. TARLTON:** No further questions, Your Honor.

**THE COURT:** All right. Thank you. You're excused. Next witness.

**MS. WILSON:** Your Honor, may Mr. Diaz be excused from his subpoena?

**THE COURT:** Yes. He's excused from the Court.

**MS. WILSON:** Thank you, sir.

Your Honor, we would call Nicholas Johnson.

**NICHOLAS JOHNSON, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MS. WILSON

Q. Sir, can you introduce yourself to the jury, please?
A. I'm Nicholas Johnson.
Q. Sir, where are you currently living?
A. Selma, North Carolina.
Q. Who do you live with?
A. My grandmother.
Q. How long have you been living with your grandmother in Selma?
A. Upwards of ten years.
Q. Are you working right now?
A. Yes, ma'am.
Q. Where are you working?
A. Novo Nordisk in Clayton. It's an insulin plant.
Q. What kind of work do you do there?

A. Simple labor.
Q. Do you run a baling machine?
A. Yes, ma'am.
Q. What are your current days and hours that you work?
A. I work weekends, 12 hour shifts, so Friday and Saturday and Sunday I work 12 hours.
Q. And what do you do the rest of the week?
A. Take care of my son.
Q. How old is your son?
A. He's about a year and six months.
Q. What's your son's name?
A. O'Shay.
Q. What's his middle name?
A. Lucas.
Q. Did you know Lucas Urbina?
A. I did.
Q. How did you know Lucas?
A. He was my best friend.
Q. How long had you all been best friends?
A. Since about sixth grade and all the way through high school, so it had been a good while.
Q. Where did you all meet?
A. Lower Johnston Middle School.
Q. Did you all live close to another?
A. Yeah, about five or ten minutes.

Q. Five or ten minutes. Where were you living when you guys were growing up?
A. Same place, at my grandmother's.
Q. In Selma?
A. Yes.
Q. And Lucas was living close to you?
A. Yes, ma'am.
Q. So have you struggled with heroin addiction?
A. Yes, ma'am. I'm in recovery now, but I've struggled with heroin addiction for five or six years.
Q. How long have you been in recovery?
A. Upwards of six months.
Q. Does that mean for six months you've been heroin free?
A. I've had relapses, but I've mostly been heroin free, yes.
Q. You're not using on the regular, so to speak?
A. No, ma'am.
Q. And you said you had been clean for about six months. Before six months ago were you using heroin regularly?
A. No, ma'am.
**THE COURT:** When is the last time you used heroin, this week?
A. No. It would have been probably in February.
**THE COURT:** This is August. Do you know that, or you don't know that?

A. No, my date is in February.
**THE COURT:** Your what?
A. My last date of usage.
**THE COURT:** Okay.
Q. Is heroin the only drug that you struggled with?
A. No. I've struggled with a lot of drug addictions just in general like not really a specific substance.
**THE COURT:** Marijuana, cocaine?
A. Yeah, basically everything.
Q. Including meth?
A. Yeah.
Q. And how did it start for you?
A. I guess in my adolescence, probably around 11 or 12 I started experimenting with drugs.
Q. What drug did you first start to experiment with?
A. Marijuana.
Q. And then what did you move to?
A. I would say pain pills.
Q. And then is that how you got to heroin, pain pills?
A. Yeah. I had an opiod addiction for awhile, so that probably led to that.
Q. How old were you when you started using heroin?
A. The first time I used was probably in my teens, so it would be 15 or 17. I can't really give you an exact date because I was using drugs.

**THE COURT:** How old are you today?
A. Twenty-five (25).
**THE COURT:** So ten years ago you started?
A. Yes.
Q. When you first started using heroin how did you ingest it?
A. Nasally.
Q. Did you snort it?
A. Yes, ma'am.
Q. Did you move to IV use at some point?
A. Yes, ma'am.
Q. What caused you to switch from snorting and go to IV use?
A. More concentrated so I could keep -- I could keep a larger amount of stuff if I did it in smaller increments is something to think about as well.
Q. Did you end up going to rehab?
A. Yes, ma'am.
Q. Where did you go to rehab?
A. San Diego, California.
Q. Was it an in-patient facility?
A. Yes, ma'am.
Q. Was that your first rehab treatment?
A. Yes, ma'am.
Q. When did you go?

A. It would have been I believe March through April, right at the end of February. It was around my last usage that I decided to go to rehab. It would be back in March after February, around the 24th of February.

**THE COURT:** What year?

A. It would be this year.

Q. So earlier this year you were in California for a time in rehab?

A. Yes, ma'am.

Q. How do you know who's selling heroin? How do you get it?

A. Really just ask around.

Q. Is there a difference between knowing somebody who sells it and knowing somebody who would sell specifically to you?

A. Generally speaking if somebody is going to sell it to you they'll sell it to you, so I can't really distinguish on that really.

Q. Well, let me ask you this. Did you ever have a hard time having people sell you heroin?

A. Yes, ma'am.

Q. Why?

A. I'd say because of my skin color. Like I come from a good family and people knew that, so.

Q. So you felt like because of your skin color some

people would not deal with you?
A. Yes, ma'am.
Q. Did Lucas have that same problem?
A. No, ma'am.
Q. Why not?
A. Probably because he was half Hispanic.
Q. If we're talking about a single dosage unit, what would you call that?
A. A point.
Q. What else do you call it?
A. A ticket.
Q. Anything else?
A. Not that I can think of.
Q. Did you ever hear it called a bindle?
A. That would be -- that would be ten bags if it's sold a point at a time. So a bundle would be ten bags.
Q. A bundle or a bindle?
A. Either one.
Q. And what were the individual bags called?
A. Tickets.
Q. Did you ever hear it just called a bag?
A. Yes, ma'am.
Q. And how much would one of those cost?
A. Ten dollars. Anywhere from eight to ten dollars.
**THE COURT:** When you shoot up you would use three or four

of them?
A. No, I wasn't to that point. I was only using one bag at a time.
**THE COURT:** Okay.
Q. When you would get heroin, how would it typically be packaged?
A. Various ways. I've seen it various ways.
Q. When you bought it in tickets or bundles or bindles, can you describe the packaging?
A. It would be like white plastic bags you would fold up.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 62. Do you see the package that's contained within Government's Exhibit 62?
A. Yes, ma'am.
Q. Is that consistent with what you're talking about?
A. Yes, ma'am.
Q. But you don't know where this particular one came from, but that's consistent with how you've seen heroin packaged? Can you answer outloud?
A. Yes, ma'am.
Q. In the time that you have used drugs, have you ever seen any other drug packaged in those wax bindles?

A. Not normally. I have, but not normally.
Q. When you would buy marijuana, what kind of bag would it be in.
A. Clear plastic bag, cellophane.
Q. What about methamphetamine?
A. Same thing.
Q. Regular plastic or cellophane bag.
A. The only other substance I've seen in those bags is cocaine.
Q. When you would buy heroin, how much would be in one of those small tickets?
A. Anywhere from .1 gram or .2 gram.
Q. How much -- would you use the whole thing, use the whole bag?
A. Yes, ma'am.
Q. And how long would that keep you high?
A. Anywhere -- for me it would probably be about 12 hours. I would use one every 12 hours, and that was kind of like the schedule I was on, so basically two a day.
Q. And what did the drug inside the glassine bindle, what did it look like?
A. It would normally be light brown.
Q. Can you describe its consistency?
A. It was a powder.
Q. And when you would see heroin or what you believed to

be heroin, could you tell if it was cut with any other substance?
A. Yes. I can say now I can.
Q. What about when you were using?
A. Not at the time, no.
Q. When you would look at heroin could you tell if it had a small amount of fentanyl in it?
A. I wouldn't say small amounts. For it to change color I would assume there would have to be a lot.
Q. In your experience does fentanyl and heroin have a slightly different color?
A. Yes, ma'am.
Q. Was there a benefit to using heroin that had fentanyl in it?
A. Probably be stronger.
Q. And after you used a substance that you believed to be heroin, could you tell whether or not it had fentanyl in it based on how your body responded?
A. Yes, ma'am.
Q. And how could you tell?
A. Fentanyl, it will make you pass out, so normally you get -- normally heroin would be like an onset of euphoria, but fentanyl would just put you straight out.
Q. What would you call heroin?
A. Boy.

Q. What else?
A. Food.
Q. Did you ever hear it called bomb?
A. Yes.
Q. Any other names that you would hear heroin go by?
A. No, ma'am.
Q. And when you were asking someone if they had heroin for sale, how would you ask?
A. Just ask if they had food, how much a G was normally.
Q. How much a G was?
A. Yeah, a gram.
Q. So a G would stand for a gram.
What about the word straight? Did you ever hear that used? Are you straight?
A. Yes. It's like basically asking somebody if they've got something they would sell, you know.
Q. When you were asking about buying it, how would you ask for tickets? Would you just say, do you have tickets?
A. No. You wouldn't ask for the packaging. You're more or less worried about the substance, so you wouldn't care less what it comes in. You wouldn't specifically ask for like either way.
Q. How would you ask for or how would you know how to ask for like how much you wanted?
A. Regardless it's based on the amount. There's not

really a term that you can use so somebody will know. You basically go off of an amount. The packaging is just a derivative of that.

Q. And so would you typically say I've got a hundred bucks or I've got fifty bucks?

A. Yeah. If you know what a person charges you just ask for a gram, but you can also just tell them the amount of money you have.

Q. When you use heroin and you're injecting it, how do you take the powder and make it into an injectable form?

A. Filter it through a common liquid and then inject it.

Q. What liquid?

A. Water.

Q. And so you mixed it with water and something. What do you commonly use to mix it?

A. The end of the syringe, the back of it, the plunger. You just put it in a spoon and pull it out, and then I'll use that to mix it.

Q. And where would you get needles?

A. Various sources. There's never really been a specific location. I never really went to a store and got them.

Q. Why would you choose one way of ingesting it over another?

A. So the concentration, like which of it, which of it would make me feel it more, I guess.

Q. And you've described heroin as giving you a sense of euphoria. Is that always what you felt when you used heroin?
A. Yes, ma'am.
Q. How many times did you overdose on heroin?
A. One time.
Q. And when was that?
A. I want to say it was in 2017 or 2018. I couldn't really tell you the exact year.
Q. Was that a time when you were with Lucas?
A. Yes, ma'am.
Q. The time that you got high with Lucas, did that feel like a normal high or did it feel like something different?
A. I knew it was different because I woke up in the hospital.
Q. What do you mean you woke up in the hospital?
A. I don't remember the events leading me there.
Q. And how was that different than if it had been a normal time for you?
A. If it had been like a normal usage I can still remain cognizant enough to realize what's going on. I don't -- I don't come out of myself whenever I'm using it like normal heroin. I'm trying to think of the way to word it correctly, but I can just tell what's going on, like I'm not going to black out and stuff off of normal heroin

usage.

Q. In all the time that you've used drugs have you ever been convicted of a drug crime?

A. No, ma'am.

Q. Do you have any convictions on your record?

A. No, ma'am.

Q. When was the first time you knew that Lucas had a problem with heroin?

A. It seemed to become a problem when it changed who he was. There's no like real precursor that I could determine to let me know, but he just seemed to deteriorate as a person.

Q. Was there a time that you discovered that he was using heroin?

A. Yes, ma'am.

Q. About how old was he if you remember?

A. I'd say 16 or 17.

Q. And do you remember where you were when you found out?

A. Yeah, I was at his father's apartment.

Q. And how did you find out?

A. He offered me some.

Q. Do you know how Lucas used heroin?

A. Normally IV.

Q. Did you ever see him snort heroin?

A. Yeah, a few times.

Q. Do you remember October 21st of 2017?
A. I can't say specifically, because like I said, I blacked out that day, so I couldn't really recall any of the events of that day, but that would have been the day that I passed out.
Q. And when you say passed out, you're talking about the time that you overdosed?
A. Yes, ma'am.
**THE COURT:** What date was that, October?
**MS. WILSON:** October 21st, 2017.
**THE COURT:** That's a month before the death?
**MS. WILSON:** Correct.
**THE COURT:** Okay.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 3. Do you recognize this?
A. Yes, ma'am.
Q. Can you tell me what this is?
A. It's messages between me and Lucas.
Q. Messages on what platform?
A. Messenger.
Q. On?
A. Facebook Messenger.

Q. And so you and Lucas were friends on Facebook?
A. Yes, ma'am.
Q. And you would sometimes exchange messages on Facebook?
A. Yes, ma'am.
Q. Did you sometimes exchange messages about acquiring heroin?
A. Yes, ma'am.
Q. Where were you on October 21st of 2017?
A. At my grandmother's.
Q. At some point during the day were you doing some yard work to make money?
A. Yes, ma'am.
Q. Were you sober at the time?
A. I couldn't really answer that.
Q. At some point did you and Lucas decide to get together?
A. Yes, ma'am.
Q. And where did you all get together? Do you remember?
A. I believe he picked me up from my grandmother's house.
Q. Were you taking any other controlled substance that day?
A. Not that I remember.
Q. Were you trying to get heroin?
A. Yes, ma'am.
Q. Who was trying to get heroin? Was it you or Lucas?

A. It would have been me.
Q. Was Lucas also trying, also going to get heroin?
A. Yes, ma'am.
Q. Who were you trying to call to get heroin?
A. My normal supply.
Q. And what about Lucas, did you know who he was trying to call?
A. No, ma'am.
Q. Did you know who Lucas would normally get heroin from?
A. He had enough connections to where I couldn't concretely tell you.
Q. At some point did you go to Selma?
A. We were already in Selma, but, yes.
Q. Did either you or Lucas buy heroin that day?
A. Yes, ma'am.
Q. Who found it?
A. Lucas.
Q. So Lucas was able to contact somebody that got heroin?
A. Yes, ma'am.
Q. How much heroin did you all buy?
A. I want to say it was like $50 or something like that.
Q. And did Lucas meet with somebody to get heroin?
A. Yes, ma'am.
Q. Do you know who it was?
A. No, ma'am.

Q. Did he talk about who it was?
A. No, ma'am.
Q. Did he give you any idea about who his contact might have been?
A. No.
Q. Where did you go to get the heroin?
A. I want to say we went to a Burger King in Smithfield.
Q. And where did you all end up?
A. I think whenever I overdosed was at the Wendy's in Selma, so that would have been where I technically ended up that day.
Q. And was that late in the day, or when was it?
A. I want to say it was like nighttime, like after eight o'clock.
Q. Did you end up snorting some heroin?
A. Yes, ma'am.
Q. How much did you snort?
A. One bag.
Q. One bag, like one of the bindles?
A. Yes, ma'am.
Q. And was that the usual amount for you?
A. Yeah, if I was trying something.
Q. Did that affect you like normal?
A. No, ma'am. That's the day I overdosed, so that definitely would not have been the normal reaction.

Q. Do you know whether or not Lucas used heroin that day as well?
A. I would assume so because he overdosed as well.
Q. Do you know where he was?
A. He was in the bathroom at Wendy's, I believe that's where they found him, and they found his car keys, which led them to me in the parking lot.
Q. Who paid for the heroin that day?
A. Me.
Q. And then you all split it?
A. Yes, ma'am. I always give him some if I've got some and vice versa.
Q. You said earlier that you woke up and you thought you had been in a car wreck.
A. Yes, ma'am.
Q. Can you explain that?
A. I would guess it had to be something traumatic for me to not remember it, because I always pride myself on staying normally cognizant, so knowing that something happened that made me -- just basically because I woke up in the hospital, I thought it had to be something pretty severe, so I jumped to the car wreck.
Q. When you had more than one like bindle or bag or tickets of heroin, where would you normally keep them?
A. Keep them in my sock.

Q. Why your sock?
A. When you pull stuff out of your pockets, I had lost stuff so much I stopped keeping it in my regular pockets. I just kept them in my sock.
Q. After you were discharged from the hospital, did you get charged criminally?
A. No, ma'am.
Q. Did you go to jail after that?
A. Yeah, I went to jail for about 12 days, a little over a week.
Q. So you were arrested, but not convicted?
A. Yes, ma'am.
Q. What do you attribute this to?
A. It was dropped because of the Good Samaritan Law. I've never researched it formally, so I don't know what it is, but I wasn't charged because of the Good Samaritan Law.
Q. Had you heard the name Shamel Nesbitt before October of 2017?
A. No, ma'am.
Q. Had you heard of somebody by the nickname of Mista?
A. Yeah, I had heard of that name, but not the definite name.
Q. Who was Mista?
A. It was somebody that Lucas knew.
Q. Somebody that Lucas dealt with?

A. Yeah, dealt with.
Q. By dealt with, what do you mean?
A. He would get like weed and stuff like that.
Q. Did he get heroin from Mista?
A. Not to my knowledge.
Q. What about the nickname Pepsi?
A. That's been like probably 2015 or 2016. It was somebody I knew to get bud from.
Q. What about heroin?
A. No, ma'am, not at the time.
Q. When you said you knew somebody like Pepsi to get bud from, are you talking about marijuana?
A. Yes, ma'am.
Q. Where would you do that, where would you get it from him?
A. In Smithfield?
Q. Where?
A. It's behind Deacon Jones in Smithfield. I can't remember the name of the apartments.
Q. Do you know Michael Horrall?
A. Yes, ma'am.
Q. What about Richard Rojas?
A. No, ma'am.
Q. Robert Pernicaro?
A. No, ma'am.

Q. The Facebook records that are in front of you, you've had an opportunity to review those outside of the courtroom; is that right?

A. Yes, ma'am.

Q. And do they go over October 21st, you all were sending messages back and forth between them?

A. What's your question? I'm sorry.

Q. Do those Facebook messages address or do they show the messages that you and Lucas were sending back and forth?

A. Yes, ma'am.

**MS. WILSON:** Your Honor, may I have a moment?

**THE COURT:** Yes.

**MS. WILSON:** Your Honor, that's all I have.

**THE COURT:** Do you have any questions?

**MR. TARLTON:** Just briefly, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Mr. Johnson, or Nick; is that right?

A. Yes, sir.

Q. The police in this case, they never seized your cell phone or asked for access to your social media records; is that right?

A. Yes, sir, I don't believe I was asked formally for my Facebook records at all.

Q. Yes, sir. And to be clear, you were not present with Lucas on the night or afternoon of November 19 of 2017; is

that right?
A. No, sir.
Q. And in fact you've been asked about October 21st of 2017, and I think you shared with us that you, frankly you ere blacked out and you don't remember much?
A. Yes, sir.
Q. Is that fair to say?
A. Yes, sir.
Q. Would that be the term you used?
A. Yes, sir.
**MR. TARLTON:** No further questions.
**THE COURT:** All right. Thank you. We're going to take a ten minute bathroom break now, so you can go in the jury room and take a break.
(Off the record 3:51 - 4:19 p.m.)
**THE COURT:** Call your next witness.
**MS. WILSON:** Your Honor, I have a couple of follow-up questions for Mr. Johnson. May I have him return to the stand for a moment?
**THE COURT:** Really?
**MS. WILSON:** Yes, sir.
**THE COURT:** All right.
**MS. WILSON:** Thank you.
**THE COURT:** You're still under oath. Come on up here and sit down.

REDIRECT EXAMINATION BY MS. WILSON

Q. Sir, you testified that Mista was somebody you knew by nickname; is that right?
A. Yes, ma'am.
Q. And what substance would you buy from Mista?
A. Marijuana.
Q. And did you know if Lucas bought anything from Mista?
A. Yeah, normally heroin.
Q. I think earlier you testified that it was just marijuana?
A. Yeah.
Q. Did you understand my questions?
A. I was just confused by your line of questioning at the time.
Q. And so in October of 2017, did you know where Lucas was trying to get heroin?
A. Yes, ma'am.
Q. From where?
A. Mista.
**MS. WILSON:** Your Honor, may I approach again?
**THE COURT:** Yes.
**THE COURT:** My hearing doesn't allow me to understand the word that you say, Mista?
A. Mista, M-I-S-T-A.
**THE COURT:** Mista, M-I-S-T-A? Like Mister, a contraction

of that?
A. Yes, sir.
**THE COURT:** Okay.
Q. And so you had previously said that you recognized Government's Exhibit 3, like these were your Facebook messages back and forth between you and Lucas?
A. Yes, ma'am.
Q. And have you, before today did you have a chance to read every single one of these messages?
A. Yes, ma'am.
Q. And they were your conversations between you and Lucas in October of -- October 21st of 2017?
A. Yes, ma'am.
**MS. WILSON:** Your Honor, we would seek their admission.
**THE COURT:** What's that?
**MS. WILSON:** We would seek the admission of Government's Exhibit 3.
**THE COURT:** It will be received.
Q. In here are you guys discussing the purchase of heroin?
A. Yes, ma'am.
Q. And can you read, can you read a couple of these messages?
A. It says, Aight mista is selling tickets. I told him I got 50. He asked how much I had. And that was it.

Q. Okay.

**MS. WILSON:** Your Honor, that's all. Thank you.

**THE COURT:** Do you have any cross?

**MR. TARLTON:** Yes, Your Honor.

RECROSS-EXAMINATION BY MR. TARLTON

Q. Earlier today you told us that you didn't really have a memory of what happened on October 21st; is that right?

A. Yes, sir.

Q. And after you testified when you got off the stand did you go outside in the hallway and have a conversation?

A. Yes, sir.

Q. What happened in that conversation?

A. Basically she had reminded me of something I had said in one of our previous meetings, and I told her that my response didn't align with her questions. So I was confused at the line of questioning, so I misspoke.

Q. Did you feel under pressure?

A. No, sir.

**MR. TARLTON:** No further questions, Your Honor.

**THE COURT:** All right. You're excused.

**MS. WILSON:** Your Honor, we would call Jeffrey Perkins. And, Your Honor, may Mr. Johnson be released from subpoena?

**THE COURT:** Yes.

**JEFFREY PERKINS, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MS. WILSON

Q. Sir, can you introduce yourself to the jury?
A. My name is Jeffrey Alan Perkins.
Q. Are you currently working, sir?
A. No, ma'am, I'm retired.
Q. And how long have you been retired?
A. Basically since May of '21.
Q. And are you about to start a new job?
A. Yes, ma'am, Wednesday.
Q. Where did you work prior to your retirement?
A. I worked at Johnston UNC Healthcare in Smithfield.
Q. How long did you work at Johnston Health Center?
A. January 2016 to May 2021.
Q. What was your position there?
A. C-Squad Supervisor.
Q. How many folks did you have that worked under you?
A. Approximately about five.
Q. And you moved to Ohio in October of 2021; is that right?
A. Yes, ma'am.
Q. And is that currently where you reside?
A. Yes, ma'am.
Q. Do you have some prior military experience?
A. I'm retired military, ma'am. I did 20 years.
Q. With what branch?
A. Army.

Q. And did you -- were you deployed overseas a few times?
A. Yes, ma'am.
Q. When were you deployed?
A. That's all the time. I spent a lot of time overseas back and forth between Korea to Bosnia to Panama, south of the border.
Q. I want to focus your attention on November 19 of 2017. Were you working at the hospital on that day?
A. Yes, ma'am.
Q. What was your shift that evening?
A. It would be six p.m. to six a.m., night shift.
Q. Generally how many people would be working per shift?
A. It's generally five.
Q. Do you recall responding to the Emergency Department at some point that evening?
A. Yes, ma'am.
Q. What caused you to respond to the Emergency Department?
A. About 9:30 p.m. on the cameras I saw a car going through the parking lot at a high rate of speed with flashers on, which generally indicates to me that they're probably going to the Emergency Room entrance and there's some type of emergency.
Q. So is that when you made your way to the Emergency Department?

A. Yes, ma'am.
Q. What did you find when you got there?
A. When I stepped out the door, one of my officers already, he said, overdose in the back seat. So I immediately called the Emergency Department, advised them of a medical emergency at the Emergency Room entrance. He opened the car door, and I opened one side of the car door, and we had individuals in there. He went to pull out one individual on his side since he had the head side, so it's easier to pull them out that way instead of me pulling out. So after he pulled him out, I happened to notice something in the floorboard behind the front seat.
Q. What did you notice?
A. Which was another individual who had OD'd. I pulled him out my side of the vehicle, and we both had started CPR.
Q. How long was it that you were performing CPR on these individuals?
A. Probably no more than somewhere close to maybe pushing it 20 seconds before the Emergency Room staff had a bed at our location where --
Q. I'm sorry, go ahead.
A. -- where then we took both of the individuals and put them on a bed and wheeled them in all the way to rooms.
Q. Were these men or women?

A. Both of them were men.
Q. Were there --
A. Men and women in the vehicle or came out to us?
Q. The overdose.
A. It was two men.
Q. And what's your recollection about anybody else that was in the car?
A. I knew there were two other people. A lot of things were happening at the time. I was focused more on getting the two individuals who had OD'd into the Emergency Department. Once we got them into their beds where they were going to start working them, I went back out to one of the individuals and asked him, hey, hospital security, you're not being arrested to make sure that they know that whatever information they give me I don't go tell the police because they won't give me the information I need. I asked him and he really didn't tell me what they had OD'd on, so at that point then I went back in and told the doctor, I don't know what they've OD'd on. They're not giving much information. He wasn't really -- he was kind of agitated, but he had concern.
Q. Did you know the identity of the two men that had overdosed?
A. I didn't know -- I didn't know them. The only time that I found out who one of them was is when the

individual's mother came in. Then that's when I was able to put two and two together.

Q. Who is his mother?

A. That was the county coroner at the time.

Q. Mrs. Urbina?

A. Yes, ma'am.

Q. How did you put things together to find out the identity of one of the men that had overdosed?

A. When she came in and I started talking to her, that's when she had said that it's her son over there. And then at that time I had the keys to the vehicle. Because the gentleman had said, I asked who the car belongs to and they said, one of the guys that were in there. So the car was parked. I made sure the vehicle was secured and had the keys on me. And then I gave -- and then when she said that she was the mother of one of them, I gave her the car keys because she said it was hers and her son was using it.

Q. Do you remember which one her son was? Was he the fellow that was pulled out first?

A. He was the one I pulled -- he's the one I pulled out.

Q. From the floorboard?

A. Yes, ma'am.

Q. And you gave the keys to Mrs. Urbina?

A. Yes, ma'am.

Q. At some point the other man that had overdosed, did he

come back to you and have a conversation with you?
A. Yes, ma'am. He had come to me when he was being discharged and asked if he could get into the vehicle to get his belongings. And the keys had already been turned over to her and so I went to her and said, hey, this individual wants to get back in the car. She said, no. So I went to him and says, no, you cannot get back into the vehicle. It's not yours. And that was -- then you'll need to leave.
Q. What happened next?
A. Then he walked out and he went and walked out and went to the vehicle and went into the back of the vehicle.
Q. How did you know that?
A. The security officer at the metal detector called me and said, I think somebody had broken into a vehicle. So we reviewed the camera footage, and I said, yes. So that's when I walked out there and caught him coming out of the vehicle.
Q. Did you confront him?
A. Yes, ma'am.
Q. What did you do at that point?
A. At that point then I called Smithfield PD, and we stood there with him. He tried to kind of leave once and we stepped in front of him so he couldn't leave. And Smithfield PD showed up. Then it's their scene.

Q. Did you stand by while the Smithfield PD was having a conversation with this man?
A. Yes, ma'am.
Q. At some point did you see the man hand over to the officer some suspected narcotics?
A. Yes, ma'am.
Q. How about syringes?
A. I didn't see syringes. I just know some drugs that were handed over.
Q. Thank you. That's all I have, Judge.
**THE COURT:** Do you have any questions?
**MR. TARLTON:** No, Your Honor.
**THE COURT:** Thank you. You're excused.
A. Thank you.
**MS. WILSON:** Thank you, Judge.
**THE COURT:** He can be released.
**MS. WILSON:** Thank you, sir.
Your Honor, we would call William Medlin.

**WILLIAM MEDLIN, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MS. WILSON

Q. Sir, can you introduce yourself to the jury?
A. William Medlin.
Q. Where do you work, sir?
A. Town of Fuquay-Varina.
Q. And in what capacity are you employed with Fuquay-

Varina?

A. I'm on the Traffic Safety Unit.

Q. With the police department?

A. That's correct.

Q. How long have you been on the police department?

A. Fuquay-Varina since January of 2018.

Q. And so that's a little over four years?

A. Close to it.

Q. And in your four years what have been your primary duties and responsibilities?

A. I handle all traffic crashes in the Town of Fuquay-Varina, DWI investigations, and all traffic complaints in the town.

Q. How long have you been in that particular assignment?

A. Just almost three years.

Q. Before that were you on patrol?

A. I was.

Q. And what is the difference between a traffic unit and the patrol unit?

A. The patrol unit I handle calls for service, I respond to domestics, larcenies of businesses.

Q. Where did you work prior to Fuquay-Varina Police Department?

A. The Town of Selma Police Department.

Q. For how long?

A. I started in October of 2014 and left in December of 2017.
Q. And in your three years at the Selma Police Department what were your duties and responsibilities?
A. Patrol Division.
Q. Were you working the evening of October 21st, 2017?
A. I was.
Q. What shift?
A. Night shift.
Q. Were you doubled up or riding alone?
A. Riding alone.
Q. At some point did you get dispatched to a Wendy's?
A. I did.
Q. What was that address or what road was that Wendy's on?
A. U.S. 70 near I-95.
Q. What was the time of the call, if you remember?
A. 11:15 p.m.
Q. What was the nature of the call?
A. An unconscious person in the bathroom of the business?
Q. When you heard the nature of the call was an unconscious person in the bathroom, what did you think you were responding to?
A. A possible overdose.
Q. Was this close to closing time for the Wendy's?

A. This was at closing time.
Q. When you arrived what other officers were present?
A. Corporal Evans and Officer Fiddler.
Q. And then you arrived?
A. Yes.
Q. Did any other officers respond after you arrived?
A. Sergeant Neilson arrived after we had already spoken to both individuals.
Q. Where did you go when you arrived at the Wendy's?
A. Me and Corporal Evans went to the bathroom where the subject was located on the floor.
Q. And describe what you saw when you went into the bathroom.
A. A male subject laying on the floor in a stall with an open needle in his left arm and a fresh track mark in his right arm where he had just injected.
Q. Were you able to identify this person?
A. Not at first.
Q. At some point during the course of your investigation were you able to identify him?
A. Yes.
Q. Who was it?
A. Lucas Urbina.
Q. How did you identify him, if you remember.
A. I believe Corporal Evans asked him his name as he was

in the ambulance.
Q. Was EMS already enroute to the Wendy's?
A. Yes.
Q. And did they arrive?
A. Yes, they did.
Q. Did they come into the bathroom?
A. They did.
Q. At that point did you kind of back out of the bathroom so EMS could attend to this person?
A. Me and Corporal Evans pulled Mr. Urbina from out of the stall into the open area of the bathroom.
Q. For what purpose?
A. Corporal Evans attempted a sternum rub to try to have the individual revived.
Q. What's a sternum rub?
A. A strong rubbing of the chest.
Q. And have you responded to overdoses in the past?
A. I have.
Q. Had that been an effective way of having somebody regain consciousness?
A. It has been.
Q. In this particular circumstance did Mr. Urbina regain consciousness with the sternum rub?
A. He did not.
Q. What happened then?

A. Selma Fire and Selma EMS administered a Narcan through the nasal passages.
Q. What is Narcan?
A. It's a drug used to revive subjects who may have overdosed.
Q. And did you see the EMS personnel give him Narcan?
A. Yes. While I was standing there, yes.
Q. Do you know how many doses of Narcan they gave him?
A. Mr. Urbina only used one.
Q. And at that point did you kind of back out of the bathroom?
A. I did.
Q. Were there any customers in the store?
A. No.
Q. Only employees?
A. That's correct.
Q. At some point did you and your fellow officers begin trying to explore who, if anybody, might be with Mr. Urbina?
A. Yes, we did.
Q. For what purpose?
A. Try to locate any vehicles that may have been in the parking lot to see -- again, to find out who the person in the bathroom was, just to ID him, and see if anyone else was with him.

Q. And what did you all find?
A. Located a red Ford Explorer in the parking lot of the Wendy's after hours, and a subject was inside there as well.
Q. Did you all ask the folks in the Wendy's about if the Ford Explorer was theirs?
A. We did.
Q. Is that kind of what led you to that Ford Explorer?
A. That's correct.
Q. When you asked the employees if that red Ford Explorer belonged to them, how did they respond to you?
A. They said that red Ford Explorer did not belong to any of their employees.
Q. What did you find in the red Ford Explorer?
A. Corporal Evans located a subject in the passenger seat unresponsive.
Q. And did you or Corporal Evans also attempt to do a sternum rub on that individual as well?
A. Yes.
Q. Was that successful in that person regaining consciousness?
A. It was not.
Q. Did EMS come and administer aid to that individual as well?
A. Yes, they did.

Q. Did you later learn his identity?
A. Yes.
Q. Who was that?
A. Nicholas Cody Johnson.
Q. Do you know how many doses of Narcan Mr. Johnson received?
A. Two.
Q. At some point did you search Mr. Johnson?
A. I did not.
Q. Did Corporal Evans?
A. He did.
Q. Were you standing by when that search was conducted?
A. Yes.
Q. What, if anything, was found on Mr. Johnson?
A. Four bindles of heroin.
Q. Where were they located?
A. In his sock.
Q. Do you know if Mr. Urbina was ultimately searched?
A. He was after locating bindles of heroin on Mr. Johnson.
Q. And did you or Corporal Evans do that?
A. I believe Corporal Evans did.
Q. Were you standing by when Corporal Evans searched him?
A. I was.
Q. What, if anything was found on Mr. Urbina?

A. We asked Mr. Urbina if he had anything on his person, and he stated he had a bindle of heroin in his sock.
Q. And did he, in fact, have a bindle of heroin in his sock?
A. He did.
Q. When you talk about a bindle of heroin, what do you mean by that?
A. Wax paper folded up so it would create a sealant where narcotics are kept.
Q. At some point did you take out warrants for both Mr. Johnson and Mr. Urbina for the possession of heroin?
A. I did.
Q. And do you know what happened to those charges?
A. They were dismissed the next day.
Q. Because of what?
A. The Good Samaritan Law.
Q. What is the Good Samaritan Law?
A. When someone calls reference someone being overdosed, they cannot be charged with any narcotics that are located on their persons or around their persons.
Q. And at any point after that did you end up having a conversation with Lucas Urbina or his mother?
A. I did.
Q. Can you tell us about that?
A. I spoke with Ms. Urbina the following day. She

indicated that Mr. Urbina had overdosed eight times previously. And roughly two weeks later I spoke with Mr. Urbina himself. He met me at the police department and said he was trying to get his life back together, start his classes at Johnston Community College. And I gave him my business card and told him if he needed anything to let me know. I'd try to help him out.

Q. Did you have any other involvement in this case?

A. I did not.

**MS. WILSON:** Thank you. That's all I have, Judge.

**THE COURT:** Do you have any questions?

**MR. TARLTON:** No questions, Your Honor.

**THE COURT:** Thank you, Officer. You're excused from your subpoena.

A. Thank you, Your Honor.

**THE COURT:** Next witness.

**MS. WILSON:** Jason Thompson.

**JASON THOMPSON, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MS. WILSON

Q. Sir, can you introduce yourself to the jury, please?

A. I'm Jason Thompson. I'm a medical examiner for Johnston County.

Q. And in addition to being a medical examiner for Johnston County, what other employment do you have?

A. I am a paramedic by profession and trade.

Q. Where are you a paramedic?
A. In Johnston County.
Q. How long have you been a paramedic in Johnston County?
A. I began as an EMT in 1992, and I've been a paramedic since 1999.
Q. And during that time did you also have the role of a 9-1-1 dispatcher?
A. I did.
Q. How long did you do that, sir?
A. Sixteen (16) years.
Q. How long have you been a medical examiner?
A. I believe this is my seventh year.
Q. Since 2016?
A. Yes, since 2016.
Q. Can you describe to the jury what a medical examiner does?
A. A medical examiner has the obligation to determine if we have jurisdiction over a person that passes away, and so we have to use the applicable state statutes and administrative code to determine should the medical examiner certify their death or should their family physician certify the death.
Q. And what's the difference? How do you decide whether or not the family physician makes the call or whether the medical examiner's office has jurisdiction over a

particular deceased individual?
A. The medical examiner must take jurisdiction over any death that is not caused by a natural disease process, anything that has external wounds, accident, trauma, all that only the medical examiner can certify the death.
Q. And so in your job as a medical examiner do you work sometimes with law enforcement?
A. Yes.
Q. In what capacity?
A. Law enforcement's job is to investigate the criminal reasons that the incident has occurred, and the medical examiner's job is to be medical knowledge to the scene or to the death and you put that together with their knowledge to determine the cause and manner of death.
Q. Is your position under the Office of the Chief Medical Examiner?
A. It is.
Q. And can you describe to the jury how your position works in connection with the Office of the Chief Medical Examiner?
A. We are appointed by the Chief Medical Examiner to serve certain counties of the State of North Carolina. And we work under their control as far as guidance, management, all of our rules. And we work with the Chief Medical Examiner's Office directly to determine what happens to the

decedent with regard to autopsy or not.
Q. And who makes the call about whether or not an autopsy is performed? Is that the local medical examiner or is that somebody in Raleigh or both?
A. It is both. If they meet the criteria we are obligated to report it to them, and they make the ultimate decision whether they get an autopsy or not.
Q. What kind of qualifications do you have to have to be a medical examiner?
A. You have to be at least a paramedic, nurse, doctor, PA or nurse practitioner.
Q. Can you describe the licensing procedure to become a medical examiner?
A. Yes. There is an application process. You have to submit your medical licensing for whatever your medical profession is. And the Chief Medical Examiner's office reviews that, researches your background, determines if you have sufficient knowledge and experience to be a medical examiner.
Q. And are there continuing education requirements?
A. Yes, ma'am, annually.
Q. How many medical examiners exist in North Carolina?
A. It fluctuates, but generally between 350 to 400.
Q. How many are in Johnston County?
A. Currently four.

Q. And this is a position that specifically is appointed by the state?
A. Yes.
Q. And is this position, is it also the person is overseen by the state?
A. Yes.
Q. In terms of overdose cases, how many do you think you -- how many individuals that have overdosed have you responded to?
A. Hundreds.
Q. And does that include cases outside of Johnston County?
A. Yes.
Q. Sometimes do you take cases that are outside of Johnston County?
A. I do.
Q. For what purpose?
A. We're appointed by the state to serve, you know, we have state wide jurisdiction, so we also cover multiple counties and so in my role I will also cover Franklin County and Harnett County.
Q. Are the majority of your cases inside Johnston County?
A. They are.
Q. And so you said hundreds. Are you talking 100, 200?
A. I would say greater.

Q. I'm sorry, let me clarify. Is that the number of deaths you respond to in a year?
A. Oh, the total number of deaths I respond to in a year is roughly 150.
Q. And out of the total number that you typically respond to during the year how many of those are overdose deaths?
A. I would say roughly a third.
Q. In your experience are there really two ways that an overdose death presents, that being somebody that dies very quickly from an overdose?
A. Yes.
Q. And then what's the other way?
A. We have what we call prolonged death in which they pass in medical care later. After the event some people pass immediately, but some pass away in hospitals.
Q. Are those situations handled differently?
A. They are.
Q. Why?
A. Because if somebody goes to the hospital, they -- the longer after the overdose event, your body naturally excretes the toxins that are in the body. So if somebody is found acutely deceased at the scene, then the toxicology is within them and they need immediate testing beyond what I do locally. If somebody passes away under medical care days later, their body has likely excreted the substances

or has greatly changed from the original event.
Q. And so then where do you get your samples from?
A. If it's a prolonged down time then we get them from the medical facility when they came in like admission blood samples.
Q. Do you know Christina Urbina?
A. I do.
Q. How did you know her or how do you know her?
A. I know her professionally. She was one of our local medical examiners as well, and we've interacted professionally and as acquaintances over the years.
Q. Would you ever work cases together?
A. Perhaps one or two. Generally we function independently.
Q. And generally that's how it works with the medical examiner, you may have a couple on scene, but one person really has the lead; is that right?
A. That is correct.
Q. And one person is ultimately going to be responsible for the reporting, the investigation, even though you may have had assistance?
A. That's correct.
Q. And from how well you knew Mr. Urbina -- Mrs. Urbina, do you have some social interactions?
A. Occasionally.

Q. But not on a regular basis?
A. No, ma'am.
Q. Did you know that she had a son, Lucas?
A. I do.
Q. Did you know that Lucas struggled with addiction?
A. Yes, ma'am.
Q. Was that something that Mrs. Urbina was open about?
A. Yes.
Q. Had you ever met Lucas?
A. I don't recall ever meeting Lucas prior to him passing.
Q. At some point did you learn that Lucas was in the hospital?
A. Yes.
Q. And did you know why he was in the hospital?
A. Yes, ma'am.
Q. What was your understanding of why he was in the hospital?
A. My understanding was that he had suffered an overdose and that he was brought to the hospital by private vehicle and that he was not expected to survive.
Q. When did you learn this?
A. Likely the day after the overdose. I had communication with Detective Wheeler from the Smithfield Police and had also spoken with Ms. Urbina, you know,

letting me know that her son was in the hospital and it doesn't look good.

Q. And to be clear, we're talking about November of 2017?

A. That is correct.

Q. Do you remember the exact date?

A. I remember he passed on November 22nd. I don't remember the exact date I was notified prior. It could have been one or two days before.

Q. When you say that you were notified, did somebody in Raleigh eventually call you about taking the case?

A. Yes, ma'am.

Q. Can you describe that conversation for the jury?

A. Yes. I was notified by the Chief Medical Examiners Office, Patricia Ford. She is our medical examiner trainer and who is our liaison to the Chief Medical Examiner in Raleigh. And she called and wanted to know if, you know, since this is an impending death if I had any problems handling the case and being objective in handling the case. That it would not be, you know, that it wouldn't be upsetting to me or any personal feelings involved.

Q. Did you feel like you could be objective?

A. Yes, ma'am.

Q. To be clear Smithfield, Johnston County it's a small community; is that right?

A. Yes, ma'am, roughly 200,000 people.
Q. Would it be unusual for you to pick up somebody in death that you knew in life?
A. No, it's not unusual.
Q. When were you notified that Lucas has passed away?
A. Within likely the hour after he passed, by the hospital.
Q. Where did you go when you learned that he had passed?
A. Reported to the morgue at the hospital.
Q. And why did you report to the morgue?
A. Because we have an obligation after -- when we take jurisdiction of the case to do an external examination on the decedent.
Q. At some point did you call the hospital and request his evidence samples?
A. I did.
Q. And can you tell the jury what those are?
A. Sure. So as we were talking earlier with admission blood samples, you know, when somebody comes into the emergency department they draw blood samples and that would be where the most accurate representation of what was in his system would be since he had been there for a long time, you know, more than a few hours. Then we requested the admission blood samples so we would have a snapshot of what was in his system at the time that he went into the

emergency department.
Q. When you got to the morgue was Lucas already there?
A. He was not.
Q. How long did it take for Lucas' body to arrive at the morgue?
A. Roughly 30 minutes.
Q. And when Lucas' body came to the morgue were the those blood samples with him?
A. Yes.
Q. What did you do when you saw this?
A. The first thing we do is complete an external examination. We remove the clothing if there's any clothing on the person, which is a hospital gown, and we remove medical devices like IVs and things of that nature that are inside of the person so we can do an examination.
Q. And what is the purpose of the external examination?
A. To verify that there's no trauma or anything externally that we can see that would have contributed to the cause and manner of death.
Q. Did you see any trauma or signs of injury on Lucas' body?
A. No, ma'am, only medical devices.
Q. Did you collect some samples from Lucas' body?
A. I did.
Q. Can you describe those samples to the jury, please?

A. We obtained a femoral blood sample out of the vein of the femur and also a sample from the vitreous humor out of the eye.
Q. What is the vitreous humor.
A. It's very accurate with toxicology. It's basically, you know, with every decedent we obtain at least two samples and vitreous is the fluid within the eye, and it is extremely accurate with regard to toxicology testing.
Q. What happened with the samples of blood that were taken upon Lucas' arrival and the postmortem samples?
A. They were packaged in a box that is provided by the State of North Carolina to the Medical Examiner. We break the seal at the time of the examination. That way the chain of custody is maintained. We open the box. We obtain the postmortem samples, and put in bottles that are provided and then we include the antemortem or the prior, the admission blood samples in the same package, and we seal that with tamper evidence seal and send that to the Chief Medical Examiner's Office for analysis.
Q. Do you send that via United States Postal Service?
A. Yes.
Q. Is that the regular way that it is done?
A. It is.
Q. Are they ever hand delivered?
A. No.

Q. They're always mailed?
A. Yes. The only hand delivered would be at the autopsy facility, if they obtained them at that facility, that would be the only way they would be hand delivered.
Q. And where are they mailed to?
A. To the Chief Medical Examiner's Office on District Drive in Raleigh.
Q. And specifically where are they forwarded to?
A. To the State Lab of Public Health.
Q. At some point did you complete a death certificate?
A. I did.
Q. And by law is there a certain time frame in which the death certificate has to be completed?
A. Yes, ma'am. We have three days.
Q. I'm sorry?
A. We have three days.
Q. And so when you fill out the death certificate do you have to indicate a cause of death?
A. We do or we list it as pending if directed by the pathologist.
Q. Typically in cases where toxicology is going to be a large part of the determination of manner and cause of death, is it listed as pending on the death certificate?
A. Yes, ma'am.
Q. Do you remember whether or not Lucas' original death

certificate was listed as pending?
A. Yes, ma'am, it was.
Q. The cause of death?
A. Yes, ma'am, it was.
Q. Did you take any photographs of Lucas that day?
A. No, ma'am.
Q. And now is the practice in terms of documenting evidence, is it different?
A. We are encouraged now to take more photographs, but there was no policy in place at the time that we take photographs.
Q. After you did the external examination of Lucas' body as well as collected samples, what would have been your next step?
A. We release him and by releasing I mean that we notify the hospital that we have completed our examination and they can contact the funeral home.
Q. Would you have consulted with Dr. Radisch in this case?
A. We did, but my direction came directly down from Dr. Radisch with that notification from Patricia Ford. If that notification had not happened, then, yes, we would have after the examination contacted Dr. Radisch for guidance.
Q. And who is Dr. Radisch?
A. Dr. Radisch at the time was the Chief Medical Examiner

for the State of North Carolina.

Q. And so you were consulting with her at least via paperwork and documents about Lucas' death; is that correct?

A. Yes, ma'am, that is correct.

Q. Now when you're doing your examination and your investigation do you fill out a report?

A. We do.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 61. Do you recognize this?

A. Yes, ma'am.

Q. Can you tell me what it is?

A. This is my Report Of Investigation By Medical Examiner.

Q. And how many pages is that report?

A. Four pages.

Q. Is that a report that you fill out after completing that investigation?

A. It is. It is our preliminary report that is submitted to the Chief Medical Examiner of the State of North Carolina, and it is completed. It must be completed within 14 days of the death but generally it's completed much

sooner.
Q. And then your investigation report is forwarded on to Raleigh; is that right?
A. That is correct.
Q. And then who ultimately completes the investigation report?
A. The pathologist lists the cause and manner of death ultimately after they obtain all the results of the toxicology.
Q. And the investigation, was that Dr. Radisch?
A. It was Dr. Deborah Radisch.
Q. That particular investigation report, is that where you would have noted any sign of injury or any other trauma on Lucas?
A. Yes, ma'am.
Q. Is that also where you would make any notes about what you understand the circumstances that surrounded the death were?
A. That is correct.
Q. Did you do that in this case?
A. I did.
Q. And did you pass that document on to Dr. Radisch who completed it?
A. Yes, ma'am.
Q. Thank you. Ultimately who would have filed the

Amended Death Certificate when the manner and cause of death was determined?

A. Dr. Deborah Radisch.

Q. Thank you. Judge, that's all I have.

**THE COURT:** Do you have any questions?

**MR. TARLTON:** Just briefly, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Just to be clear, sir, you're not a toxicologist; is that correct?

A. No, sir, that's correct.

**MR. TARLTON:** No further questions.

**THE COURT:** All right. Thank you. You're excused. You're free from your subpoena.

A. Thank you, sir.

**THE COURT:** Call your next witness.

**MS. WILSON:** Your Honor, we would call Joey Wheeler.

**JOEY WHEELER, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MS. WILSON

Q. Sir, can you introduce yourself to the jury?

A. Yes. My name is Joey Alan Wheeler.

**THE COURT:** What's your last name?

A. Wheeler.

**THE COURT:** Wheeler.

A. Yes, sir. Yes, Your Honor.

Q. Where do you work, sir?

A. The Smithfield Police Department.
Q. How long have you worked for the Smithfield Police Department?
A. With the police department a little over 12 years now.
Q. And in what capacity?
A. I have worked as a patrol officer, as a narcotics detective, and now I work as a patrol sergeant with the Town of Smithfield.
Q. How long were you in the narcotics department?
A. From 2013 until 2020.
Q. Do you also have some military service?
A. Yes, ma'am, I do.
Q. What branch did you serve in?
A. So from 2003 to 2007 I served with the United States Marine Corps and from 2014 until 2020 I served with the National Guard.
Q. Have you had multiple deployments overseas?
A. I have, ma'am.
Q. And specifically in Afghanistan and Iraq, a couple of times with the Marines?
A. Yes, ma'am. From November 2003 until May we went to Afghanistan with the 2nd Battalion 8th Marines. In 2005 we were on the 26th MEU where we eventually headed into Iraq. And in July of 2006 until February of 2007 I went into Iraq with 2nd Battalion 8th Marines.

Q. And then Kuwait again in 2019 and 2020?
A. Yes, ma'am.
Q. That was when you were with the National Guard?
A. Yes, ma'am.
Q. In November of 2017 you were in the United States working with the Smithfield Police Department; is that right?
A. Yes, ma'am, I was.
Q. And you were in the Narcotics Unit at that point?
A. Yes, ma'am, I was.
Q. How did you find out that there had been an overdose November 19, 2017?
A. So I believe either I checked the morning email or I talked to Officer Sholes directly. I know I spoke with Officer Sholes almost immediately after it occurred. I want to say he was still on shift when I got to work that morning, and he relayed to me about the breaking and entering into a motor vehicle and the seizure of suspected fentanyl as he called it to me. And he relayed the information that Lucas Urbina was taken to the hospital for a drug overdose.
Q. Did any information about Lucas' condition get relayed to you?
A. It did, yes, ma'am. Officer Sholes, he told me that Lucas looked bad, that it looked like he was not going to

survive as he understood.

Q. At that point what did you decide to do?

A. At that point I decided to speak with Lucas' mother and begin an investigation. An overdose death could potentially mean that a criminal act had occurred, so I then decided to speak with Ms. Christina Urbina that day.

Q. And when did you go to the hospital to see Ms. Urbina?

A. I believe it was November the 20th.

Q. Maybe it could have been the 21st?

A. It might have been the 21st.

Q. Did you go to the hospital to meet with Ms. Urbina?

A. Yes, ma'am, I did.

Q. Where did you meet with her at?

A. I met with her at the family room.

Q. Did you know Ms. Urbina?

A. I did know Ms. Urbina. She had been a medical examiner.

Q. So in your professional capacity you had met her?

A. Yes, ma'am.

Q. How many times do you think you had met her before November of 2017?

A. At least -- at least five or six, I would say. And one that I know of professionally where we worked together.

Q. When you went to the hospital, who else was with Ms. Urbina?

A. I believe when I began speaking with her she was alone at the hospital.

Q. How did she appear to you?

A. She was -- she was composed, but she was distraught. She was very upset.

Q. Ultimately did any other family member of Lucas join your conversation?

A. Yes. Lucas' father, Efrain Urbina, he eventually arrived as well.

Q. And in that questioning with Ms. Urbina, what did she tell you?

A. She told me a lot of things. I did learn that Michael Horrall, that she knew Michael Horrall and that she saw Michael Horrall there that night. She told me I believe the rough overview of the story about the gentleman who wanted to get in her truck, and she did not want him to get in her truck. She told me -- I relayed to Ms. Urbina that I would like Lucas' telephone if we could find that. I'm sure there's much more to that conversation as well. I can't recall all of it. I believe she did mention Lucas' ex-girlfriend.

Q. Safe to say this was a general conversation about Lucas' struggle and then whatever she knew about what happened that led him to be in that hospital?

A. Yes, ma'am, that's correct.

Q. At some point did Efrain Urbina give you something?
A. He did. When Efrain finally came to the hospital, came and arrived and joined the conversation, he gave me a Walgreens receipt and actual Walgreens shopping bag.
Q. Why did you collect them?
A. So Ms. Christina had told me about Efrain finding a receipt for needles that were purchased from Walgreens. At this point I had very little information and every little scrap of evidence could potentially be important, up to and including maybe going and looking at the video at Walgreens if that was pertinent later, so I asked them if they could present that to me.
Q. And was it brought to you?
A. Yes, ma'am, it was.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 11 and also Government's Exhibit 12. Do you recognize both 11 and 12?
A. I do, yes, ma'am.
Q. Tell me what Government's Exhibit 11 is.
A. Government's Exhibit 11 is the bag and the receipt that was turned over by Mr. Efrain and Christina Urbina.
Q. And this is the one that you collected?
A. Yes, ma'am.

Q. What day did you collect it?
A. It looks like November the 21st, 2017.
Q. And then what is Government's Exhibit 12?
A. That's going to be a photocopy of this receipt.
Q. So Government's Exhibit 12 is a photocopy of the receipt that is contained within Government's Exhibit 11?
A. Yes, ma'am, that's correct.
**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 11 and 12.
**THE COURT:** They're received.
**MS. WILSON:** May I publish?
**THE COURT:** You can publish.
Q. I'm showing you Government's Exhibit 12. Is that -- that's a photocopy of the receipt that you collected?
A. Yes, ma'am, it is.
Q. And can you tell from this receipt that's up on the screen the date of the receipt?
A. I can, yes, ma'am. It looks like November 19th, 2017 around 5:50 p.m..
Q. What is that receipt for?
A. It looks to be that Walgreens brand 1CC insulin syringes were purchased.
Q. And 10C, what does that mean, if you know?
A. 10C, or --
**THE COURT:** It doesn't really matter. I mean it's an item

for the syringes. I don't know what this is about.

A. I would assume it's the volume of the syringes.

**THE COURT:** It's not a dispute that he had syringes.

**MS. WILSON:** Correct.

**THE COURT:** Let's go.

A. Sorry, Your Honor.

Q. And so at some point after you spoke to Mrs. Urbina did you have other individuals that you wanted to talk to?

A. Absolutely. I knew that Officer Sholes had told me of Robert Pernicaro's involvement. And Ms. Urbina actually talked to me about Michael Horrall being present.

Q. And did you talk to those two individuals?

A. Yes, ma'am, I did.

Q. Did that further your investigation?

A. It did.

Q. In what way?

A. So the very first thing I went to do is speak with Robert Pernicaro because he was in jail, and I knew he would be there.

Q. Did he speak to you?

A. He did.

Q. Did he give you information that led you to follow up on certain things or try to collect certain evidence?

A. He did. He confirmed Michael Horrall was also present.

**MR. TARLTON:** Objection to the conversation, Your Honor, hearsay.

**THE COURT:** Overruled.

A. He confirmed that Michael Horrall was present. And I also tried to learned who this Richie Rojas was from Robert Pernicaro. He mentioned his presence, Richie Rojas. He also made a mention of Facebook messages.

Q. Did Mr. Pernicaro give you any information about where this could have happened?

A. He did, yes, ma'am. He stated that it happened at the Kangaroo gas station in Smithfield.

Q. Did that lead you to go to the Kangaroo gas station to try to follow up on that lead?

A. Ultimately, yes, ma'am, it did.

Q. Now when you spoke to Michael Horrall, was he willing to speak to you?

A. He was. I had to go to his house a couple of times I think before I finally could arrange that meeting, but, yes, ultimately he was.

Q. When were you notified that Lucas Urbina had passed away?

A. I believe it was November the 27th, 2017 is when I received that notification.

Q. After you learned that he had died, what did you do?

A. So after I learned that he died, obviously I wanted to

make contact with the Medical Examiner, Jason Thompson. My concern was I wanted to ensure the blood was preserved, the antemortem blood as he had said and confirm that he had taken care of those things. I also believe that I spoke with Ms. Urbina again that day.

Q. And was that the day after the funeral?

A. That was, yes, ma'am.

Q. When you met with her, what, if anything, did she bring to you?

A. Ms. Christina brought me Lucas' phone. I believe they had located it in Ms. Christina's red Ford Explorer under the driver's seat.

Q. At that point did you physically examine the phone?

A. I did.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 18. Do you recognize this?

A. Yes, ma'am, I do.

Q. Can you tell me what it is?

A. That's the phone that Ms. Christina Urbina turned over to me on November 27th as Lucas' phone.

Q. And is it in the same --

**THE COURT:** It's in evidence, isn't it?

A. It is. Yes, Your Honor.

**MS. WILSON:** Judge, I haven't admitted it yet. Mrs. Urbina just identified it. But Your Honor we would seek its admission at this point?

**THE COURT:** It will be received.

Q. Sir, I'm showing you a series of photographs that start at Government's Exhibits 19, 20, 21, 22, 23 and 24. You reviewed these; is that right?

A. I have, yes, ma'am.

Q. And who took these photographs?

A. I believe I took those photographs.

Q. What are those photographs of?

A. Those are photographs of the screen of this phone right here, Lucas' phone?

Q. How did you get these photographs?

A. By taking them with a department issued camera.

Q. When you received this phone was it able to be powered on, or was it already on?

A. I can't recall if we had to plug it into a charger for a little bit or if it still had power left on it, but I was able to get into it eventually.

Q. And so where did you first start looking in this phone?

A. I can't recall if I first began looking at text messages. I'm pretty sure though the most recent calls,

the last calls that Lucas had made.

Q. What was important for you to find out from this phone?

A. The last few contacts he had made.

Q. And were you able to document that in Government's Exhibits 19 through 24?

A. Yes, ma'am.

**MS. WILSON:** Your Honor, we would seek their admission.

**THE COURT:** They're received.

**MS. WILSON:** Your Honor, may we publish?

**THE COURT:** Yes.

Q. Publishing Government's Exhibit 19. Was that the contacts on Lucas' phone?

A. Yes, ma'am, that is.

Q. And the area code is cut off. Is it pictured on Government's Exhibit 20?

A. It is not. The area code is not pictured, no, ma'am.

Q. Okay. I'm sorry. Is that the call back number for Lucas?

A. That's the call back number for Lucas.

Q. In this Government's Exhibit 20 the top of it says Sent, and then it says, To. Can you see that from where you're sitting?

A. Yes, ma'am, I can.

Q. Who was that message sent to?

A. That was sent to the contact Mista.
Q. And what is the body of that text?
A. It says, straight with a question mark.
Q. I'm publishing Government's Exhibit 21. Did you kind of scroll down so you could see when this text message was sent?
A. Yes, ma'am, I did.
Q. When was it sent?
A. It looks like it was sent Sunday, November the 19th.
Q. And did you further scroll down to see the time?
A. I did.
Q. Publishing Government's Exhibit 22. What time was this text message sent?
A. 7:50 p.m..
Q. Did you also attempt to see who Lucas had called from his phone?
A. Yes, ma'am, I did.
Q. Publishing Government's Exhibit 23. Who were the dialed phone calls?
A. The dialed phone calls were to the contact Mista.
Q. And can you tell from where you're sitting what time some of those phone calls were made?
A. There was a call made at 8:32 p.m., 8:12 p.m.
Q. And publishing Government's Exhibit 24, was there another screen that showed some other missed calls?

A. It looks like all these were dialed calls from Lucas' phone: 7:56 p.m., 6:44 p.m., all on November 19th. There's also a Jordan.
Q. That's at the very bottom of that screen?
A. Yes, ma'am.
Q. At some point after you found this, did you go back to Mr. Urbina's house and search the Ford Explorer again?
A. Yes, ma'am, I did. I went to Efrain Urbina's house, I believe at their request to ensure that there is absolutely nothing in their vehicle that is tied to drug use, drug paraphernalia, any needles that could pose any danger or anything of that nature.
Q. And was that upon the request of Mr. and Mrs. Urbina?
A. It pretty much was, yes, ma'am.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 26. Do you recognize what this is?
A. I do. It looks like a bindle cap and a plunger cap for a -- I'm sorry, a needle cap and a plunger cap for a hypodermic needle, also a wax glassine paper that's roughly the size of a typical bindle of heroin.
Q. And what day did you collect this on?
A. November the 28th.

Q. And did you note on here where you collected it from?
A. The victim vehicle.
Q. And is it in substantially the same condition as when you collected it?
A. Yes, ma'am, it is.
**MS. WILSON:** Your Honor, we would seek its admission.
**THE COURT:** It will be received.
Q. After you examined the phone, what did you do with the information you found connected to that contact, Mista?
A. So I had received information from both, well, from Michael that Mista is who they met. So when I saw that contact in the phone I immediately looked at that phone number that was published for Mista, the 919-333 number. I can't remember the exact last numerics. And I looked in our police record management system to see if I could identify who used that phone.
Q. Were you able to identify anybody?
A. Yes, ma'am, I was.
Q. Tell me how.
A. So in our records management system I entered that phone number, and it came back that it belonged to a Mr. Shamel Nesbitt because Mr. Nesbitt had gotten a ticket I believe it was in February of 2017, and the officer who wrote that citation collected that phone number.
Q. At some point did you go on Lucas' Facebook page?

A. I did, yes, ma'am.

Q. How did you get on his Facebook page?

A. So I -- Ms. Urbina -- Ms. Christina came to me and she had Lucas' Facebook page log-in. And I did use that, but I also wasn't 100 percent comfortable with the possible legality of it. I know he was deceased; he had no real privacy interest, but I did look at his Facebook public page, and I also briefly looked at the logged in message portion using the log in information she provided.

Q. Did you get a search warrant ultimately for Lucas Urbina's Facebook page?

A. Yes, ma'am, I did. I ultimately did receive a search warrant.

Q. And did Facebook provide you with hundreds of pages of records from his Facebook page?

A. I believe it would be at least hundreds, if not thousands, or 15 hundred.

Q. At some point did you notice on Lucas' Facebook page that he was Facebook friends with somebody named Chris Nesbitt?

A. Yes. Yes, ma'am, I did.

Q. Did that stand out to you?

A. It did. So actually when I looked at -- when I very first started looking at Lucas' Facebook page, I actually recall I looked at his public page. It meant his page was

made public, it wasn't on lock down at the time. And I actually searched for his friends, and I typed in Nesbitt in the last name, and Chris Nesbitt came up.

Q. And why did that seem important to you?

A. Same last name I didn't get too excited initially because this could be an entirely different Nesbitt, but it was at least worth investigating.

Q. You're familiar with people that use Facebook, well, general use?

A. Yes, ma'am.

Q. And sometimes people don't use their real name?

A. It's very common for people to not use their real name on Facebook.

Q. Ultimately did you end up getting a search warrant for Chris Nesbitt's Facebook page?

A. I did, yes, ma'am.

Q. And when you got the results back, what, if anything, stood out to you?

A. So before I even applied for the search warrant, I wanted to make sure, you know, this Facebook page was open and public. I noticed that -- I had looked at Mr. Nesbitt's, Mr. Shamel Nesbitt's driver's license photo. All the public photos on his Facebook page matched him, and I saw numerous references to Mista, so I believe that that ultimately did provide probable cause for that search

warrant. And then upon receiving these records we did receive all of those photographs, and we received a lot of instant messages that were on his Facebook account.

**THE COURT:** This might be a good place to stop for the night. You have travels to go home. Anybody live in Dare County? Anybody live in Northampton County? Okay. We'll recess for the evening at this point. And let me admonish you and let you know that you are not to discuss the case with anyone. You're in the first day of the trial. We will undoubtedly finish with it tomorrow, give you some planning idea. Don't think about the case while you're away. Wait until you hear the evidence. Leave your notes in the jury room. Have a safe trip and return at ten o'clock tomorrow morning. You have to all come back because we don't have any alternates, so that's important. I'll excuse the jury.

(Jury out 5:17 p.m.) Close the door.

You didn't show up this morning when Court was supposed to start. Don't say anything. You listen to me. That threw this whole trial into a delay. I don't want to hear an excuse. This is the most important day in your life. You don't come back tomorrow on time you're going to be a prisoner. You don't have to say anything. I'm not going to allow -- and if you don't come back at all, you'll be tried in abstensia and you'll be a fugitive. So the

fact that I let you out two years ago is something that I don't want abused. Don't say a word. You get it?

(Nod head up and down)

All right this witness will resume tomorrow morning at ten, and we'll be in recess now until ten o'clock tomorrow morning.

(Recess 5:19 p.m.)

STATE OF NORTH CAROLINA )
) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS )

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Sandra A. Graham, CVR-M* *11/14/2022*
Sandra A. Graham, CVR-M November 14, 2022
Court Reporter & Notary Public
Notary Public Number: 19940140086