IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | CASE NO. 5:19-CR-226-BO |
| | . | ELIZABETH CITY, NC |
| V. | . | AUGUST 30, 2022 |
| | . | AUGUST 31, 2022 |
| SHAMEL NESBITT | . | |

. . . . . . . . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE TERRENCE W. BOYLE
JUDGE, UNITED STATES DISTRICT COURT

APPEARANCES:

FOR THE UNITED STATES: CHARITY WILSON, ESQUIRE
BRANDON BOYKIN, ESQUIRE
ASSISTANT U.S. ATTORNEY
800 FEDERAL BUILDING
310 NEW BERN AVENUE
RALEIGH, NC 27601-1461

FOR THE DEFENDANT: RAYMOND C. TARLTON, ESQUIRE
TARLTON FIRM
P.O. BOX 91624
RALEIGH, NC 27675

COURT REPORTER: MS. SANDRA A. GRAHAM, CVR-CM

Proceedings recorded by stenomask, transcript produced from dictation.

I-N-D-E-X

EXAMINATION OF THE WITNESSES


| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **JOEY WHEELER** | | | | |
| BY MS. WILSON | 3 | | 62 | |
| BY MR. TARLTON | | 46 | | |
| **SANDRA BISHOP-FREEMAN** | | | | |
| BY MS. WILSON | 63 | | | |
| BY MR. TARLTON | | 84 | | |
| **DEBORAH RADISCH** | | | | |
| BY MR. BOYKIN | 87 | | | |
| BY MR. TARLTON | | 100 | | |
| **WILLIAM MEGGS** | | | | |
| BY MR. TARLTON | 112 | | 131 | |
| BY MR. BOYKIN | | 122 | | |

CHARGE CONFERENCE 132

CLOSING ARGUMENT BY MS. WILSON 136

CLOSING ARGUMENT BY MR. TARLTON 153

REBUTTAL BY MS. WILSON 169

JURY CHARGE 175

JURY QUESTION NO. 1 187

JURY QUESTION NO. 2 191

VERDICT 193

10:04 a.m., August 30, 2022)

**THE COURT:** Good morning, ladies and gentlemen. You can resume with your witness.

**MS. WILSON:** Thank you, Your Honor.

DIRECT EXAMINATION OF JOEY WHEELER RESUMED

Q. Detective Wheeler or Sergeant Wheeler now, yesterday we discussed your interviews with a couple of individuals that led you to believe you knew where this drug transaction occurred. Do you recall that line of questioning?

A. Yes, ma'am, I do.

Q. In subsequent interviews what did you or where was some place that you wanted to go to see if you could find any evidence of this drug transaction occurring?

A. So the Kangaroo, formerly the Kangaroo gas station on North Brightleaf Boulevard in Smithfield at the intersection of Booker Dairy Road and Brightleaf Boulevard.

Q. And you said formerly the Kangaroo. What is it now?

A. I believe now it's the Circle K, ma'am.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 13 and Government's Exhibit 15. Can you identify these for me, please?

A. Yes, ma'am, I can. Exhibit 13 is a picture of the sign of the Circle K or the Kangaroo gas station. And Exhibit 15 is a map of the north side of Smithfield that shows both the hospital and 1137 North Brightleaf Boulevard, which is the Circle K.

Q. And this Circle K, that's exactly where that Kangaroo was back in November of 2017?

A. It's the exact same building, yes, ma'am.

Q. And Government's Exhibit 15, does it show the distance between the gas station and the hospital?

A. Yes, ma'am, it does, approximately.

Q. Just the distance, meaning how close they are together?

A. Yes, ma'am.

Q. And are these both fair and accurate representations of their depictions of the gas station and the distance?

A. Yes, ma'am.

Q. Would it aid you in your testimony to be able to refer to these?

A. Yes, ma'am.

**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 13 and 15.

**THE COURT:** They will be received.

**MS. WILSON:** Thank you. May I publish?

**THE COURT:** What's that?

**MS. WILSON:** May I publish?
**THE COURT:** Yes.
**MS. WILSON:** Thank you.
Q. Publishing Government's Exhibit 13, is that the front sign of the gas station in question; is that right?
A. Yes, ma'am, it is.
Q. Back then it would have said Kangaroo. Today it says Circle K; is that correct?
A. That is correct.
Q. Publishing Government's Exhibit 15. Can you see from where you're sitting the two little like yellow push pin points on there?
A. I can.
Q. And do you see the one that's closer to the upper right-hand side of that map?
A. I can, yes, ma'am.
Q. What is at that like push pin noted on the map?
A. It is noted as 1137 North Brightleaf Boulevard, Smithfield, which would be the Kangaroo gas station at that time.
Q. And what about the one that's closest to the bottom left-hand side of that map? What does that push pin point designate on the map?
A. So it's 509 North Brightleaf Boulevard, which is Johnston Medical Center.

Q. That's the hospital that Mr. Urbina presented at on November 19, 2017?

A. Yes, ma'am.

Q. Thank you. When you went to the Kangaroo gas station, what was your goal in doing that?

A. My goal was to corroborate witness statements. I had two independent witnesses that said that this occurred here, so I wanted to corroborate what they told me. And so I went.

Q. How were you going to try to corroborate that?

A. By looking at the surveillance footage.

Q. Had you previously been to that gas station in your official capacity to know whether or not they had surveillance cameras?

A. Yes, ma'am, I had.

Q. And had you operated the system that managed or handled all the surveillance cameras?

A. Yes, ma'am, I have.

Q. Was this a business that had multiple cameras that kind of downloaded into one system?

A. Yes, ma'am, it is.

Q. And were there cameras both inside and outside the store?

A. Yes, ma'am, there are.

Q. What day was it, if you remember, that you went to the

Kangaroo to try to view this footage?
A. The very first time? I remember the day that I recorded the footage.
Q. Well, at some point when you went and tried to get footage, were you able to view footage from November 19th of 2017?
A. I was.
Q. Did you see anything that you felt like was relevant to your investigation?
A. I did.
Q. What was it?
A. So looking at the time frame in question, I was able to locate where the red Ford Explorer operated by Lucas Urbina had pulled into one of the gas pumps on the south side of the gas station.
Q. The south side, is that when you're facing the building from the streets, is that the left side pumps?
A. That would be the left side pumps.
Q. What else did you see on that surveillance video.
A. I saw, once the truck pulled in and parked at the gas pump, I observed some people exit the truck. I also shortly thereafter observed a black color passenger car pull on the other side of the gas pump opposite of that red Ford Explorer.
Q. What else did you see?

A.    I could tell that someone exited the driver's seat of the red Ford Explorer and walk around and enter into the passenger side of that black passenger car.
Q.    Did any of these persons that you saw outside at the gas pump, did they ever go inside the building?
A.    Yes.
Q.    Were you able to see them on the cameras inside the building?
A.    Yes, ma'am, I was.
Q.    This surveillance footage from the Kangaroo, is it the most clear that you've ever seen?
A.    It is not.
Q.    Were you able to get a copy of the surveillance footage downloaded directly from the system?
A.    I was not.
Q.    Tell me about your efforts to make that happen.
A.    So I had spoken to the manager, and I have a good working relationship with the clerks and the manager at the store.  They have always -- never had any problems with letting me view any of it.  We made an effort to download the video from that night.  If we ever did download any, the file was always corrupted.  I asked the manager if she could assist me.  They even had a service technician to go out and look at the video system, and they were unsuccessful in downloading a copy.

Q. So you never got a downloaded copy directly from the Kangaroo gas station system; is that right?

A. No, ma'am, I did not.

Q. Did you make some efforts to preserve what was on those cameras?

A. The best way I could, yes, ma'am, I did.

Q. What were your efforts?

A. My effort was I took a department issued camera, hand held camera, and I actually went to the store, and I held that department issued camera and played the video, and I took a video of the screen as it played.

Q. While you were taking the video, did you switch between cameras to try to get the persons that you believed were involved in this in your video that you were taking?

A. Yes, ma'am.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 17. Do you recognize what this is?

A. I do.

Q. Tell me what this is.

A. So that's the video, a copy of the video that I have actually made of the screen.

Q. How do you know?

A. Because I viewed it yesterday.
Q. And did you write the date that you viewed this particular copy and your initials right on the disk?
A. Yes, ma'am.
Q. Is this a fair and accurate representation of what you took a video of from the Kangaroo surveillance system?
A. Yes, ma'am.
**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 17.
**THE COURT:** It will be received.
**MR. TARLTON:** Your Honor, I just want to make an objection to authentications. He wasn't there that night. He hasn't produced evidence that the system was reliably working that recorded this video and things of that nature, and he can't do that under this scenario.
**THE COURT:** Overruled.
Q. Detective Wheeler, while you were making this video, were you kind of narrating it as it went along?
A. Kind of, yes.
**MS. WILSON:** Your Honor, I would seek to publish Government's Exhibit 15 but without audio. I'm sorry, 17.
**THE COURT:** Okay.
(Video played)
Q. Sir, do you see the time and date stamp on the upper right-hand corner of your screen?

A. I do, yes, ma'am.

Q. And when you were recording this, did you notice anything about the time stamp on the video as opposed to the actual time in November of 2017?

A. I did. The time stamp on this is 21:37, which would actually mean that it's 9:37 p.m.. However, I did note that daylight savings time had just occurred prior to this day, a couple of weeks or three weeks, but prior. And they had not changed the time on the camera system.

**MR. TARLTON:** Objection to hearsay, Your Honor.

**THE COURT:** Overruled.

A. They had not changed the time in the camera system to reflect that daylight savings time had expired.

Q. And so the real time on this is 20:37; is that correct?

A. That is correct.

Q. The vehicle that just pulled in, is that what you believe to be a red Ford Explorer?

A. It is.

(Video resumes playing)

Q. Is that where you believe the driver of the red vehicle was getting in the passenger side of the other car?

A. That is correct, yes, ma'am.

(Video continues)

Q. Detective Wheeler, did you pause it there purposely?

A. I did, yes, ma'am.
Q. For what purpose?
A. Because that's when the person that exited the driver's side of that black passenger car had walked in.
(Video continues)
Q. And, again, did you purposely pause it there?
A. I did.
Q. For what purpose?
A. That showed who I believed to be Lucas Urbina.
Q. And did you again purposely pause your video there?
A. Yes, I did.
Q. Why?
A. I believe it to be one of the closest depictions of who he met there.
Q. Sir, after that in the video that you searched did you kind of rewind it and try to capture some other things at a secondary time?
A. Yes, I did.
Q. Is there anything else of evidentiary value that remains on that that the jury has not seen?
A. Not that I'm aware of, no, ma'am.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 60. Can

you tell me what this is?

A. That's going to be a still shot. The gentleman who exited the black passenger car as they walked into the store.

Q. A still shot from the Kangaroo video?

A. From the Kangaroo video, yes, ma'am.

**MS. WILSON:** Your Honor, we would seek its admission.

**THE COURT:** It will be received.

**MS. WILSON:** May I publish?

**THE COURT:** Yes.

Q. Publishing Government's Exhibit 60. And, sir, in fact is this one of the times you purposely paused the video to try to get a decent image of the person that got out of that black car?

A. That's correct, yes, ma'am.

Q. Sir, how long were you specifically in the Vice and Narcotics Unit of Smithfield Police Department?

A. A little over seven years. From February 2013 to 2020.

Q. And during that time did you have an occasion to set up controlled purchases from somebody that you believed to be selling narcotics using confidential informants?

A. Yes, ma'am, I have, numerous times.

Q. Was it unusual when you would set up these deals for the meeting place to actually be in a public location?

A. It was not uncommon at all. In fact, it was probably more often than not.
Q. When you would set up these attempts at buying controlled substances, would you oftentimes have your confidential informant fitted with some audio or video recording equipment?
A. Always, almost always.
Q. Did you always capture the transaction?
A. No, ma'am, not always.
Q. Tell me why.
A. So even when an informant is trying to capture a hand to hand transaction or even an undercover officer, people who sell controlled substances, they don't like to do it in the light of day. They go to great lengths to conceal their efforts, so there is a lot of slight of hand. There are times when somebody will walk by an open car window and just drop something inside. So even when you're trying to, with a covert camera, capture a hand to hand drug transaction, there are times when you cannot.
Q. During the course of this investigation you testified yesterday that you ended up getting a search warrant for some Facebook messages; is that right?
A. That's correct, yes, ma'am.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.

Q. Sir, I am showing you what's been marked for identification purposes as Government's Exhibit 57, 53, 54, 55, and 56. Do you recognize those?
A. Yes, ma'am, I do.
Q. Can you tell me what they are?
A. So these are Facebook records from the Facebook account with the vanity name Chris Nesbitt.
Q. When Facebook provided the records, did they also provide the police department with a Certificate of Authenticity?
A. That is correct, they did.
Q. And is that Government's Exhibit 57?
A. That is correct, yes, ma'am.
Q. How do you know that Government's Exhibit 57, that Certificate of Authenticity went to the records for the Facebook pages presented?
A. So it goes through and actually it identifies the account identifier. It says, videos, other content and records for the account with identifier 100000, five zeros, 382181444. And that matches the account identifier for the records I have for the Facebook of Chris Nesbitt.
Q. When you got the Facebook records back from Facebook for the pages of Chris Nesbitt, how many pages were included from Facebook?
A. A lot. Over a thousand.

Q. Somewhere around 15 hundred pages?
A. Approximately 15 hundred pages.
Q. What you have in front of you are not the full and complete records of the Facebook pages for Chris Nesbitt; is that right?
A. That is correct, yes, ma'am.
Q. Most of those Facebook pages was not relevant to this investigation; is that correct?
A. That is correct.
Q. Much of it was just dedicated to how most people use Facebook, which is just for general social interaction; is that right?
A. That's correct, yes, ma'am.
Q. Nonetheless, when you look at those Facebook pages, were there things that were relevant to this investigation?
A. Yes, ma'am, there were.
Q. Specifically was there information -- and I direct your attention to Government's Exhibit 53, that led you to some information about who Mista was.
A. Yes, ma'am, it did.
Q. If you would take a look at Government's Exhibit 53, is it multi pages stapled together?
A. It is, yes, ma'am.
Q. From various parts of those Facebook records; is that right?

A. Yes, ma'am.

Q. And as you looked through them -- and you looked through them prior to court; is that right?

A. Yes, ma'am, I did.

Q. And were they an accurate representation of Facebook records or at least portions of them that you received?

A. Yes, ma'am.

Q. And in fact for Government's Exhibit 54, 55 and 56, have you had a chance to look at them before court this morning?

A. Yes, ma'am.

Q. And have you verified that all of those came back from that search warrant returned from Facebook for the name, Chris Nesbitt?

A. Yes, ma'am.

Q. Are they fair and accurate representations of the pages that you received back from Facebook?

A. Yes, ma'am.

**MS. WILSON:** Your Honor, at this point we would seek the admission of Government's Exhibit 57. That was the Certification. Government's Exhibit 53, 54, 55, and 56.

**THE COURT:** They're received.

**MS. WILSON:** Thank you, Your Honor.

Q. Sir, if you would turn your attention to Government's Exhibit 53.

A. Yes, ma'am.

**MS. WILSON:** Your Honor, may I publish?

**THE COURT:** Yes.

Q. On Government's Exhibit 53 do you see at the top where it says right under -- do you see where it says Name, First, Middle, Last?

A. Yes.

Q. What does it say?

A. So --

Q. What does that list as the first and last name?

A. Name, first, middle, last -- so it has a vanity name and registered email and address. The vanity name is mista.nesbitt.

Q. And what about the email beside the word, registered?

A. It says, mista.nesbitt@facebook.com.

Q. What about the email right below that?

A. nesbitt.shamel@yahoo.com.

Q. Do you see that portion right above it that says, name, first, middle, last?

A. I do see that now, ma'am, yes, ma'am.

Q. And what's the name under there?

A. So first is Chris and then last is Nesbitt.

Q. The remaining pages, if you'll go to the second page in your packet, the page number on the top right-hand corner is page 144 Do you see that page?

A. I do, yes, ma'am.
Q. Would you look at the third set of messages from the bottom?
A. I can, I see that. From Ms. Ta'keeya Yates.
Q. And does it have any nicknames on there?
A. It does. It says, Hey Mista.
Q. And if you will go to the next page, which is page 160, about midway through from an Ashleigh Kelsoe, do you see also the name Mista used?
A. It says, happy happy birthday mista.
Q. What's the date that that was posted?
A. October 2nd, 2017.
Q. Does that stand out to you or mean anything to you?
A. It did in fact.
Q. Why?
A. Because that is Mr. Shamel Nesbitt's birthday.
Q. How do you know that?
A. From his DMV records.
Q. If you go, flip a few pages and go to page 199. Do you see those from Emmy Bell?
A. Yes, I do.
Q. And what name is she using in that post?
A. The text is, your smile, hi, mista Pepsi.
Q. Did that mean anything to you?
A. Mista Pepsi, I had later learned that that's also a

nickname or street name associated with Mr. Nesbitt.
Q. The other pages that we haven't necessarily talked about, do all of them contain references either to Mista or Pepsi?
A. That is correct, yes, ma'am.
Q. Turning your attention to Government Exhibit 54. Do you have that in front of your, sir?
A. I do, yes, ma'am.
**MS. WILSON:** Your Honor, may I publish?
**THE COURT:** Yes.
Q. Are all of the pages included in Government Exhibit 54 photos that you saw on Chris Nesbitt's Facebook page that you believe are substantially similar to Shamel Nesbitt's photo or what he looked like?
A. Yes, ma'am.
Q. Starting with page 174 in that top corner, is that one of the photos that you saw in the Facebook records?
A. That is one of the pages, yes.
Q. Can you go to the next page in your packet, 176. Is that another picture that was posted on the Facebook page?
A. Yes, ma'am.
Q. Going to the next page, 178, is that another one that was posted on that Facebook page?
A. That does look like Mr. Nesbitt, yes. That is posted on the page.

Q. Next page, page 180, is that another photo that was posted?
A. Yes, ma'am.
Q. Next page, 429, is that another picture that was posted?
A. Yes, ma'am, that was on the page.
Q. And finally 430, that final page, is that another picture that you saw on that Facebook page?
A. Yes, ma'am.
Q. And did that further your investigation in any way.
A. It did.
**MS. WILSON:** Your Honor, may I publish Government's Exhibit 55?
**THE COURT:** Yes.
Q. Sir, if you'll turn your attention to Government's Exhibit 55. Do you see on that first page that's listed as 235, a few lines from the top an exchange between Jerry Raiford and Chris Nesbitt?
A. Yes, ma'am, I see that.
Q. Now with Facebook records how do they come to you in a search warrant? So in other words if you're reading them from the top of the page down, are you reading them the correct way?
A. So the top of the page, left to right, top to bottom is the most recent message. So if you're trying to read

the message subsequently as far as what was sent first you actually have to read it from the bottom up.

Q. So do you see the message --

**THE COURT:** Sequentially, is that what you meant?

A. Yes, Your Honor, that's what I meant. I'm sorry.

Q. So do you see the message from Jerry Raiford, the highlighted part of the second message from the top?

A. The second message from the top, yes, ma'am.

Q. Can you read that?

A. It says, Same shit. Looking for some smoke.

Q. And then what is the response from Chris Nesbitt?

A. I just ran out.

Q. Going to the next page 441, do you see right in the middle of the page there is an exchange between Chris Nesbitt and Story Bucks Bigger. Do you see that?

A. I do.

Q. And the second, the middle message there, can you read that?

A. It says, you know where some percs?

Q. And what's the response?

A. Nope.

Q. Going to the next page 443 at the bottom of the page, that bottom message, what does that say?

A. It says, Let me get a birthday blunt.

Q. And then what else does that person say?

A. They respond with Lol.
Q. And then what is Chris Nesbitt's response?
A. He says, I don't have none.
Q. And then what else?
A. But I got you when I do.
Q. Going to the next page, do you see at the very bottom of page 482 at the very bottom -- so go to page 483 first and look at the top two messages. What does Chris Nesbitt say?
A. Aye, you know anybody that need some food?
Q. What does food mean to you?
A. Food is a street slang name for heroin?
Q. And what is their response?
A. The person, Dwight Williams, says, yes.
Q. Now because of how Facebook records are viewed, do you have to go to the previous page to see the next response?
A. Yes.
Q. Can you see those messages down at the bottom? What did Chris Nesbitt respond?
A. Give me a call.
Q. If you go to page 567, two over. If you look at three messages from the bottom, there is a -- there is a message from Dorian Bellamy on October 18, 2017. Do you see that?
A. I do, yes, ma'am.
Q. What does it say?

A. She asked, U got straight yet.
Q. And what's the response from Chris Nesbitt?
A. I wish.
Q. And then a few messages up from that, do you see the message again from Dorian Bellamy on 10/19/2017
A. I do, yes.
Q. What does it say?
A. It says, You straight yet?
Q. What's the response?
A. Nope, in two more days.
Q. Going to the next page right in the middle again between Dorian Bellamy and Chris Nesbitt, do you see where that individual sent a 10/18/2017 message to Chris Nesbitt?
A. Yes, ma'am.
Q. What's it say?
A. You straight?
Q. And what's the response?
A. No, I wish.
Q. In your training and experience what does you straight mean?
A. It's -- you straight is often used by someone seeking to purchase a controlled substance. They are asking that person, hey, do you have any -- do you have any dope to sell, to put it frankly.
Q. Can you turn to page 570 in your packet, sir?

A. 570?
Q. Yes, sir. There are a set of messages starting from the third one, the fourth one from the bottom, do you see those?
A. Yes, I do.
Q. Can you read that one from Chris Nesbitt?
A. The one from Chris Nesbitt?
Q. At the very bottom of that string.
A. Man you mad late.
Q. What's the response?
A. I know man lml, but you straight?
Q. What's Chris Nesbitt's response?
A. Yeah, where you at or wya.
Q. In your experience what does wya mean?
A. Typically, where you at.
Q. And what's the response from Dorian Bellamy?
A. I'm at the crib. My mom want to get it for me before I get locked up today.
Q. And then a question mark. And then what is Chris Nesbitt's response?
A. What you need?
Q. What does Bellamy say?
A. A gram for ten.
Q. What does Chris Nesbitt say?
A. Okay, give me a minute or min.

Q. Can you go two pages over to 583 and look at the very top record. What is Chris Nesbitt saying?
A. You know anybody that needs some gas?
Q. And because of how Facebook records, you've got to go to the page before it. So if you can flip back to 582 at the very bottom, what's the response?
A. Me and my sisters be looking for some. I'll hit you up if you got some.

**THE COURT:** Let me excuse the jury for a few minutes if you'll take a recess. Everybody will stay in place.

(Jury out - 10:39 a.m.)

**THE COURT:** I've never seen anything like this in a thousand trials. How is he qualified as an interpreter to explain language that is self sufficient. Just wait a minute. Let me finish. I understand that people talk in slang. I don't understand what it means, and I don't know that he's been qualified as an expert to give opinion testimony as to what the meaning is other then the text of what you're showing, and that's what he's doing. And I don't think you have any foundation for that whatsoever. Defend yourself.

**MS. WILSON:** Judge, I think -- I guess I'll answer it two ways. Number one, I am totally fine and prepared just to have him read exactly what is on the screen. I think I can lay a foundation for him to be able to talk about

interacting --

**THE COURT:** I can't imagine that a sergeant in a local police department is technically qualified to interpret what is in effect a foreign language and give meaning to it as you're having him do for the last 15 or 20 minutes here. He can't look at words like gas and tell the jury what that means or words like straight and say what that means. It's English or it's slang or it's, you know, whatever you want to call it. Generationally maybe a 16 year old kid knows what it is, but there's no 16 year old kid on that jury.

**MS. WILSON:** Yes, sir. Judge, I'll just have him read it as it is.

**THE COURT:** What?

**MS. WILSON:** I'll just have him read it as it is.

**THE COURT:** I don't know what sense it makes.

**MS. WILSON:** I understand. I can move along here, Judge.

**MR. TARLTON:** I would just ask the Court to consider a move to strike or give a limiting instruction to the jury.

**THE COURT:** I'll give a limiting instruction to the jury.

**MR. TARLTON:** Thank you, Your Honor.

**THE COURT:** All right. We can take a short break and I'll bring the jury in and then I'll come in and give a limiting instruction and then finish up with this witness.

(Off the record 10:42 a.m. - 10:49 a.m.)

**THE COURT:** Ladies and gentlemen, let me give you a

cautionary instruction. I took a recess because I'm sitting here watching the evidence and the screen is showing Facebook correspondence back and forth with people, and the officer is giving an opinion as to what it means. And he doesn't have any qualification to interpret Facebook information and neither do I and neither do you. And you can take it for whatever it means. It could have been Chinese for all I knew. The words are interpreted as having a secondary meaning. Maybe they do, maybe they don't. The word straight means going in one direction to me, but it may mean something else to somebody else, so just take that into account. And you be the judge of the facts. Go ahead.

**MS. WILSON:** Thank you, Your Honor.

Q. Sir, turning your attention to Government's Exhibit 56, when you reviewed the results of the Facebook records, did you notice some messages between Chris Nesbitt and Lucas Urbina?

A. I did, yes, ma'am.

Q. And the pages that are in front of you, that's a brief snapshot of some of those messages?

A. Yes, ma'am, it is.

Q. And if you would start on the second page. That's page 364. And start at the bottom do you see messages between Mr. Urbina and Chris Nesbitt?

A. I do, yes, ma'am.
Q. What does the one at the bottom say?
A. It starts with, hey bro.
Q. What's the response?
A. What's good G.
Q. What does Mr. Urbina say?
A. You got a new phone?
Q. And then what?
A. I've been trying to call you.
Q. Do you see the message or that indication right above that one?
A. I do, yes.
Q. What is that?
A. So it looks like a call record.
Q. And then the one above that?
A. Another call record.
Q. What's the message say right above it?
A. The message above that is, U straight?
Q. So there are a series of messages that Mr. Urbina sent. Do you see the very top message on page 364?
A. Yes.
Q. What does it say?
A. The very top message says, I got you.
Q. And then if you will turn to page 366 -- actually, let me ask you, what was the date those were sent?

A. November 19th, 2017.
Q. And the time is in UTC time. Do you know what UTC time is?
A. Yes. It's universal time.
Q. And so do you know how to convert it to Eastern Standard Time?
A. I do.
Q. What is it?
A. So UTC is usually Eastern Standard Time minus five hours or minus four hours depending on if we're in daylight savings time or not.
Q. And November of 2017 do you recall whether or not we were in daylight savings time?
A. November the 19th we were not in daylight savings time; we were in standard time.
Q. So on page 366, do you see the messages from the top to about almost all the way down that page?
A. Yes, ma'am.
Q. And what date are those messages sent back and forth between Lucas Urbina and Chris Nesbitt?
A. Uhm, on page 366?
Q. Yes, sir.
A. They were on October 22nd, 2017.
Q. Do you see the time for UTC?
A. I do.

Q. If you were to convert that to Eastern Standard Time, would that change the date?
A. That actually would change the date, yes.
Q. To what date?
A. To October 21st.
Q. And in those messages do you see an interaction -- do you see a message about midway down, so October 22nd, 2017 at 00:55:29?
A. I do.
Q. What does it say?
A. Selma McDonalds wbu.
Q. At some point did you feel like -- well, let me ask you this. At some point did you get a search warrant for Mr. Nesbitt's residence?
A. I did, yes.
Q. And to effectuate that did you have to have a detective with the Smithfield Police Department to assist in that?
A. Yes, I did.
Q. Specifically was Sergeant Tyndall one of those detectives that you asked to do some surveillance on the house?
A. That is correct, yes, ma'am.
Q. Did you get notified by Sergeant Tyndall on February 15th of 2018 that he was in fact doing that surveillance?

A. I did.
Q. At the time he was doing surveillance, where were you?
A. I was actually obtaining the search warrant for 114 Landmark Drive, which I concluded was the address and also obtaining arrest warrants.
Q. So you were at the Smithfield Police Department?
A. At the courthouse I believe.
Q. At some point did Sergeant Tyndall notify you that he had stopped a car that he believed Mr. Nesbitt was in?
A. Yes, ma'am, he did.
Q. What did you do?
A. Once I had the search warrant and arrest warrants, I traveled to that traffic stop.
Q. And did you see Sergeant Tyndall there?
A. I did.
Q. Did you see the occupants of the car?
A. I did.
Q. Who were the occupants of the car, if you know?
A. So there was a female there and Shamel Nesbitt was also there.
Q. The same person that was in that car at the traffic stop, do you see him in the courtroom today?
A. Yes, ma'am, I do.
Q. Can you point him out?
A. It's the Defendant, the gentleman sitting at the

defendant table.
Q. Does he look the same today as he did then?
A. Not exactly.
Q. Tell me what's different.
A. There's a hairstyle change.
Q. What do you mean?
A. He did have dreds that day. His hair is shorter now.
Q. What kind of a car had Sergeant Tyndall stopped?
A. It was a black Dodge Dart.
Q. And is that consistent with the car that you saw in the surveillance video at the Kangaroo?
**MR. TARLTON:** Object to the interpretation.
**THE COURT:** Overruled.
A. It looked consistent with the car I saw in the video.
Q. Did Sergeant Tyndall give you anything from the traffic stop that you later collected as evidence?
A. He did.
Q. What was it?
A. There was a small amount of marijuana. There was a scale weight, and there was also Mr. Nesbitt's phone.
**MS. WILSON:** Your Honor, may I approach?
**THE COURT:** Yes.
Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 31, 30, 33, and 32. Do you recognize them?

A. I do, yes, ma'am.
Q. Can you tell me what Government's Exhibit 30 is?
A. So that's a small amount of marijuana.
Q. And where was that located?
A. It looks like it was located in Mr. Nesbitt's car.
Q. Who gave that to you?
A. Sergeant Tyndall did.
Q. And what is Government's Exhibit 31?
A. That's a weight, a scale weight for a digital scale.
Q. Who gave the scale weight to you?
A. Sergeant Tyndall also.
Q. Where was it located?
A. In the suspect's car.
Q. And what is Government's Exhibit 32?
A. That is a photograph of the scale weight.
Q. And is it a fair and accurate representation of the plastic bag and its contents of Government's Exhibit 31?
A. It is.
Q. And then what is Government's Exhibit 33?
A. That is Mr. Nesbitt's phone.
Q. And so for Government's Exhibits 30, 31, and 33, are they all in substantially the same condition as when you had seized them?
A. Yes, ma'am, they are.
Q. After you seized them did you put them in the evidence

section of the Smithfield Police Department?

A. Yes, ma'am, I did.

Q. Have they been altered in any way?

A. No, ma'am.

Q. And Government's Exhibit 32, is it a fair and accurate representation of Government's Exhibit 31?

A. Yes.

**MS. WILSON:** Your Honor, we would seek to admit Government's Exhibit 30, 31, 32 and 33.

**THE COURT:** It's received.

**MS. WILSON:** Thank you. Your Honor, may I publish?

**THE COURT:** You may.

Q. I'm showing you Government's Exhibit 32. Why was that collected, sir?

A. The weight. So that's used to verify the accuracy of digital scales.

Q. How do you know?

A. Because I've actually used digital scales to weigh controlled substances during controlled buys and through the course of my duties.

Q. The marijuana that's packaged, the suspected marijuana that's packaged in Government's Exhibit 30, you can't see in it. Do you know how it's packaged inside?

A. Do I know how it's packaged inside?

Q. Yes, sir, what this looks like.

A. I believe it would have been in just a clear plastic corner baggie.

Q. Now this --

**THE COURT:** Let's stick to the indicted charge here.

**MS. WILSON:** Yes, sir.

**THE COURT:** This isn't a broad based -- this is one indictment with one charge, and I don't hear anything about that right now.

**MS. WILSON:** Yes, sir.

Q. The cell phone in Government's Exhibit 33, did you attempt to extract its contents?

A. No, I did not.

Q. Tell me why.

A. Because I believed -- I believed it was an iPhone, and the technology to extract that at the time, that was at the same time where iPhone and Apple was really restricting their content and making it much more difficult for law enforcement to do that.

Q. Did you try to verify in any way that that phone number belonged to the contact in Lucas Urbina's phone?

A. I did.

Q. How did you do that?

A. So I called that phone number labeled as Mista in Lucas Urbina's phone. It would have been the 919-333 number, and that phone rang after I called that phone

number.

Q. When you arrived at the traffic stop, did you take Mr. Nesbitt into custody?

A. I did.

Q. And is that because you had some arrest warrants?

A. Yes, ma'am.

Q. For state charges?

A. Yes, ma'am.

Q. Where did you go?

A. We traveled to Smithfield Police Department.

Q. For what purpose?

A. I wanted to interview Mr. Nesbitt.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 59. Do you recognize this?

A. I do.

Q. What is it?

A. That's a Miranda Waiver.

Q. And is this a copy of the form that you used with Mr. Nesbitt?

A. Yes, ma'am, it is.

Q. How do you know?

A. Because I know that I made that copy. It's got my

signature as well as Mr. Nesbitt's signature.

Q. Does it also have identifying information about Mr. Nesbitt on the top?

A. It does.

Q. And I'm showing you what's been marked for identification purposes as Government's Exhibit 25. Do you recognize this?

A. I do.

Q. Tell me what it is.

A. So that's a still shot from the video in the Smithfield Police Department interview room.

Q. And is this a fair and accurate representation of how Mr. Nesbitt looked on February 15th of 2018?

A. Yes, ma'am, it is.

**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 59 and 25.

**THE COURT:** They're received.

**MS. WILSON:** May I publish?

**THE COURT:** Yes.

Q. Publishing Government's Exhibit 59. When you brought Mr. Nesbitt to the police department did you communicate to him that you wished to have a conversation with him?

A. I did.

Q. Before you did that did you go over his Miranda rights?

A. Yes, ma'am, I did.
Q. Did you read this form in its entirety to him?
A. Yes, ma'am.
Q. At some point did he indicate he wanted to have a conversation with you?
A. Yes, at some point he did.
Q. Was it a lengthy conversation that you had with him?
A. It was not.
Q. And at some point did he indicate that he did not want to talk to you?
A. At one point he indicated he did not want to talk to me.
Q. Did he say anything about the interaction between he and Lucas on November 19, 2017 before he wished to stop speaking with you?
A. At first it was basically I didn't sell Luke no nothing. I remember that being said.
Q. After he indicated he did not wish to talk to you, did you continue to ask him questions.
A. He did. He asked some --
Q. Did you continue to ask him questions?
A. Oh, did I continue, no, ma'am, I did not.
Q. What happened at that point?
A. We continued -- I did ask some booking questions and only booking questions like address, you know, height, date

of birth, things of that nature. I wanted to complete that before we went to the jail.

Q. Within the time period that you were asking some of those booking questions and procedural questions, did he ask you questions?

A. He did.

Q. What did he ask you?

A. He asked when he would have an attorney appointed or an opportunity to speak with an attorney. And then he began to ask questions about when his next court date will be and things of that nature.

Q. In the midst of those kind of procedural questions did he ask you anything that related to the investigation?

A. He began to make statements about things related to the investigation, yes.

Q. What did he say?

A. He asked, you know, why, why is the only black man that was there that night being charged.

Q. Before he made that statement to you had you talked to him about the race of any individual involved?

A. No, ma'am.

Q. Did he say anything else related to the investigation?

A. Ultimately he did make an utterance that he did meet Lucas that night, but it was just a friendly just to say, hey.

Q. Publishing Government's Exhibit 25, is this how Mr. Nesbitt appeared on February 15th of 2018?
A. Yes, ma'am.
Q. After you spoke to Mr. Nesbitt, did you go back to his residence to assist in the execution of the search warrant?
A. Yes, ma'am, I did.
Q. Did you take some photographs and collect some evidence from that residence?
A. I did.
Q. Where was the -- well, can you describe the residence?
A. So, it was --
**THE COURT:** Why do you need a description of the residence? Let's get going with this. How much longer do you have with this witness?
**MS. WILSON:** Not long.
**THE COURT:** Because you've had him for two hours or so.
**MS. WILSON:** Yes, sir. It's not much longer.
**THE COURT:** Well, let's go.
Q. Was a bedroom searched?
A. Yes, a bedroom was searched.
Q. What, if anything, was seized from the bedroom?
A. There were some documents and papers with Mr. Nesbitt's name on it and mail addressed to him at that address that I always show for proof of ownership of residence. There was a small amount of marijuana in a pill

bottle seized. There was also a larger digital scale seized from the bedroom.

Q. Was there heroin packaging material or packaging material consistent with heroin packaging material seized?

A. In the kitchen there was.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yes.

Q. Sir, I'm showing you a series of photos that's Government's Exhibit 35, 37, 29, 51, 40 and 41. Do you recognize all those photos?

A. I do.

Q. Are they taken from the search warrant or evidence collected afterwards?

A. Yes.

Q. And are they a fair and accurate representation of the location of these items as well as how they appeared?

A. Yes, ma'am.

**MS. WILSON:** Your Honor, we would seek the admission of those exhibits.

**THE COURT:** They will be received.

**MS. WILSON:** And may I publish?

**THE COURT:** You can publish it.

Q. So publishing 35, what room of the house is this?

A. That was the upstairs bedroom.

Q. And publishing 37. Within that dresser, did you seize

anything?
A. I did.
Q. What was it?
A. A red digital scale.
Q. And I'm showing you what's been marked for identification purposes as Government's Exhibit 28. Do you recognize this?
A. Yes, ma'am, that's that scale that I seized.
**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 28.
**THE COURT:** All right.
Q. Publishing 29. That's the photograph of Government's Exhibit 28 after it was collected?
A. That's correct.
Q. Publishing Government's Exhibit 51, what room in the house was this?
A. All right, so that's -- we're in the laundry closet, but it's in the kitchen. It's adjacent to the kitchen.
Q. What does Government's Exhibit 51 show of note to you?
A. So of note, on the top shelf here in the center you're going to see three cardboard boxes. Those cardboard boxes contained a large quantity of glassine wrapping papers similar in appearance as what would be used to package heroin.
Q. What about on the shelf below that, was there anything

of note to you there?
A. There was. There were some nitrile gloves that I believed is likely to be used for personal protection.
Q. When you are packaging narcotics or moving them from one package to another, do you wear those types of gloves?
A. Anytime I handle controlled substance evidence I wear gloves.
Q. Publishing Government's Exhibit 40, are those the three boxes that you ended up collecting?
A. Yes, ma'am.
Q. And, sir, I'm showing you Government's Exhibit 49 here on the witness stand. Are they the actual boxes you collected?
A. Those are the actual boxes.
**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 49.
**THE COURT:** They're received.
Q. And publishing 41, did you photograph an open box of those to show the contents?
A. I did.
Q. And is that what is in all three boxes of Government's Exhibit 49?
A. Yes, ma'am.
Q. Do you have an approximate number of how many of those wax glassine bindles are inside Government's Exhibit 49?

A. There wasn't a count written on the box. I could estimate maybe about a thousand per box.

**MS. WILSON:** Your Honor, may I have one moment?

**THE COURT:** Yes.

**MS. WILSON:** Your Honor, may I approach?

**THE COURT:** Yeah.

Q. Sir, I'm showing you what's been marked for identification purposes as Government's Exhibit 52. Do you know -- can you tell me what is photographed here?

A. Yes. It's going to be one of the boxes from the previous exhibit you just showed with the wax glassine papers, and that's being compared next to a wax glassine wrapper that I obtained from the red Ford Explorer.

Q. And did we do this in preparation for trial?

A. Yes, ma'am, we did.

**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 52.

**THE COURT:** Received.

**MS. WILSON:** May I publish?

**THE COURT:** You can publish.

Q. Publishing Government's Exhibit 52, yesterday I believe it was Government's Exhibit 26, did you see the end caps for those syringes along with that wax bindle that was collected from Mr. Urbina's red Ford Explorer?

A. I did.

Q. And is that what's pictured in Government's Exhibit 52?

A. Yes, ma'am.

Q. And is the box beside that one of these boxes that are open next to it?

A. That is correct, yes, ma'am

**MS. WILSON:** Thank you, Your Honor. That's all I have.

**THE COURT:** Do you have any cross?

**MR. TARLTON:** Yes, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Detective Wheeler, you've told us that you met with Christina Urbina on November the 27th, the 27th being eight days after Lucas' overdose?

A. That's correct, yes, sir.

Q. Concerning that meeting, you recorded that meeting, correct?

A. I can't recall if I recorded that meeting or not. I know I recorded my first meeting with her. I cannot recall if I recorded the meeting on the 27th.

Q. Okay. And in this meeting she gave you -- this is eight days later -- gave you Lucas', a flip phone, believed to be Lucas' cell phone; is that right?

A. That's correct, yes, sir.

**MR. TARLTON:** At this time, Your Honor, I would ask the Government to put on its screen Exhibit 24 that it

submitted and published.

**THE COURT:** You would like what?

**MR. TARLTON:** Ask the Government to put on Exhibit 24.

**THE COURT:** There it is.

**MR. TARLTON:** Thank you.

Q. You see this as part of the screen shots that you took of that flip phone?

A. That's correct, yes, sir.

Q. All right. This is on November the 19th; is that correct?

A. Yes, sir.

Q. All right. Do you see that contact Jordan?

A. Yes.

Q. All right. You can take it down. Thank you.

You told us that you had obtained from Facebook not just Shamel, Shamel's Facebook records but also Lucas' Facebook records?

A. That is correct.

Q. All right. And you have submitted portions of those records today; is that correct?

A. That is correct.

Q. The totality of Facebook records you received for Lucas' account was roughly 561 pages; is that right?

A. I'd say about that much, yes.

Q. But in all those records you were focusing on two

particular days; is that right, for the most part?
A. Largely, yes, sir.
Q. November the 19th, correct?
A. Uh-huh.
Q. And then obviously October the 21st of 2017; is that right?
A. Yes.
Q. And you discussed messages that you say that Shamel had with Lucas and vice versa on, not just the 19th, but on the 21st, correct?
A. That is correct.
Q. But you haven't talked about messages that Lucas had with other people on those days, have you?
A. I have not.
Q. In particular do you recall Lucas actually meeting up with a man named Jordan Dickerson on the night of October 21st? Do you recall that from the Facebook records?
**MS. WILSON:** Objection.
**THE COURT:** Overruled.
A. I don't -- I believe I poured through those Facebook records. There was a large volume, but I don't specifically recall that particular message stream.
Q. If I would show you the Facebook records that you obtained, would that help refresh your recollection on this narrow point?

A. It would.

**MR. TARLTON:** May I approach the witness, Your Honor.

**THE COURT:** Yes.

Q. Detective Wheeler, I'm showing you what the Government has produced in discovery, a PDF file with 561 pages containing Facebook records for Lucas Urbina's account. Do you recognize this?

A. I believe so. I do see, yeah, author Lucas Urbina.

Q. Okay. And do you see the author Jordan Dickerson?

A. I do see that, yes, sir.

Q. And do you see the date and times attributed to these messages that I'm showing you?

A. I do, yes.

Q. Okay. In fact, that's on October 22nd of 2017; is that right, but UTC time.

A. Yes. UTC time it's on October 22nd. It would have still been October the 21st.

Q. Right. So we subtract, was it four or five hours?

A. That date I believe it would be five hours.

Q. Okay. So 1:41 UTC time minus five hours, is that in the evening, right, like eight or -- around eight or nine o'clock.

A. Yeah.

Q. Eight o'clock, roughly.

A. It would have been about 8:40 I believe.

Q, All right. And that appears to be a phone call on Facebook Messenger that they're having, 56 second duration?
A. Yes.
Q. All right. And then there's other messages that they're going to meet up at the -- they're planning on meeting up at the White Swan?
A. I'll be at the White Swan. One message sent by Lucas Urbina saying, I'll be at the White Swan.
Q. Okay. And it's followed up by a call that lasted 56 seconds; is that right?
A. Yes, eventually.
Q. But before that Jordan sent him a message, I'm leaving his house now; is that right?
A. Yes.
Q. And then Lucas responded, okay?
A. Yes.
Q. And then also that night around 8:42 p.m. Jordan told him, said, call me, I'm in front of the White Swan. Is that right?
A. Uh-huh.
Q. And then Jordan responded, yeah.
A. Yes.
Q. And then Lucas responded, yeah. Is that correct?
A. That's correct.
Q. And then Lucas -- all right. Thank you.

And Jordan, this name is not just in the cell phone screen shot from November 19, but also Facebook records from October 21st, both days that Lucas overdosed. You also talked with Christina Urbina about Jordan, didn't you?
A. I remember talking with Ms. Christina about several people that she believed were sources at one time or another.
Q. Yes, sir. In that interview you don't dispute that in at least one of your interviews that you audio recorded with her and turned it over to the Government in discovery for production to us; is that right?
A. That is correct, yes, sir.
Q. Do you remember her telling you that Jordan had something to do with this? Do you remember that?
A. Yes, sir.
Q. And that you discussed that Jordan was in the phone. Do you recall that?
A. I don't specifically recall that, but my interview was recorded, so if that conversation happened, it did happen. I would have a record of that.
Q. Understood. You told us about the phone records and social media records that you obtained in this case in an effort to try to figure out who might have given or distributed fentanyl analogue to Lucas on November the 19th. Isn't that right?

A. Yes, sir.
Q. It's fair to say you did not obtain any phone records for any Jordan or Jordan Dickerson; is that right?
A. I did not obtain records for Jordan or Jordan Dickerson.
Q. Or social media records or anything of that nature?
A. I did not.
Q. And you didn't seek to interview him, did you?
A. I did not seek to interview him.
Q. The flip phone that you obtained from Christina Urbina that we saw on Exhibit 24, the screenshots, you never submitted that phone for a digital forensic examination where they extract data from the phone to analyze things like where the calls connected, the duration of the calls, anything like that?
A. No, sir, I did not.
Q. Okay. With that flip phone you would agree you could not access Facebook; is that right?
A. I would agree it cannot.
Q. It had to have been on another device, whether a tablet, a laptop, a smart phone, something of that nature for Lucas to have been using Facebook; is that correct?
A. That is correct.
Q. All right. You have not recovered any kind of device like that that you attribute to Lucas; is that right?

A. That's correct.

Q. So put simply, for example on October 21st in these Facebook messages you see where Lucas was trying to meet up with somebody or people, you have not found the device that was used to send these messages. Is that fair to say?

A. That is fair to say, not specifically. I haven't found that specific device.

Q. And you did get information too that people like Nick Johnson and his girlfriend that even they had access to Lucas' social media account information; is that right?

A. The information I received was that they had full time access to it, but more that he would use their phone to log in.

Q. Okay. He used other people's devices?

A. Yes.

Q. And it's fair to say you didn't get -- referring to Lucas you would agree that you didn't get the cell phones for Nick Johnson; is that right?

A. I did not, no.

Q. Or Michael Horrall?

A. I did not, no.

Q. Or Richie Rojas?

A. I did not, no.

Q. In that sort of vein, when you were working as a detective you've seen where you can actually go obtain or

try to obtain cell phone tower records to try to approximate a phone's location at any given point in time. Is that fair to say that that could be done?

A. It can be done. There's qualifiers to that though.

Q. And just going on cell phone location records, that will put a cell phone in general from like a one or two mile radius of a particular segment on a cell tower?

A. Again, I can't say with certainty one or two miles. The strongest tower signal that's within range of that cell phone is what that cell phone will use to route that call. It could be one or two miles if you're within a congested urban environment. It could be within ten or 15 miles if you're out in the country.

Q. And when you want to try to be more precise you can ask, you can seek warrants for, if you so choose, or GPS information. A smart phone has a GPS that somebody can use or somebody using that device can use a particular location. Is that right?

A. Again, there's qualifiers to that. Not every company provides historical GPS location data. As a matter of fact, very few companies at that time did.

Q. You did not obtain cell tower location information or GPS information for Shamel's phones in this case, did you?

A. I did not.

Q. Or for anyone else; is that fair to say?

A. I did not.
Q. Did you -- you re-examined the Ford Explorer, correct, in this case after it was originally examined by Officer Atkinson at the parking lot?
A. I did.
Q. At the hospital?
A. I did, yes, sir.
Q. Okay. Despite him releasing it that is you and your team days later were able to locate some wax paper in the red Explorer; is that correct?
A. That is correct, sir. And if I may elaborate on that just a bit. It was just me alone. It wasn't a team, and I knew the span of time that there was some compromise there a little bit. I couldn't testify to the security. I was asked to go to the Explorer and ensure that there was nothing else in it.
Q. Okay. And in fact you found some additional things; is that right?
A. Yes.
Q. And you were able to confirm that there was a small amount of residue on the paper in that car?
A. I didn't test for any residue on that paper.
Q. Okay. Now, you had information within days of Lucas' overdose on November 19th that in addition to Michael Horrall and Robert Pernicaro being present that

Richie Rojas was present; is that right?
A. That is correct.
Q. Is it fair to say that Richie Rojas was never interviewed until several years later, until 2020?
A. That is correct. Although I made an effort to identify who he was and figure out where he was to go interview him I never really did.
Q. Wasn't he in the Johnston County Jail in 2018?
**MS. WILSON:** Objection.
**THE COURT:** Overruled.
A. All I had -- I can't testify to that. I don't know, to answer your questions.
Q. You never looked at the record?
A. I didn't identify. If you look at Richie Rojas in the State of North Carolina, there's several dozen, so I don't know which Richie Rojas out of that 36 or 40 is my Richie Rojas. I had no indication or way to determine exactly which person that is. That's all I had was the name Richie Rojas. I didn't have the actual legal name or identifier or date of birth or anything.
Q. Okay. So later on you did somehow interview Richie Rojas several years later. You did find him eventually, correct?
A. I did not. Sergeant Tyndall did.
Q. And he's from Johnston County; isn't that correct?

A. It's my understanding he is.

Q. This gas station video, when you met with Christina to get the flip phone, do you remember talking to her about that you had not yet obtained a video from the gas station?

A. Yes.

Q. So it was after -- is it fair to say it was after November 27th, is that when you obtained footage or recorded the monitors at the gas station; is that right?

A. Yes. I had viewed it, but I had not obtained the video at that point.

Q. So the first time that you -- didn't you tell her that you didn't know the time frame to look at and that's why you hadn't obtained the footage?

A. Excuse, me, yeah, that is correct. I had not viewed it.

Q. You had not reviewed it?

A. I had not reviewed it because I did not know the time frame.

Q. You didn't know the time frame; is that right?

A. That's correct.

Q. So other than looking at hours of video, you were trying to investigate more or figure out what time frame you should look at before you had to look at hours of video; is that correct?

A. That is correct.

Q. And when you finally did record it, you weren't able to get a copy off the system; isn't that right?
A. That is correct, I did not.
Q. It was sent to a camera where it recorded bits and pieces of this video that you were looking at?
A. That is correct.
Q. And you would agree that that video had nine screens?
A. I do agree with that.
Q. And the video excerpt that you created, it doesn't capture the totality of all those nine screens even for the time frame that you were interested in?
A. It does not.
Q. Okay. Now, Shamel wasn't arrested in this case or even sought to be interviewed until February 15, 2018; is that right?
A. That is correct, sir.
Q. When you -- in between -- you had his name, what was purported to his nickname back when you were talking to Christina Urbina on the 27th, correct?
A. I believe - I don't believe I had that when I talked to her on the 27th unless we discussed it, unless I discovered it right there in front of her, because I didn't have the phone to know who -- I had the nickname, I'm sorry. I had the Mista.
Q. Correct. And when you ran the nickname it came back

(inaudible); is that correct?

A. No, that's not how that happened.

Q. In between this you getting the flip phone and other information about Mista, who you believe to be Shamel Nesbitt, you didn't -- you didn't seek -- neither you nor anyone on the team sought to interview him about this until months later. Isn't that fair to say?

A. That is correct, yes, sir.

Q. And further you talked about controlled buys. Is it fair to say a controlled buy is a situation where your agency has relationships with people who either want to get paid or want to work off charges and they are tied into the drug world, and you wire them up and you give them money, and they go in and through audio and video record a buy from a suspected dealer. Is that right?

A. That is correct.

Q. And then the idea is that your surveillance team is watching it. You get the drugs back, you have a recording of the transaction and it kind of pins down what dealers are actually selling what?

A. That's correct.

Q. No attempts at a controlled buy from my client for fentanyl or heroin was ever done in this case; is that right.

**MS. WILSON:** Objection.

**THE COURT:** Overruled.
A. I would have loved to have found someone with access.
Q. You don't have a report in this case that documents you tried to recruit somebody to do that, make an attempt to do that, do you?
A. No.
Q. You would agree too just on that video alone, your video of the video at a gas station that that time frame as well 21:40 that's on the video, that couldn't show Lucas, if that was the real time that couldn't show Lucas because he was at the hospital; isn't that right?
A. That is false because that video was actually -- daylight savings time had just expired on November before that.
Q. Just hear my question?
A. Yes, sir.
Q. I know you don't agree with the time stamp on your video.
A. Right.
Q. Or your video of the video. But my point is, that time stamp taken at face value would have put Lucas at the gas station, at what, 9:00; is that right?
A. 2100 would be nine, yes.
Q. And that's in fact when he was at the hospital. He got there right around 21:40, correct, to the hospital?

A. I don't recall exactly what time he got to the hospital.

Q. You haven't reviewed the medical records?

A. I have reviewed the medical records, yes, sir. As far as the exact specific time, I know it was after -- it was before the time stamp on the video.

Q. Okay. I want to back up now to October 21st with this overdose and went to the hospital back when he was found at Wendy's. You investigated that as part of your broader investigation; isn't that right?

A. That is correct, yes, sir.

Q. And you don't dispute that there he was found in Wendy's and then taken to the hospital right before midnight; is that right?

A. I think it was a little bit earlier than right before midnight.

Q. 23:58.

A. 23:58, that would have been two minutes before midnight then.

Q. You don't dispute that?

A. No, sir.

Q. But the messages that you were showing or that you were shown from the Government on the screen between Nesbitt and Lucas on the 21st, that was earlier in the evening, right?

A. That would have been.

Q. Much earlier. It would have been like around seven or eight o'clock?

A. I would have to look at the specific time to get it in front of me, but it was earlier. It was around the eight o'clock or nine o'clock time frame.

Q. It's fair to say based on your experience in investigating drug cases, addicts, they don't get a bag of heroin or fentanyl and wait hours to shoot it up. They do it right then, don't they?

A. Usually, yes.

**MR. TARLTON:** No further questions, Your Honor.

**THE COURT:** Any redirect.

**MS. WILSON:** Just very briefly, Judge.

REDIRECT EXAMINATION BY MS. WILSON

Q. When did you become aware that Lucas had passed away?

A. It was on the 27th of November is when I got the official news.

Q. And so not until about five days later did you believe that he had passed away and that your investigation started full force?

A. That is correct, yes, ma'am.

Q. Nonetheless, anticipating he was going to pass away you had started doing things before then; is that right?

A. That's correct.

**MS. WILSON:** Judge, that's all I have. Thank you.

**THE COURT:** All right. Thank you, Officer. You can step down.

A. Thank you, Your Honor.

**THE COURT:** Next witness.

**MS. WILSON:** Thank you. Your Honor, we would call Dr. Sandra Bishop-Freeman.

**SANDRA BISHOP-FREEMAN, GOVERNMENT'S WITNESS SWORN**

DIRECT EXAMINATION BY MS. WILSON

Q. Ma'am, would you introduce yourself to the jury, please.

A. I'm Dr. Bishop-Freeman.

Q. And where are you currently employed, ma'am?

A. I'm employed at the North Carolina Office of the Chief Medical Examiner.

Q. What is your current title?

A. My current title is Interim Chief Toxicologist.

Q. How long have you been the Interim Chief Toxicologist.

A. Since May of 2022.

Q. How long have you been with the Office of the Chief Medical Examiner?

A. I've been at this office for about twelve and a half years.

Q. And in your twelve and a half years what have been your various duties and responsibilities?

A. Sure. Mostly I've been the Deputy Chief Toxicologist for the office.

Q. And what does that mean?

A. As the Deputy Chief Toxicologist, I assist with the running of the laboratory. I review analytical data from our toxicology lab, and I certify our toxicology reports.

Q. And how long have you been in that role?

A. For about twelve and a half years.

Q. What did you do prior to being the Deputy Chief Toxicologist with the Medical Examiner's Office?

A. Prior to this I was a criminalist for the Los Angeles Police Department.

Q. And what does that mean?

A. As the criminalist I was fully trained in crime scenes around the City of LA, but my primary duty was as a toxicologist for the drug unit, and I also worked in the alcohol unit.

Q. What about before the Los Angeles Police Department, where were you employed?

A. I was employed by the Department of the Navy at the Navy Drug Screening Laboratory in San Diego.

Q. In what capacity?

A. I was a toxicologist.

Q. And then prior to that?

A. Prior to that I was in grad school. However, during

my undergrad years I was an intern for the Monroe County Medical Examiner's Office as a toxicologist.

Q. When did you begin that internship?

A. The internship at the Monroe County Office of the Chief Medical Examiner was in 1998.

Q. So since 1998, has almost your entire career been at a medical examiner's office in the toxicology section?

A. Not necessarily the medical examiner's office, but I have worked as a toxicologist in some capacity and as an intern for my entire career.

Q. Can you talk about your education?

A. Yes. I have a Bachelor's of Science in Biochemistry from the Rochester Institute of Technology, and I have a Ph.D. in Chemistry from Ohio University in Athens.

Q. Are you also a fellow in forensic toxicology?

A. I am.

Q. And is that with the American Board of Forensic Toxicology?

A. Yes.

Q. When were you certified?

A. I was certified in 2012.

Q. What is the process to get certified as a fellow in forensic toxicology?

A. To get certified as a fellow, you have to have the experience and degree qualification before you are allowed

to sit for an exam.
Q. You also have some academic experience; is that right?
A. I do.
Q. Can you just briefly describe your academic experience?
A. Sure. I taught for the Cal State LA Master's Program as their toxicologist instructor in LA. And then I also am a volunteer faculty for UNC in Chapel Hill.
Q. In what capacity are you a volunteer staff at UNC?
A. It's really in a research role as far as my affiliation with UNC.
Q. How long have you done that?
A. As part of my employment with the medical examiner's office. Because the medical examiner's office is affiliated with UNC I was allowed to apply for that appointment.
Q. The Office of the Chief Medical Examiner in North Carolina has a toxicology section; is that right?
A. Correct.
Q. And can you describe for the jury how the toxicology section works in connection with the medical examiner's office?
A. Sure. The toxicology laboratory works in order to help the medical examiner or the pathologist establish a cause or manner and/or manner of death in their case work.

We actually serve all 100 counties within North Carolina.
Q. Is the toxicology section of the Office of the Chief Medical Examiner an accredited lab?
A. Yes.
Q. Who accredits the lab?
A. The American Board of Forensic Toxicology.
Q. What does it mean to be accredited?
A. To be accredited means that we follow guidelines in order to ensure the quality of our case work. We have standard operating procedures. We have a quality assurance program. We submit to PT testing or proficiency testing to make sure our methodologies are sound and the laboratory is in good working order.
Q. Occasionally does the lab have to go through some testing procedures to keep it accredited?
A. Yes. We are inspected every other year and then we do self assessments on the off years when we are not personally inspected.
Q. And you said that the toxicology section of the Office of Chief Medical Examiner serves all 100 counties in North Carolina; is that right?
A. Yes.
Q. And about how many cases come to the toxicology section per year?
A. It's been increasing. Currently we see about 15,000

cases a year.

Q. Specifically, what does the toxicology section do and what kind of testing is specifically happening in the lab?

A. It's a forensic laboratory. We perform screens which are tests in order to determine what drugs to pursue quantitatively, and if drugs or poisons are detected on screens, then we pursue confirmations to either confirm qualitatively or confirm with a number.

Q. What is a toxicologist?

A. A toxicologist is a person who studies the science of drugs and poisons.

Q. And does it also include the effects of the drug or poison on the body?

A. Correct.

Q. In the toxicology section of the Office of the Chief Medical Examiner, are you assisting a toxicologist in interpreting and finding of toxicology reports or tests on antemortem and postmortem specimens?

A. We could.

Q. What's the difference between antemortem and postmortem?

A. Antemortem specimens are specimens taken when an individual is still in a living state whereas postmortem, specimens are taken after a person is deceased.

Q. How many toxicology cases have you personally

certified?

A. I certify typically anywhere between 2,000 and 3,000 cases or more a year.

Q. And have you testified in state and federal courts in the past?

A. I have.

Q. About how many times in your career?

A. I would say about 30 to 40 times in my career.

Q. And in those times were you always declared an expert witness or have you also been a fact witness?

A. I've been both.

Q. Do you have an approximation of how many time you were declared to be an expert in the field of forensic toxicology analysis and interpretation?

A. I would say over probably 90 percent of those cases I was an expert witness.

**MS. WILSON:** Your Honor, at this point I would tender Dr. Bishop-Freeman as an expert in forensic toxicology analysis and interpretation.

**THE COURT:** Are you a medical doctor or no?

A. I'm not. I have a Ph.D.

**THE COURT:** What is your Ph.D. in?

A. Chemistry.

**THE COURT:** Okay. The Court will accept the witness as an expert in the field of forensic toxicology and allow her to

express all her opinions.

**MS. WILSON:** Thank you. Your Honor, may I approach?

**THE COURT:** Yes.

Q. Ma'am, I'm handing you what's been marked for identification purposes as Government's Exhibit 63. Do you recognize this two page document?

A. I do.

Q. Can you tell me what it is?

A. This is a report that we issue from the toxicology laboratory at the North Carolina Office of the Chief Medical Examiner.

**THE COURT:** Let me interrupt for a second. Are you qualified in your experience to express an opinion about the cause of death, or is that someone else's field?

A. So the toxicologist assists the medical examiner or pathologist with the cause and manner of death if related to drugs or poisons. So we are not rendering the cause and manner of death, but we are certainly consulting with the pathologist on his or her opinion.

**THE COURT:** The pathologist would be a specialist medical doctor.

A. Correct.

**THE COURT:** And it would be that doctor's opinion that would confirm or deny the causation of death?

A. Correct.

**THE COURT:** Okay. I just wanted to get you in the right framework.

A. Absolutely.

**MS. WILSON:** Thank you, Your Honor.

Q. Do you recognize Government's Exhibit 62 (sic)?

A. Yes.

Q. Now Government's Exhibit 62 (sic) is a couple of pages. Are you familiar with the entire span of reports and data that came from the testing that was done in this case?

A. Yes.

Q. So looking at Government's Exhibit 62 (sic), is that part of the entire packet that came from the toxicology section of the Office of Chief Medical Examiner?

A. Yes, it is.

**MS. WILSON:** Your Honor, we would seek the admission of Government's Exhibit 62.

**THE COURT:** It's received.

**MS. WILSON:** I'm sorry, Judge. I meant 63.

**THE COURT:** Okay. It will be received.

**MS. WILSON:** Thank you. Publishing -- may I publish?

**THE COURT:** Yes.

**MS. WILSON:** Thank you.

Q. Publishing Government's Exhibit 63. In this case did the office, did the toxicology section receive some samples

from a decedent by the name of Lucas Urbina?

A. Yes.

Q. And is that reflected on the report that's in front of you now?

A. Yes.

Q. What type of samples did the toxicology section receive from Mr. Urbina's body?

A. We received both antemortem specimens and postmortem specimens.

Q. And did you certify the toxicology analysis on these samples?

A. I did.

Q. And this is the report that you also certified in connection with your examinations; is that right?

A. Yes.

Q. The antemortem samples, what type of a sample was it?

A. We received peripheral blood.

Q. What does that mean?

A. That means it's blood taken by the medical examiner or pathologist -- I'm sorry -- blood taken at the hospital since it is antemortem in the peripheral or outer region of the body.

Q. Were some tests performed on the sample of antemortem blood?

A. Correct.

Q. And can you briefly describe the type of testing that would have happened?
A. Sure. The type of testing that we do on comprehensive cases where we need to do drug analysis would be we take the samples through a variety of screening procedures. I can tell from looking at this report that this decedent has been screened for ethanol and volatiles. This case has also been screened by what's known as our LCMS screen, which stands for liquid chromatography mass spectrometry screen. And we also performed what's known as an organic base screen on this case.
Q. So you said the sample was screened for ethanol. Is that alcohol?
A. Correct.
Q. And you said that the blood sample was screened for volatiles. What does that mean?
A. Ethanol is a volatile, and so while only ethanol appears on this report as none detected, I know that our volatile screen would also screen for things such as methanol or isopropanol or acetone. But ethanol undetected is the only analyte to show up on the report, and that's just standard reporting within our office.
Q. The sample would also test for organic bases; is that right?
A. Correct.

Q. What is an organic base.
A. Organic based is just short for basic types of compounds. And so what I do, again, is not medically based. It is based on analytical chemistry procedures. And drugs, a majority of drugs are basic in nature when it comes to the acid base scale and so the organic base liquid-liquid extraction would isolate these types of basic compounds for analysis.
Q. And you said that you went through a -- I hope I can say this right -- liquid chromatography mass spectrometry?
A. Correct. That is the third screen, yes.
Q. And what does that third screen test for?
A. That third screen is a targeted analysis, and we use that to target either potent compounds or compounds that wouldn't necessarily extract well on the generalized organic base extraction. And at the time of this case, the LCMS screen targeted 28 analytes.
Q. Give us an example of one of the 28 analytes you screened for.
A. Sure. Cocaine metabolite would be screened on the targeted LCMS. Screened because the type of compound that the cocaine metabolite is, it is not friendly with the base extraction, so the only way to see this compound would be to target it on a separate test, which is the LCMS test.
Q. After all these tests were run on the decedent's

blood, what, if anything, was found in his blood? What, if any, substances were found?
A. Sure. The substances that were targeted for confirmation were clonazepam and clonazepam metabolite which is 7-Aminoclonazepam. We also targeted cyclopropylfentanyl for quantitation. And we also targeted morphine for quantitation.
Q. When you say you targeted these substances, can you describe what you mean by that?
A. Sure. So the screens are general tests that detects a variety of analytes. So, for example, I already said that the LCMS test tests for 28 compounds. The comprehensive base screen actually detects over 300 or more compounds. And so any compounds that were identified and considered relevant to be targeted on a confirmation would be sent for a more specific targeted test to quantitate that substance.
Q. What is 7-Aminoclonazepam?
A. 7-Aminoclonazepam is the metabolite of clonazepam.
Q. And what is clonazepam?
A. Clonazepam is a benzodiazepine.
Q. Does that have any other name that it typically goes by?
A. The prescribed name is Klonopin.
Q. And what is a metabolite? You said 7-Aminoclonazepam is a metabolite. What's a metabolite?

A. A metabolite is a breakdown product of a drug or I call it a parent drug, because the body will break down drugs into pieces or metabolites in order to excrete it from the body.

Q. How does clonazepam affect the body?

A. Benzodiazepines are anti-anxiety type medications, so central nervous system depressants.

Q. On what level was it found -- what concentration was it found in the decedent's blood?

A. Sure. We found the clonazepam at 0.016 milligrams per liter. And we found the metabolite 7-Aminoclonazepam at 0.064 milligram per liter.

Q. Is that in your opinion a therapeutic level, a toxic level, or a lethal level?

A. That is considered a therapeutic level of clonazepam.

Q. During the testing the test also indicated that there was morphine present in the decedent's body; is that right?

A. Correct.

Q. What does this mean to you?

A. The presence of morphine means two things, actually. Morphine could exist as a metabolite of the pharmaceutical drug codeine or morphine could exist as a metabolite of the direct metabolite of heroin.

Q. And how does heroin metabolite in the body?

A. Heroin metabolizes rapidly in the blood to what's

known as 6-acetylmorphine and then the 6-acetylmorphine is then further metabolized into morphine.

Q. And so do you have an opinion based on the tests that were run or can a test even show whether or not morphine came from a pharmaceutical medication or whether it came from an illicit controlled substance?

A. So I would read the raw data in this case, and it is my professional opinion that this morphine did come from heroin.

Q. What is that based on?

A. That is based on my experiences and knowing that the typical metabolic profile of morphine when coming from a pharmaceutical drug like codeine would be ten percent of that codeine parent drug, so for a concentration to appear in our case work for morphine, I would expect that we also would have detected codeine at larger amounts than the morphine, and we did not in this case.

Q. Can you tell the jury what concentration of morphine was found in the decedent's blood?

A. On the report we have morphine detected as less than 0.020 milligrams per liter.

Q. What does that mean, less than?

A. Less than means that while within the limit of detection of this assay it was less than the lowest calibrator or the limit of quantitation that we test for.

And so .020 being the lowest calibrator for that test, this was detected at less than that value.

Q. Can you describe to the jury is this, would this be considered, even though it's an illicit drug, a therapeutic level, a toxic level or below level?

A. As either a pharmaceutical or an illicit drug, I would consider this a very trace amount of morphine.

**THE COURT:** A very what?

A. Trace amount.

Q. Not likely to be lethal?

A. Not likely to be lethal.

Q. What is cyclopropylfentanyl?

A. Cyclopropylfentanyl is a fentanyl analogue.

Q. Can you describe, or are you familiar with the chemical compound or the molecular structure of cyclopropylfentanyl?

A. I am.

Q. And is it substantially similar to pharmaceutical fentanyl?

A. It is similar but not the same.

Q. In fact, is it molecularly different on like one level?

A. Cyclopropylfentanyl has the same structural backbone as pharmaceutical fentanyl or non pharmaceutical fentanyl, and it differs in a functional group.

Q. Can you tell the jury what pharmaceutical fentanyl is?
A. Fentanyl is a semi-synthetic opiod, and it is used in the medical world for pain control. It is used in a hospital setting and then around 2014 we started seeing fentanyl in a non-pharmaceutical manner in our casework.
Q. Is it more or less powerful than heroin?
A. It is more powerful -- it is more potent than heroin.
Q. And is it more or less potent than morphine?
A. It is more potent than morphine.
Q. Is it typically used in anesthesia?
A. It could be.
Q. Do you know how it impacts the body or how it affects the body?
A. Fentanyl is a strong respiratory depressant.
**THE COURT:** So you stop breathing?
A. Correct.
Q. Even when it's being closely regulated is pharmaceutical fentanyl something that could lead to death?
A. Absolutely.
Q. And is it your opinion that even small amounts when not appropriately administered could be lethal?
A. Correct. Small amounts of fentanyl are delivered medically during anesthesia. However during anesthesia

typically you have supportive care to make sure that breathing does not stop completely.

Q. When did the toxicology section begin seeing cyclopropylfentanyl appear in the blood samples that is being tested?

A. Around the end of 2016 to 2017.

Q. Have you examined some research on the effects of cyclopropylfentanyl on the body?

A. I have not personally done research on cyclopropylfentanyl as it relates to the body. However, we do reading of the literature on the effects of fentanyl analogues.

Q. Are there many studies of how cyclopropylfentanyl affects the human body?

A. Now there are more studies to show that it was appearing in casework around this time. At the time in 2017 we really just had to rely on what we see in our casework.

**THE COURT:** Looking at that evidence from this particular case and the blood sample, does it suggest that whatever the chemical, whatever the drug was, that it was more concentrated in cyclopropylfentanyl as opposed to heroin or less or about equal, or can you not tell?

A. Well, we only have access to the blood specimen. So the blood specimen tells us that we detected

cyclopropylfentanyl at 3.3 nanograms per mil.

**THE COURT:** Which is much higher than the morphine?

A. Numerically, yes, it's higher than the morphine.

**THE COURT:** But not necessarily in effect?

A. I'm sorry?

**THE COURT:** Not necessarily in effect?

A. Oh, cyclopropylfentanyl, yes, it would be more potent than on a one to one basis. So let's say that we found the same amount of cyclopropylfentanyl as we did the morphine, the cyclopropylfentanyl is still more potent one to one. And this is not one to one. We found morphine at a less than 0.020.

**THE COURT:** Okay.

Q. Do you know how cyclopropylfentanyl affects the human body?

A. Yes.

Q. Can you tell me how?

A. As a fentanyl analogue, it is similar in effect to fentanyl. That's why it is considered a structurally similar analogue, so it would also behave as a potent respiratory depressant.

Q. For the couple of years surrounding 2017 about how many deaths did you see where cyclopropylfentanyl was present in the blood?

A. We had approximately 350, actually more, between 350

to 400 deaths where we detected cyclopropylfentanyl in the casework.

Q. Do you still see it in your samples today?

A. We don't.

Q. Why not?

A. Once a drug analogue generally receives a scheduling, then the drug for the most part, unless it's easier to make for whatever reason, will disappear from casework, because it's no longer an advantage to produce this analogue since it is now illegal to traffic and distribute.

Q. The concentration of cyclopropylfentanyl in the decedent's blood was how much?

A. The concentration of cyclopropylfentanyl?

Q. Yes, ma'am.

A. Is 3.3 nanograms per mil.

Q. And was this concentration consistent with other cases where the concentrations were fatal?

A. Yes.

Q. Did you consult with Dr. Radisch on this case?

A. I am not certain if I consulted with her on this particular case, but I've consulted with Dr. Radisch on may cases over the years. As far as back in 2017, I don't know.

Q. And Dr. Radisch is ultimately the person who would make the determination of cause and manner of death; is

that right?
A. Correct.
Q. But for the cyclopropylfentanyl were the other drugs present in a toxic or lethal concentration?
A. The other drugs in this decedent in my opinion would not be at concentrations that I would consider primary causes of death in a decedent.
Q. In this much a small amount of a larger case in trying to determine cause and manner of death; is that right?
A. Correct.
Q. So you have the blood, but you don't necessarily have access to any injuries of the decedent or circumstances that surrounded the death; is that right?
A. Sometimes the information becomes available to me whether or not -- there is case calls within our medical examiner information system or information that I see on the toxicology request form, but generally speaking I may not always see extra information on a case if I don't need to seek it.
Q. And so if the pathologist or medical examiner has said that he or she does not have a death consistent with any other means, could the concentration of cyclopropylfentanyl at 3.3 nanograms per millimeter explain the death separate and apart from any other drug found in his system?
A. Yes.

Q. Thank you. That's all my questions.

**THE COURT:** Do you have any questions?

**MR. TARLTON:** Just a few, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Dr. Bishop, you discussed other cases where you've seen concentrations of cyclopropylfentanyl at around 3.3 nanograms per millimeter; is that right?

A. Yes.

Q. Okay. And in cases where there were fatalities; is that right?

A. Correct.

Q. Were other drugs involved in those cases? Were they in the blood, in the system?

A. Some, yes.

Q. It's important or an important part of what toxicologists do, they also look at the interactions between two or more drugs in somebody's blood or system; isn't that right?

A. Absolutely.

Q. And in fact you're aware that the U.S. Food and Drug Administration has come out specifically with a warning about the concomitant or simultaneous use of benzodiazepines and opiods can result in serious side effects or difficult breathing culminating in death. Are you aware of that?

A. Yes.

Q. Isn't this saying that even taking -- and fentanyl or a fentanyl analogue is under the umbrella of an opiod; is that right?

A. Yes.

Q. Okay. If you take an opiate and a benzodiazepine like Klonopin, you're risking your life?

A. You could be.

Q. That either in therapeutic or otherwise safe amounts but when combined the FDA said that could be lethal?

A. Did you say in therapeutic and safe amounts?

Q. Therapeutic uses.

A. I'd have to see what you're reading from.

Q. Okay. What's your understanding of the FDA's warning that's shown on prescriptions, for example?

A. Well, my understanding -- beside from the FDA warning, again, I'm not a prescribing physician, so I don't have to be responsible for what the FDA says, but as a board certified toxicologist I'm well aware that an opiod and benzodiazepines are combinatory in its effects.

Q. Correct. Isn't the purpose of this type of warning if somebody prescribed codeine they're warning them that if you take your one pill that you otherwise can safely take, if you combine it with a drug like Klonopin or a benzodiazepine you're risking your life. That's the

purpose of the warning, isn't it?
A. I do not know about that warning. Again, I'm not a prescribing physician.
Q. You have not researched for purposes of this case the interactions between benzodiazepines and fentanyl; is that right?
A. Can you repeat that, please?
Q. For purposes of this case you have not studied the interactions between and what could happen between benzodiazepines and fentanyl or cyclopropylfentanyl?
A. Not for the purposes of this case but generally understood interactions between opiates and benzos is something that's understood in the field of toxicology.
Q. Okay. You said earlier that cyclopropylfentanyl is you said similar to actual fentanyl, a Schedule II controlled substance?
A. I think my words were structurally similar.
Q. Structurally similar. Okay. In this case you didn't do sort of a molecular comparison between the two?
A. Well, our detection methodology is based on molecular structure, so by us detecting cyclopropylfentanyl we would be detecting the molecular structure of this drug.
Q. Okay. And you say similar; is that right?
A. The drugs are structurally similar in the fact that they differ by only a carbon unit.

Q. Okay. Thank you. No further questions.
**THE COURT:** All right. Thank you very much.
A. Thank you.
**THE COURT:** You're excused. You're excused from your subpoena. Call your next witness.
**MR. BOYKIN:** Your Honor, we would call Dr. Deborah Radisch to the stand.

**DR. DEBORAH RADISCH, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. BOYKIN

Q. Good afternoon, ma'am. Would you please state your name for the jury?
A. Dr. Deborah Radisch.
Q. And, Dr. Radisch, what do you do for a living?
A. I'm sorry, what?
Q. What do you do for a living?
A. Well, I'm retired.
Q. What did you used to do?
A. I used to work as a forensic pathologist in the Office of the Chief Medical Examiner, first in Chapel Hill and then in Raleigh.
Q. How long did you do that?
A. For a total of about 31 or 32 years.
**MR. BOYKIN:** Your Honor, may I approach?
Q. Dr. Radisch, I'm going to hand you what's been pre-marked as Government's Exhibit 65. Do you recognize that?

A. Yes, I do.
Q. What does that appear to be?
A. Government Exhibit 65 is a copy of my CV or my resume.
Q. Okay. And did you provide that to us?
A. Yes, I did.
Q. Does it fairly and accurately depict your career and your qualifications?
A. Yes, it does.
**MR. BOYKIN:** Your Honor, I move to admit Government's Exhibit 65.
**THE COURT:** It will be received.
**MR. BOYKIN:** Permission to publish.
**THE COURT:** You can publish it.
Q. So, Dr. Radisch, give us your educational background, please. What degrees do you have?
A. I graduated from the University of North Carolina at Chapel Hill in 1976 with a Bachelor of Science Degree in Medical Technology. Then I attended and graduated from Bowman Gray School of Medicine, which is Wake Forest University, with my medical doctor degree in 1980. After receiving that I count as education my training in anatomic clinical and forensic pathology. This is the time where after you become a medical doctor you actually learn a specific area to specialize in. So it's like paid training or paid education. And I trained in each of those three

areas of pathology, two years each, and became eligible to take an examination at the end of that in 1986. And I also incidentally went back to school and got my Master's in Public Health from UNC Chapel Hill in 1995.

Q. Now, this examination you speak of, was that administered by the American Board of Pathology?

A. Yes, it was.

Q. And what's the objective of this board?

A. The American Board of Pathology is one of a couple of dozen medical boards that strive to ensure to the public proper certification of medical doctors in their specialties or subspecialties.

Q. And did you in fact pass this test?

A. Yes, I did.

Q. And so are you a duly licensed physician?

A. Yes, I am.

Q. And are you also certified by the American Board of Pathology?

A. Yes, I am.

Q. Can you explain to this jury what a forensic pathologist is?

A. A forensic pathologist is a doctor with subspecialty training in the area of forensic pathology, which is an area of pathology. In general pathologists are anatomic and/or clinical pathologists. So those would kind of be

what you might think of as a general pathologist or hospital pathologist, so an anatomic pathologist would -- those would be the doctors that would look at a specimen that the surgeon might remove from somebody and look at it under a microscope and come to a diagnosis, say what kind of cancer it was. That would help that surgeon and the oncologist treat a patient. Clinical pathology are the pathologists who runs the laboratories in the hospital, make sure that the laboratory testing is done properly and also serve as consultants.

So forensic pathology -- and I did not mention also in anatomic pathology there is also training in autopsy pathology, so the examination of the body after death to determine the cause of death or the presence and extent of natural disease processes.

So forensic pathology takes the testing from these two main areas, especially the autopsy examination in order to determine cause and manner of death in cases of sudden unexpected or violent death, a death due to external means.

Q. And over the course of your career, approximately how many autopsies would you say you've performed?

A. I've performed an estimated 6,000 autopsies.

Q. And how many of those involved suspected overdoses?

A. I don't have a good number for that. I don't have a great number for that, but it's in the thousands.

Q. Have you ever testified as an expert witness before?

A. Yes, I have.

Q. Approximately how many times?

A. Approximately 250 times.

**MR. BOYKIN:** Your Honor, at this time the Government would tender Dr. Radisch as an expert in forensic pathology.

**THE COURT:** The Court will accept the witness as an expert in the field of forensic pathology and allow her to express her opinions in that regard.

Q. Now, Dr. Radisch, can you explain to this jury how I guess as a Chief Medical Examiner you get assigned a case to review.

A. Well, the Chief Medical Examiner, any of the pathologists in the Office of the Chief Medical Examiner in Raleigh when I worked there, we basically were on a rotation as far as cases assigned. Someone would be available to take call to enter cases or determine if the case needed, if the body needed to be autopsied and then in a morning meeting the cases were divided among the pathologists in as equal a manner as we could accomplish.

Q. And at some point were you assigned Lucas Urbina's case?

A. Well, I was assigned his case for review. In this instance an autopsy was not deemed necessary.

Q. Why not?

A. In most cases of suspected overdose, an autopsy would be performed. However, in cases where there's prolonged survival after the presenting incident, the suspected drugs would be metabolized from the body, and one of the main reasons to perform an autopsy on the case of suspected drug overdose is to collect specimens to test for the presence of drugs and then to identify those drugs. So in this case after almost three days, those drugs would be metabolized away. However, what we did have in place of that were his admission blood specimens which would show the concentration of drugs at or very close to the time of the incident that brought him to the hospital.

Q. And another name for those admission samples would be antemortem samples?

A. That's correct. Antemortem being before death as opposed to postmortem, after death.

Q. And, Dr. Radisch, do you also have up there with you what's been marked as Government's Exhibits 61 and 62? 61 is the first, and 62 should be the last page.

A. Yes, I do.

Q. Do you recognize those?

A. I do.

Q. What do they appear to be?

A. State's, excuse me, Government's Exhibit 61 is a copy of the Report of Investigation By Medical Examiner, and

that's a four page document. And Government's Exhibit Number 62 is a copy of the Supplemental Report Of Cause Of Death.

Q. Now would these be reports that were prepared by a medical examiner?

A. Yes. The Report Of Investigation By Medical Examiner is a document prepared by the medical examiner and then submitted to the Office of the Chief Medical Examiner for review. The Supplemental Report Of Cause Of Death is either prepared by the Office of the Chief Medical Examiner and sent to the Medical Examiner for final signature or it's prepared by the Medical Examiner and signed. In this case it was prepared by the OCME and sent to the Medical Examiner.

Q. In this particular case was this the report that you reviewed and signed off on?

A. The Medical Examiner Report, yes. I signed off on that and then, as I said, I had the Supplemental Report of Cause of Death or the Supplemental Death Certificate prepared and sent to the Medical Examiner for his approval and signature.

Q. And does that report appear to have been altered in any way?

A. Has it been?

Q. Altered in any way?

A. Altered, no. No, sir.

**MR. BOYKIN:** Your Honor, at this time I move to admit Government's Exhibits 61 and 62 and permission to publish.

**THE COURT:** They're received; you can publish them.

Q. First, looking at Government's Exhibit 61, this is the report of the medical examiner, right?

A. That's correct.

Q. Now, under the case number there's November 27, 2017. What does that date mean?

A. That is the date that this report was received at the Office of the Chief Medical Examiner from the Medical Examiner.

Q. So is it fair to say that you often get the reports after someone has expired?

A. Yes. The Medical Examiners actually have to submit this form completed within 14 days of notification of the death.

Q. And down in the bottom right-hand corner, it says, for Office of Medical Examiner Review Only. And what was written in that review?

A. This is the section -- you can see a little bit on the left-hand side I've just crossed these out. When the Medical Examiner, like I said, has to submit this report within 14 days of notification of death. In this case the final cause of death was not known so it had to be left

pending. And so in this little box on the right-hand side is my chance upon review of further information, testing, whatever to put the final cause of death in here, which I did based on the toxicology findings. And the little column on the right-hand side that has SDC at the top, that's for the Supplemental Death Certificate that I discussed, and I X'd the box AL, which means auto letter, which means that I've sent this information to the medical examiner to sign off on.

Q. Now as the Chief Medical Examiner or Medical Examiner only you all have the final say in the cause and manner of death; is that correct?

A. Yes, in that, one of the main duties of the pathologists in the Office of the Chief Medical Examiner is to review every single medical examiner case from the state. So in many cases the final cause and manner of death are listed on the left side of the page near the bottom and they're fine. There are no changes that need to be made. But there might be changes that need to be made that are important for death certification or like, as in this case, when the final toxicology report comes in that needs to be added as a final cause and manner of death.

Q. Dr. Radisch, can you explain to us what the difference is between cause of death versus manner of death?

A. The cause of death is the actual, the actual process

or injury or natural disease process that caused the death. The manner of the death kind of explains how the death came about. And as you can see, we only have five choices here for death certification. So we need to fit the cause of death, based on the investigation of the case, the circumstances, laboratory testing, autopsy findings, whatever is required in each particular case and fit that into one of the five manner of death categories.

Q. And in terms of cause of death it's listed on here as cyclopropylfentanyl and clonazepam toxicity. Am I reading that right?

A. That's correct.

Q. Now, why is clonazepam on here as a cause of death?

A. In this case both of these drugs were identified in the toxicology testing performed in the laboratory at the OCME. And both of these drugs cause central nervous system respiratory depression. For purposes of cause of death and death certification, the CDC and the World Health Organization advise medical examiners to put down all drugs or medications that might have actually caused the death or may have contributed to the death so that they can get the statistics for public health. And so in this case cyclopropylfentanyl was present in a fatal concentration and clonazepam was present in a therapeutic concentration. We also have a worksheet for toxicology, and the worksheet

in this case had that the cyclopropylfentanyl -- this is the worksheet that I signed -- had the cyclopropylfentanyl as the primary cause of death and clonazepam as a potential added cause of death.

Q. So am I hearing you correctly in that the level of cyclopropylfentanyl was fatal but not necessarily these levels of clonazepam?

A. Yes.

Q. I'm going to show you what's been admitted as Government's Exhibit 63. Now, did you also review this toxicology report as part of your investigation?

A. Yes, I did.

Q. Now, what, if anything, are you able to tell us about the clonazepam levels that was found in Lucas' blood?

A. As I said, the clonazepam metabolizes to 7-aminoclonazepam, so these concentrations together fall into a therapeutic concentration of the drug or one that would in most people provide the required or desired effects of that drug, which is primarily used for seizure disorder, when it's prescribed, for seizure disorder like epilepsy or a panic disorder. The cyclopropylfentanyl was present in a low but still reported in the literature a fatal concentration. There was no alcohol detected, no beverage alcohol, and a very low concentration of morphine was present.

Q. So, Dr. Radisch, to say that this clonazepam level was within therapeutic range, does that mean that we have no evidence that Lucas was abusing his prescription?

A. Well, I can't tell from this if he even had a prescription for this medication. All we know is that it's present in what is reported to be a therapeutic concentration.

Q. Well, it's fair that there is not an over abundance of it?

A. That's correct.

Q. Do you know what cyclopropylfentanyl is?

A. Cyclopropylfentanyl is an analogue of fentanyl or the shorthand for that is fentalog. And basically whoever is manufacturing this is taking fentanyl as the base and changing different molecules on it to slightly change the parent drug fentanyl. Whether it makes it more toxic or less toxic it depends on the changes that are made. And then as far as I know, there is no -- there certainly is no medical use for cyclopropylfentanyl. It seems to be a reference standard for confirming that drug.

Q. So, Dr. Radisch, based on your investigation of everything that you reviewed, were you able to form a professional opinion as to Lucas' cause and manner of death?

A. Yes.

Q. And what was that opinion?
A. In my opinion his cause of death was due to cyclopropylfentanyl and clonazepam toxicity, and the manner of death would be accident.
Q. Okay. Now, absent the clonazepam being present at all, do you believe that Lucas would still be dead?
A. Yes, I do.
Q. Why is that?
A. Well, that's based on my experience with fentanyl toxicity, the fentanyl analogue toxicity. We were seeing a lot of that in the office before, during and after the time of Lucas' death. And certainly the investigation, the circumstances of his death. He's a 20 year old man in good health and reported to have injected a drug. Got to the hospital, was resuscitated but never regained consciousness. No other cause of death or disease processes were discovered at that time.
Q. Now, Dr. Radisch, this cyclopropylfentanyl was 3.3 nanograms per millimeter. Is that amount of cyclopropylfentanyl consistent with levels you've seen in other overdose cases?
A. For cyclopropylfentanyl or fentanyl fentanyl analogues in general, it can be. There can be any range of concentrations. It's a very -- it's a very toxic compound. It's difficult -- there's not a dose per se. People talk

about a dose, but no one knows what the dose is. It's a powder. It doesn't really come in doses. And so there will be many factors acting both with the drug and the person to determine the level of toxicity. But in some studies just the presence of it without being necessarily quantitated or low concentrations up to very high concentrations can be found to be lethal concentrations.
Q. So that means less than 3.3. nanograms could potentially be fatal?
A. If this same case happened with the only drug being present in a measurable concentration was cyclopropylfentanyl with the circumstances of this case, that would still -- I would still determine that to be the cause of death.
Q. Thank you, Dr. Radisch.
One moment, Your Honor.
Thank you. Your Honor, those are my questions.
**THE COURT:** Do you have any questions?
**MR. TARLTON:** Thank you. Just briefly, Your Honor.

CROSS-EXAMINATION BY MR. TARLTON

Q. Dr. Radisch, are you familiar with the FDA warnings about mixing opiates with benzodiazepines?
A. Yes.
Q. What's your familiarity with that kind of warning?
A. Well, both of those classes of drugs are respiratory

depressants or CMS depressants, so the warnings advise against using them together.
Q. Okay. And it advises that that could result in death or serious complications?
A. Yes.
Q. I think you elaborated on saying there is really no magic number in terms of concentration for fentanyl or fentanyl analogue to be a fatal amount; is that right?
A. Yes.
Q. Okay. Are you aware of sort of any average or mean or median concentration in studies on fatal cases involving cyclopropylfentanyl?
A. In median concentrations?
Q. In the studies.
A. Not -- not specifically. It's kind of difficult to find those. I mean they're out there, but a median concentration is, you know, a data point. It's not -- it doesn't really account for an individual.
Q. Okay. There's an individualized test; is that right?
A. I'm sorry, what?
Q. There's an individualized assessment in part; is that correct?
A. There can be, yes. Sure.
Q. Okay. And what we mean by that is drug levels alone do not determine the toxicity or fatality because chronic

users of opiods and other drugs tolerate much higher doses than individuals with no prior exposure. Is that right?
A. That's correct. And I think a lot of that is based on people who have prescriptions for opiods.
Q. Okay.
A. So they know what they're getting. I mean you're just talking about opiods.
Q. A chronic user would be beyond those people with prescriptions, people that chronically use drugs like heroin and fentanyl?
A. It would depend on what their schedule for using them would be. I don't know where you cross the line into a chronic user.
Q. Understood. You would agree a chronic user would be somebody who over a period of months who regularly ingest heroin and other opiates in over those period of times, overdose multiple times, that would be a chronic user, wouldn't it?
A. It could be, but I, again, I don't -- I've never seen a real definition of that.
Q. Fair enough. Thank you. No further questions.
**THE COURT:** All right. Thank you. Is that all for this witness? Thank you, ma'am. You're excused.
**MR. BOYKIN:** May she be excused.
**THE COURT:** Yes. Thank you.

Ladies and gentlemen, I think your lunch is here, and we'll take a recess until 1:45.

(Lunch recess 12:35 - 1:47 p.m.)

**THE COURT:** Do you have any other witnesses?

**MS. WILSON:** No, sir, the Government will rest when the jury gets back in the courtroom.

**THE COURT:** Well, you'll rest now and I was going to inquire of the defendant if you have any motions?

**MR. TARLTON:** Yes, Your Honor. I am obligated at this stage to raise a motion under Rule 29 for insufficiency of the evidence and under due process principles, Your Honor, under the 5th Amendment. I sort of make a general objection to the sufficiency of the evidence to all the elements of the single count indictment that on or about November 19, 2017 that my client knowingly and intentionally distributed a mixture of a substance containing cyclopropylfentanyl, a Schedule I controlled substance, causing serious bodily injury and death of a person resulting from such use of the fentanyl. And I also have a more specific count, Your Honor. Unlike the traditional controlled substance case, the only, involving heroin and cocaine, here the Government is really proceeding under the Analogue Substances Act and it invokes a statute 21 USC 802. There is a specific definition of what is an analogue of a substance that otherwise is not

listed -- in other words, not been scheduled as a controlled substance. I think probably one of the most important cases to consider, and we put in our supplemental draft for proposed jury instruction, Your Honor, is McFadden versus United States. In 2015 the Supreme Court reversed the Fourth Circuit for giving or allowing for trial where the traditional mens rea as to an ordinary controlled substance. Particularly the mens rea instruction that applied for an ordinary controlled substance to be in effect, as Your Honor well knows, that is the Government needs to prove in an ordinary controlled substance case that the person on trial, the defendant, had some idea that they were doing an illegal controlled substance. As to -- in McFadden the Supreme Court said that knowing and intentional element has to be read in light of specific definition of an analogue substance under 802. That means the person is either on trial, the Defendant, has to know that either its legal status is that it's on the DEA list of prohibited analogues. And that's the first way that they can prove it. But they can't do it that way because here they can't because even under Carlos Diaz's own testimony cyclopropylfentanyl was not on the DEA list back in 2017, at least not back in November of 2017. DEA didn't put it on the Federal Registrar of Analogue, of prohibited analogues, even on their temporary substances

until January 4th of 2017.

**THE COURT:** 2018.

**MR. TARLTON:** 2018. 2018, right. Several months after the only charge in this case. So to go back that means they're left under McFadden versus United States with having to prove that the Defendant knew that -- knew of its chemical structure and then, two, under its chemical structure and it also had to -- and actually prove it is an analogue is the first thing the Government has to prove, that it was structured substantially similar to a chemical structure of a controlled substance in actual Schedule I or Schedule II. And, second, fentanyl has a stimulant, depressant or hallucinogenic effect on the central nervous system and substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance Schedule I or II.

And the other way they can prove that second element is knowledge that with respect to a particular person which that person represents or tends to have a stimulant, depressant or hallucinogenic effect on the central nervous system that is the case similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system in Schedule I or II. I know there is confusing language in there, but the bottom line is there is a special mens rea, and they have not produced

evidence especially considering this was not on the DEA list at the time, that my client knew about that chemical structure. It's hard enough for a chemist to explain it, Your Honor. And actually there's a second point that even if Your Honor thinks there is substantial evidence on mens rea, their DEA agent or chemist said it was outside his sort of realm to get into the comparison of whether this substance here, cyclopropylfentanyl, is substantially similar in terms of the chemical structure to actual fentanyl, which is a Schedule II controlled substance. Dr. Bishop-Freeman when asked if this is substantially similar she caveated her response by saying it's similar. She did not say substantially similar and simply gave a conclusory statement that the chemical structure is similar. In other words, that's a deficiency that's right there irrespective of mens rea. And I say all this to contrast. This isn't a case where they charged my client with conspiracy to distribute heroin that turns out to be something else or attempted distribution of heroin that turns out to be something else. They charged only an analogue that wasn't even listed as of the date of the offense by the DEA. That also goes to the due process as applied (inaudible) challenge, essentially, that improvised the Rule 29 challenge, Your Honor.

**THE COURT:** Okay. Is that it?

**MR. TARLTON:** Yes, Your Honor.
**THE COURT:** Okay. Have a seat.
Where is the evidence on the 19th that he sold the dope?
**MS. WILSON:** Well, Judge, the evidence would be from the Kangaroo video, from the Facebook messages.
**THE COURT:** Whoa, whoa, whoa, whoa. The Kangaroo video?
**MS. WILSON:** Yes, sir.
**THE COURT:** All right. That's virtually worthless so go somewhere else.
**MS. WILSON:** So, Judge, we would contend that this is largely a circumstantial case based on the messages with Mr. Urbina seeking out heroin and making contact with this Defendant, which we've shown through Facebook records showing --
**THE COURT:** Seeking out heroin.
**MS. WILSON:** Seeking out heroin.
**THE COURT:** But he's charged in this unique statute with knowingly and intentionally distributing a mixture of fentanyl analogue. Where's the evidence that he knew and intended it to be fentanyl?
**MS. WILSON:** So, Judge, I don't think that that's the Government's burden.
**THE COURT:** Why not?
**MS. WILSON:** When you look at McFadden, McFadden is really

clear that the Government can prove knowledge in multiple ways about the controlled substance. Just like in an ordinary case I don't have to prove that the Defendant knew it was heroin because it might be fentanyl, it might be a fentanyl analogue, it might be something different. I have to prove the Defendant knew it was a controlled substance. And McFadden says --

**THE COURT:** But it wasn't a controlled substance.

**MS. WILSON:** But what McFadden says if you can show that he knew it was a fentanyl analogue or a controlled substance.

**THE COURT:** Suppose he thought it was a controlled substance but actually it was a counterfeit. It was just milk or powder. Is that a crime?

**MS. WILSON:** No, it's not a crime.

**THE COURT:** But that's the analogy here. Because the thing wasn't scheduled and so it's just like powdered milk.

**MS. WILSON:** But under 813 it is scheduled. It is Schedule I as a fentanyl analogue because it was molecularly similar to fentanyl, and it had similar pharmacological effects on the body.

**THE COURT:** But it wasn't on the controlled substance list.

**MS. WILSON:** Correct. It was an analogue. It only became on the controlled substance list later.

**THE COURT:** Well, what's the consequence of being an analogue?

**MS. WILSON:** It was an analogue and therefore it was illegal to distribute if it is molecularly similar and had a similar effect on the body.

**THE COURT:** I thought you were going to put one of the boys on who survived of the three survivors in that car and say, yes, I looked over around this room and that man over there is the person that sold us the fentanyl, but you didn't do that. You don't have that, do you?

**MS. WILSON:** What they had said on the stand was they didn't know if that was who Lucas got it from.

And whether or not --

**THE COURT:** They didn't know who --

**MS. WILSON:** Who Lucas had got it from.

**THE COURT:** -- Lucas had gotten it from. How can you go to the jury on that?

**MS. WILSON:** I think we can go to the jury on circumstantial evidence based on all of the things that we have shown this Court, that this Defendant met with Lucas at the Kangaroo gas station.

**THE COURT:** What's the evidence of that?

**MS. WILSON:** The video.

**THE COURT:** The video is completely inconclusive.

**MS. WILSON:** Well, Michael Horrall testified that he was in the car and there was no dope. He went into the Kangaroo gas station and got some alcohol and when he came out --

**THE COURT:** Yeah, but you haven't identified the Defendant as being there.

**MS. WILSON:** Well that circumstantially from the text messages and --

**THE COURT:** Well, those pictures weren't -- they were completely obliterated. I mean they didn't show anything.

**MS. WILSON:** Well, and his own statement, because he said he met with Lucas that night. He just didn't sell him any dope. And so, Judge, we have never contended that this was an eyewitness case where somebody was going to say, that's they guy that sold the dope?

**THE COURT:** Are you saying his confession, he made a confession that can be used against him?

**MS. WILSON:** I'm saying he made a statement that can be used against him. But, no, did he confess in the traditional sense, no. But did he place himself with Lucas that night, yes, he sure did. And that is in evidence.

**THE COURT:** Where did he do that?

**MS. WILSON:** So Detective Wheeler has testified that initially he waived his Miranda Rights. Then after a very short period of time he said he didn't want to talk to him. But he continued to make statements, and one of them was he acknowledged that he had been with Lucas that day but did not sell him any controlled substances.

**THE COURT:** That day?

**MS. WILSON:** That day.
**THE COURT:** Is that what he said, that day?
**MS. WILSON:** I think that's what he said. I mean he also made the comment that it was only the black dude that was there getting charged indicating that there was nobody else -- that he had knowledge of who was with Lucas on the day.
**MR. TARLTON:** Your Honor, I would clearly point out that day wasn't clarified. There's two dates, as Your Honor well knows. There's the 21st and then there's the 19th. October 21st and 19th.
**THE COURT:** October the 21st doesn't have anything to do with this case.
**MR. TARLTON:** Exactly. The point being like that they don't clarify that they meant the 19th. In other words, they put on evidence of another day and didn't clarify which date he was talking about.
**THE COURT:** Wow.
**MR. TARLTON:** And also, just quickly, this controlled substance statute it's not just similarity to the structure as the Government would say. It's substantial similarity and nobody has said that. And certainly there is mens rea as to that under the McFadden standard.
**THE COURT:** I'll let it go forward, but I've got to tell you don't be surprised if he's acquitted, a hung jury, or a Rule 29 later on.

**MS. WILSON:** Yes, sir.

**THE COURT:** It's just really, really a marginal situation. It's a terrible crime, a terrible situation, but your proof is full of holes, just couldn't be weaker.

**MS. WILSON:** I understand the Court's position.

**THE COURT:** All right. Call the jury back in. Are you going to have evidence?

**MR. TARLTON:** Yes, Your Honor.

(Jury in 2:02 p.m.)

**THE COURT:** The Government rests?

**MS. WILSON:** Yes, sir.

**THE COURT:** Ladies and gentlemen, you've heard all the evidence from the Government in this case. I'll ask the Defendant whether they have any witnesses or evidence. Do you have any witnesses?

**MR. TARLTON:** Yes, Your Honor, just briefly.

I would renew the Rule 29 Motion.

**THE COURT:** I've ruled on that.

**MR. TARLTON:** Yes, Your Honor. We would call Dr. William Meggs, Your Honor.

**DR. WILLIAM MEGGS, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. TARLTON

Q. Good afternoon. Will you please tell the Court and the jury your full name?

A. William Joel Meggs.

Q. Sir, where are you currently employed? Where do you work?

A. I work in Greenville, North Carolina at ECU Health and Brody School of Medicine.

Q. What is your role in the School of Medicine there at ECU?

A. I'm an emergency physician and I'm a medical toxicologist.

Q. Does that mean you're a medical doctor, sir?

Q. Yes.

Q. Do you have any other postgraduate degrees?

A. I'm sorry?

Q. Do you have any other postgraduate degrees?

A. Yes. I have a Ph.D. degree.

Q. Okay. And at Vidant Medical Center, the hospital here in Greenville, what's your role there?

A. I practice emergency medicine and I practice medical toxicology, which is a subspecialty for treating poisoned people.

Q. Okay. Where did you go to medical school?

A. The University of Miami in Florida.

Q. After medical school, what, if anything, did you pursue to become a toxicologist?

A. You have to be board certified in a primary specialty such as emergency medicine, and you have to do a two year

fellowship being supervised treating poisoned people, and then you take a certification exam.
Q. Okay. Where did you get your -- after your residency where did you get your fellowship in medical toxicology?
A. I did it at Bellevue Hospital in New York City in association with the Medical School at New York University at the New York Poison Center.
Q. Okay. At some point were you there, what from -- what years were you there at the Bellview Hospital in New York City?
**THE COURT:** Bellevue.
Q. Bellevue.
A. From 1992 to 1996. I did it half time over four years as a faculty government project at the Medical School in Greenville.
Q. Yes, sir. At what point did you come out of East Carolina University?
A. 1988.
Q. Okay. And that's where you -- you've been working at East Carolina Brody Medical School and in the hospital since then?
A. Yes.
Q. And I take it you teach in the subject -- in medical toxicology?
A. Yes. Most of my teaching is clinical work at the

bedside supervising residents and medical students.
Q. Okay. Have you also published or coauthored articles and things of that nature in the field of toxicology and peer reviewed publications?
A. Yes.
Q. What about teaching textbooks for medical school?
A. Yes.
Q. Have you been retained as an expert in the field of toxicology in prior court cases?
A. Yes.
Q. Have you done depositions in civil litigation --
A. Yes.
Q. -- as an expert?
A. Yes.
Q. Have you testified as an expert in the field of toxicology in both state court and federal court?
A. Yes.
Q. Did you qualify as an expert previously?
A. Yes.
Q. Going back on the professional list, how often do you have to renew your board certified status in the field of toxicology?
A. Every ten years.
Q. When was the last time you renewed that?
A. For the third time in 2016.

Q. You were asked to get involved in this case by a prior lawyer; is that right?
A. Yes.
Q. Have you authored a summary report for your opinions?
A. Yes, I did.
**MR. TARLTON:** Your Honor, at this time I would tender Dr. Meggs as an expert in the field of medical toxicology.
**THE COURT:** The Court will accept Dr. Meggs as an expert in the field of medical toxicology and allow him to express his opinions.
**MR. TARLTON:** Thank you, Your Honor.
Q. Dr. Meggs, do you have a notebook up there in front of you with the documents?
A. Yes.
Q. Would you flip to Tab 1? Do you recognize that document?
A. Yes.
Q. And what is that?
A. It's a letter that I wrote on January 6th in 2020 to Dhamian Blue, an attorney in Raleigh.
Q. Okay. Does this document fairly and accurately summarize your opinion and what records you relied on in doing your analysis in arriving at that opinion?
A. Yes, it does.
Q. I want you to also look at Under Tab 2 that thick

document. Do you see that?

A. Yes.

Q. All right. Is this a copy of your more recent curriculum vitae or resume, CV?

A. Yes.

Q. All right. Does that appear to be a fair and accurate copy of what you provided to us and provided to the Government?

A. Yes.

**MR. TARLTON:** Your Honor, I have a copy for the Court at this time, and we would move for admission what I have marked for authentication purposes as Defendant's Exhibits 1 and 2 into evidence.

**THE COURT:** They will be received.

**MR. TARLTON:** Thank you. May I approach?

**THE COURT:** Yes.

Q. Dr. Meggs, what was the referral question to you I guess back in 2019, early 2020, in this case.

A. I was asked to review the toxicology report from the autopsy and to give my opinion as to the cause of death.

Q. Okay. Is that something that you do in your line of work as both a professor at the School of Medicine and as a medical toxicologist in a hospital?

A. Yes.

Q. And in other cases?

A. Yes.
Q. In addition to the sort of toxicology reports, was there -- did you review other records in this case?
A. Yes.
Q. Can you just summarize briefly for the jury the type of records that you saw and summarized?
A. Yes. I was supplied with the medical records of Mr. Urbina. I was supplied with the police report. I wasn't provided with, but I reviewed the prescribing information for clonazepam and fentanyl. And then I reviewed the medical literature on cyclopropylfentanyl and the levels seen at autopsy reports from people who died with that substance in their blood.
Q. Okay. Did you also review medical records relating to Lucas Urbina from a prior overdose in October 21st, 2017?
A. Yes, I did.
Q. Okay. Sir, why was it important for you to review prescribing information for fentanyl and clonazepam or benzodiazepine.
A. It's very important because the United States Food and Drug Administration has put on the prescribing information for clonazepam and for fentanyl a black box warning, which is the highest level of warning that the Food and Drug Administration gives to physicians. And this black box warning warns against prescribing these pharmaceuticals

together. And this is for physicians prescribing it at the normal doses. It says if you prescribe these together there's a risk of coma, respiratory depression and death.

Q. Sir, is that, in your opinion is that true for all opiates that they're mixed with benzodiazepines?

A. Yes. The warning is general. It says, don't prescribe benzodiazepines, which is a broad class of drugs that includes clonazepam and opiods, which, again, is a broad class of drugs that includes fentanyl and heroin and morphine and their analogues and derivatives.

Q. I'm not sure, you may have said this, is that true of therapeutic or otherwise non lethal opiates, that that's combined with benzodiazepines, is that part of that black box risk?

A. That's correct. This warning is for physicians prescribing them at the therapeutic doses that you would give for treatment.

Q. You also said that you reviewed studies on fatalities associated with the specific fentanyl or analogue in this case, cyclopropylfentanyl; is that correct?

A. That's correct.

Q. And what did you learn?

A. Well, I learned that in these autopsy studies there's a broad range of values that's seen. I also learned that in these autopsy studies the people didn't take just

cyclopropylfentanyl. They took them with other things too. And I learned that the level found at the autopsy was low relative to the average amount seen in people who had autopsies with cyclopropylfentanyl in their blood, which led me to conclude that the cause of death was this horrible interaction between clonazepam and cyclopropylfentanyl.

Q. Okay. If I heard you correctly, you are saying that from the toxicology report in this case that 3.3 nanograms to millimeter, that quantitative amount of cyclopropylfentanyl in Lucas Urbina's system, that that was independently rather low compared to the ranges that you saw in the autopsy studies?

A. Yes, it was. The average amount found in autopsies was about five times that high and in the people who fell below the average they were mixed overdoses. They were overdoses that had fentanyl on board or other drugs that could have also contributed to the death.

Q. Okay. Was cyclopropylfentanyl the only opiate detected in the toxicology report that you reviewed?

A. Well, they mentioned morphine and said that the level was less than .02 milligrams per liter.

Q. Is morphine a category of opiates that it falls in that black box sort of warning that it's dangerous to mix even a very low amount of that type of opiate with

benzodiazepine?

A. Yes.

Q. Okay. To a reasonable degree of medical certainty what opinions did you arrive at in this case?

A. Well, my opinion is to a reasonable degree of medical certainty that the cause of death was interaction between the clonazepam and the cyclopropylfentanyl and that it was unlikely that either one of these alone at the levels seen in the autopsy would have caused the death.

Q. And to be clear, you said alone, when you say to a reasonable degree of medical certainty, had he just taken the cyclopropylfentanyl, that likely would not have caused his death?

A. It's my opinion that more likely than not it would not have. Individuals who chronically use opiods develop huge tolerances.

Q. Okay. Did you see anything in the records that you reviewed that might indicate he was a regular user of opiates?

A. I don't have any details about his drug use, but I know that he had used in the past.

Q. Yes, sir.

A. And we talk about opiod naive people and people who are chronically exposed, their bodies adapt. In fact, people who are on opiods for pain keep having to take

higher and higher doses to get pain relief.
Q. Yes, sir.
A. Doses that would kill an opiod naive person who has never taken them before.
Q. Yes, sir.
**MR. TARLTON:** No further questions at this time, Your Honor.
**THE COURT:** Do you have any questions?
**MR. BOYKIN:** Yes, Your Honor.

CROSS-EXAMINATION BY MR. BOYKIN

Q. Good afternoon, Dr. Meggs. If you don't understand anything I ask you, just ask me to repeat myself, okay?
A. Okay.
Q. First of all, let me start with the toxicology report. I'm showing you what's been marked as Government's Exhibit 63. Now, clonazepam is a benzodiazepine, correct?
A. Yes.
Q. And in fact about 31 million people in this country has it prescribed, benzodiazepines; is that correct?
A. I don't know the number, but they are prescribed quite commonly.
Q. Okay. And so for clonazepam it's brand name is actually Klonopin; is that correct?
A. Yes.
Q. And you're aware that Lucas actually had a

prescription for Klonopin, correct?
A. No.
Q. So when you reviewed the medical records you didn't see he had a prescription for Klonopin or clonazepam?
A. I don't recall it.
Q. Okay.
A. The records I was prescribed were over a thousand, I was given over a thousand pages.
Q. And so it's possible you just missed it?
A. Yes.
Q. Now based on these blood results you see here, do you have any evidence that Lucas was abusing clonazepam?
A. No.
Q. And, in fact, clonazepam overdoses are rarely fatal at all; is that correct?
A. An isolated clonazepam overdose without taking anything else with it is rarely fatal. However, you add a little alcohol or you add a little opiod to clonazepam or other benzodiazepines, they can call respiratory depression, coma and death.
Q. Understood. Just so we're clear, the clonazepam by itself would not have killed Lucas?
A. It's my opinion that clonazepam at that level would not be the cause of death.
Q. And looking at these toxicology reports he didn't mix

it with any alcohol, right? That would be ethanol, fair to say?

A. That's correct.

Q. Okay. Now, he does have morphine and it's true, is it not, Dr. Meggs, that heroin metabolizes in the blood as morphine, right?

A. Yes, that's correct.

Q. Okay. Could the heroin alone kill Lucas in this case?

A. Well, heroin can kill anybody given enough. According to that report he had less than 20 milligrams per liter, so it's unlikely that that alone would have killed him.

Q. Yes, sir. Now, he did have fentanyl. And of course fentanyl -- well, let's differentiate. We'll call it pharmaceutical fentanyl, that has medical uses here in the United States, correct?

A. Yes.

Q. And in fact it's used for things like pain management, specifically in cancer patients, and it's available by prescription, right?

A. Yes.

Q. Okay. Is it true, is it not, Doctor, that fentanyl is anywhere between eight to a hundred times stronger than morphine?

A. That's correct.

Q. Okay. And ingesting a large quantity of fentanyl is

likely to be deadly, correct?
A. Absolutely.
Q. Now I also want to show you Government's Exhibit 10. Can you see that, Dr. Meggs?
A. Yes.
Q. Do you have any reason to dispute this lab report that what Lucas ingested contained heroin, cyclopropylfentanyl, benzoyl fentanyl and caffeine?
A. Yes, I have reason to believe that this is not a lab report, it's not what was found in his blood. And it's not what he ingested.
Q. And what are you basing that opinion on?
A. Well, they didn't find any benzoyl fentanyl in his blood.
Q. Do you know if they screened for it?
A. I would imagine they would have seen it, but you would have to defer that question to the laboratory.
Q. I understand what you might have imagined, but do you know for a fact whether or not they screened for it?
A. I don't know whether they screened for it or not.
Q. Okay.
A. From what I know about the lab if it was there in a significant amount they should have been a peak, but I don't know if they -- if their lab saw it or not.
Q. And I hear what you say, you said if it was there in a

significant amount. So it's possible it was there, just not in any amount that was able to be detected, right?
A. That's possible, yes.
Q. Okay. And just for the record, benzoyl fentanyl is also a fentanyl analogue, correct?
A. That's correct.
Q. Now although it has a chemical structure that is substantially similar to fentanyl, cyclopropylfentanyl is not pharmaceutical fentanyl, right?
A. Yes.
Q. And in fact it would be considered at this time a designer opiod. Is that fair to say?
A. Yes.
Q. And designer opiods are drugs that are mixed to mimic the pharmacological effects of the original drug, right? In this case that would be fentanyl; is that correct?
A. I'm sorry?
Q. Designer opiods, they're meant to mimic the pharmacological effects, right?
A. Right. I'm sorry, the word meant sounded like mixed to me.
Q. I apologize.
A. That's why I asked you to clarify.
Yes, that's correct.
Q. So in this case cyclopropylfentanyl would be meant to

mimic the pharmacological effects of pharmaceutical fentanyl, right?
A. Yes.
Q. Okay. Now, do you subscribe to the World Health Organization? Do you follow the type of guidance that they put out?
A. They put out a lot of guidance. I read a lot of their guidance, but I would need to know what you're referring to.
Q. Well, let me ask you a different question. Would you consider the World Health Organization to be an authority on public health and things that doctors should read?
A. Yes.
Q. Okay. Now are you familiar with a World Health Organization report on cyclopropylfentanyl from 2018? Did you have a chance to read that? Have you ever read that?
A. No.
Q. Okay. In it they called cyclopropylfentanyl, they said one of its street names would be synthetic heroin. Would you have any reason to dispute that?
A. No.
Q. And it's true that cyclopropylfentanyl is not available by prescription anywhere in the United States, right?
A. To my knowledge anywhere in the world.

Q. All right. And also cyclopropylfentanyl is actually banned in certain countries; is that fair to say?
A. Yes.
Q. Okay. Now you mentioned that when you did do your studies on cyclopropylfentanyl these were, you reviewed it and people who died with the substance in their system, these were autopsy studies; is that correct?
A. Yes.
Q. And is that because cyclopropylfentanyl has never been studied in humans that are alive, right?
A. That's correct, to my knowledge.
Q. Because it has absolutely no medical uses, right?
A. Correct.
Q. It has no, not even uses for animals, correct? Not even animals are given cyclopropylfentanyl; is that fair to say?
A. To my knowledge it is not used medically in humans or animals.
Q. Now, you mentioned that the levels of 3.3 nanograms per milliliter, you said that that was not, in your opinion, not high enough, correct?
A. I said it was on the very low side and five times lower than the average amount seen in autopsy studies.
Q. An average amount, meaning that there were some that were way higher, correct?

A. Right. And some that were way lower.
Q. Correct. So it is within a range that could theoretically kill someone, right?
A. Yes, particularly opiod naive people.
Q. Opiod naive people?
A. Who have never seen an opiod before, they can be killed at much lower levels than people who have developed a tolerance to opiods.
Q. Or perhaps someone who just got back from rehab and has been clean for several months, right? Their tolerance would be lower too; is that correct?
A. That's correct.
Q. Now you mentioned these FDA box warnings. You keep up with the box warnings pretty regularly?
A. Yes.
Q. Isn't it true that back on September 23rd, 2020, the FDA actually updated this box warning; is that fair to say?
A. I don't recall that date.
Q. All right. Let me show you something.
Now, do you see that, Dr. Meggs, from the FDA website?
A. Yes.
Q. You see a date, September 23rd, 2020?
A. Where is it?
**THE COURT:** Second line.
A. Okay.

Q. You see that date?

A. Yes.

Q. Can you read for the jury what the headline says?

A. FDA required box warning updated to improve safe use of benzodiazepine drug class.

Q. Yes, sir. And also down below that date it says what's the safety concern the FDA is announcing. Do you see that?

A. I see that, yes.

Q. Now, do you see, I guess, what would be the second sentence that starts with current, in that first paragraph.

A. I can't really read it from here. Maybe they can magnify it a little more.

**THE COURT:** It's about the fourth line down.

Q. Can you see it now?

A. Yes.

Q. Would you read to the jury what that says?

A. The current prescribing information for benzodiazepines does not provide adequate warnings about the serious risks and harms associated with these medicines, so they may be prescribed and used inappropriately.

Q. And we agreed this came out in 2020, correct?

A. Yes.

Q. And at this point Lucas has been long gone by at least three years; fair to say?
A. Yes.
Q. So it's possible that the warning that he had on his medication was inadequate, right?
A. I don't know what warning he had on his medication.
**MR. BOYKIN:** Your Honor, those are my questions. Thank you, Dr. Meggs.
**THE COURT:** Do you have any follow up?

REDIRECT EXAMINATION BY MR. TARLTON

Q. Dr. Meggs, despite a warning that was published in 2020, back in 2017 to a reasonable degree of medical certainty was it dangerous to take benzodiazepines like Klonopin with any kind of opiate?
A. Yes.
Q. And to a reasonable degree of medical certainty that being reviewed would Lucas likely have survived just taking alone the cyclopropylfentanyl?
A. As for the reasons I've previously stated, in reviewing the record, it's my opinion that to a reasonable degree of medical certainty neither one of these medicines alone would have killed him.
Q. Yes, sir. Thank you.
**MR. TARLTON:** No further questions, Your Honor.
**THE COURT:** All right. Thank you, Doctor. You're excused

from your subpoena.

Do you have any other witnesses?

**MR. TARLTON:** No, Your Honor.

**THE COURT:** Do you have any rebuttal evidence?

**MS. WILSON:** No, sir.

**THE COURT:** All right. Ladies and gentlemen, you've heard all the evidence in the trial. The next phase will be the closing arguments. I need to meet with the lawyers before they make their closing arguments, so we'll excuse you to your jury room for the time being.

(Jury leaves the courtroom at 2:36 p.m.)

CHARGE CONFERENCE

**THE COURT:** Is there any lesser included offense in this case?

**MS. WILSON:** So, Judge, he could be found guilty of distribution of the fentanyl analogue so distribution of the cyclopropylfentanyl, or he could be found guilty of the distribution of the cyclopropylfentanyl that caused the death. But I don't think that there is any lesser included of the events. I think it is those two things. Of course the government has filed a special verdict form breaking this out so he could be found guilty of either or of course the (inaudible).

**THE COURT:** What happens if the jury -- I'm looking at your verdict sheet.

**MS. WILSON:** Yes, sir.

**THE COURT:** What happens if the jury finds him guilty of 1A and not guilty of 1B?

**MS. WILSON:** I'm sorry, Judge.

**THE COURT:** It's your special verdict form.

**MS. WILSON:** So, Judge, if they find him guilty of just the distribution of cyclopropylfentanyl then that's well within their purview if they do that. Then the sentence would be based on the drug distribution and it would not start necessarily as the level 38, offense level 38 for having death or serious bodily injury resulting.

**THE COURT:** Well, does it have a statutory mandatory minimum?

**MS. WILSON:** No, sir, it does not.

**THE COURT:** So guilty of 1A and not guilty of 1B is a zero to 20?

**MS. WILSON:** Correct. That's exactly right, Judge.

**THE COURT:** Guilty of 1A and guilty of 1B is 20 to life?

**MS. WILSON:** Correct.

**THE COURT:** Okay. How about your instruction 35 that says, you're instructed that cyclopropylfentanyl is a controlled substance. How does that square with it not being on the schedule?

**MS. WILSON:** Judge, we filed amended jury instructions in this. It's document 115. I have a copy for Your Honor.

May I approach?

**THE COURT:** Yes. So you're saying that number 35 is no longer your jury instruction?

**MS. WILSON:** Correct. Judge, when I did the jury instructions two years ago that was my understanding that because it was an analogue that that would be the appropriate instruction for Your Honor. However, we have since rethought that, and we have jury number -- it's jury instruction number 36, Judge, it's the knowledge the precise illegal substance need not be known. That's in line with the McFadden decision. It's the Government's contention that the Government's burden of proof is to prove that he either knew it was a controlled substance or a controlled substance analogue. There are multiple ways we can do that. But one of them, if he believed he was distributing a controlled substance, that that would be sufficient. Similar, too, if he were distributing heroin and it ended up being fentanyl that that would be sufficient. We don't have to prove the precise identity, and that's what McFadden says.

**MR. TARLTON:** Your Honor, I think what McFadden says is not that. The whole point of McFadden was to reject essentially the very instruction that she just announced. In an analogue case the Government has either got to prove that the Defendant knew that it was treated on a list as a

controlled substance, which would not be the case here, or that the Defendant knew the specific analogue they were dealing with, even if they didn't know the legal status.

**THE COURT:** So the special verdict form is still okay, right?

**MS. WILSON:** Yes, sir.

**THE COURT:** Okay. All right. I've reviewed your current instructions, and I'll give those. I'm not going to give the long, convoluted instruction. You can object to that.

**MR. TARLTON:** Yes, sir.

**THE COURT:** And you've preserved your objection for appeal.

**MR. TARLTON:** Yes, Your Honor. And I would also renew at this stage -- we put on some evidence -- Rule 29 due process sufficiency of the evidence challenges.

**THE COURT:** That's right. And I'll reserve a ruling on that and deny it for the time being but take it up depending upon the verdict of the jury.

**MR. TARLTON:** Yes, Your Honor.

**THE COURT:** All right. Let's take a recess for about -- until three o'clock, and we'll start the opening statements then.

(Off the record 2:47 - 3:04 p.m.)

**THE COURT:** All right. Are you ready to bring the jury in?

**MS. WILSON:** Yes, sir.

**THE COURT:** Ladies and gentlemen, you've heard all the

evidence in the case. Now you're going to hear the closing arguments. The Government goes first because it has the burden of proof and then the Defendant may make his closing argument, and then the Government has rebuttal. After that is finished, I'll give you the instructions on the rules of law, and you'll get your verdict sheet. And the verdict sheet says, we the jury find the Defendant, Shamel Nesbitt, as to the indictment either (A) distribution of fentanyl on or about November 19th, guilty or not guilty. And then, (B), that the fentanyl caused the death of LU, either guilty or not guilty. So you'll have those questions to answer as your verdict in this case. So with that comment I'll let the Government have its opening statement.

CLOSING ARGUMENT BY MS. WILSON

Thank you, Your Honor. May it please the Court. Lucas Urbina died on November 22nd, 2017 from a lethal dose of cyclopropylfentanyl. And now you know that on November 19th of 2017 it was Shamel Nesbitt who sold the lethal drugs to Lucas that caused his death. In your deliberations I would submit to you that it would be helpful to focus on three different types of evidence that you've heard in this case. First the messages. What do I mean by that? I mean the text messages, the dialed calls, the Facebook messages. I would also submit it would be helpful to think about the drugs, the drugs found on Robert

Pernicaro that were later tested by the DEA lab, the drugs that were in Lucas' system, the bindles, the heroin packaging bindles found in this Defendant's home. And finally I would ask you to focus on the blood, specifically on Lucas' Urbina's blood and its contents and what medical professionals qualified to make such determinations said about the concentrations of those different substances in his system.

First, let's start with the messages. So you've seen in Government exhibits that after Mrs. Urbina gave her son's phone to Detective Wheeler that he was able to find some missed calls, one to Jordan and then to Mista, to Mista. Mista, Mista, Mista. You've seen text messages that were sent. And the reason that there are three pictures of it is because Detective Wheeler was scrolling up so that you could get the entirety of the call, so that you could see the time and date that it was sent. Straight? Sent November 19th, 7:50 p.m.. And you've heard a lot about the Facebook messages. And remember because of the way these reports are you have to read them from the bottom up so you can get the least recent up to the most recent. So this is Government's Exhibit, I believe it's 56, the messages between Lucas Urbina and this Defendant, Shamel Nesbitt, although at that point we only know him as Chris Nesbitt. And these are November 19, 2017 and you can

read them from the Facebook messages. Hey, bro. Chris Nesbitt, What's good, G. Lucas, You got a new phone? I've been trying to call you. It looks like some calls happened over Facebook. You straight? Lucas saying, call me. Everything good? Not trying to rush you. I'm just pressed for time cuz I gotta go visit my mom at the hospital. Well, I'm deactivating so just give me a call if you can. Chris Nesbitt, 11-19-2017 at 23:14, but remember this UTC time you subtract four hours, I got you. Lucas says, cool beans. Thanx man.

The time line, the very first calls to Mista on those phone photos that I showed you was at 6:44. His first Facebook message to Chris Nesbitt was at 6:48 p.m.. He immediately made contact. It was 30 seconds later that Chris Nesbitt responds, what's good G? After that time nobody else has called and nobody else has messaged. Why? He was singularly focused on Mista because he had made contact. He sends a message, you straight, at 6:42. Chris Nesbitt responded, I got you, at 7:14. Then he texts him on his phone at 7:50, straight? He called at 7:56, 8:12, 8:32 p.m.. Do you remember Government's Exhibit 17? That's the video from the Kangaroo. You heard Detective Wheeler testify that he knew it was an hour off. They had not yet made the change, so it's at 21:37 but it's really 20:37, which means at 8:37, because you subtract 12 from

the 20:37 to get 8:37, Lucas and his friends arrive at the gas station. You saw the red Ford Explorer. It's not the greatest video. It's just not. And we can say it. But it's as good as we have, and it's as good as it gets. Could you see a red SUV on it, yes. Could you see multiple people get out of it, yes. How do you know that was Lucas? Because Michael Horrall testified we went to the Kangaroo gas station. I got out of the truck, there was no heroin or there was no dope and when I got back in there was. At 8:45 Lucas drove away. Where did Michael Horrall say that they went? They drove straight to the back of that gas station, stopped by the dumpsters, prepared the heroin or what they believed to be heroin and injected it and then at 9:30 they arrived at the hospital. And you know that because Jeffrey Perkins said it was 21:30 hours when this car came speeding in with lights on, and he knew that something was wrong. That's the time line for this case. You've seen pictures of the Circle K. It was a Kangaroo back then. You know from the video that they went to the left side because at one point the screen said, left side pump. And you know from Michael Horrall where they went. Detective Wheeler did the best he could with this video. He knew that it was about to be copied over. He had to find some way to preserve it and so he did. And he even talks about, this is Mista, the best picture I could get of

him and so I paused it, and you could see who it was that got out of that car to meet with Lucas and his friends. In the beginning of that video, there is a moment when the driver of the Ford Explorer got out of that car, walked around to the dark car that was parked beside him and got into the passenger seat. Is it beyond the realm of possibility that that's when an exchange of drugs for money occurred? I wouldn't think so. As a matter of fact, I would think that that was pretty much the best place to do it when you're out in public in the privacy of one's own car.

Michael Horrall looked at this map and he said, yeah, we were over here on the left side of this and just drove straight back. Why? Because you know now that these were men that were desperate for heroin. They were desperate for a high and they weren't going any further than they needed to in order to get high. This is the gas station and this is where they went to the hospital. And you heard Michael Horrall talk about waking up, not understanding what was going on at first and then looking up from the back seat and seeing Rob slumped over and seeing Lucas slumped over and he knew something was wrong. And so they pull him into the back seat, climb into the driver's seat and drove as fast as he can to the hospital. And you know from Mr. Perkins that when they came into the parking lot

they were going fast, lights flashing, that something was very wrong.

What do you do with this business about October 21st of 2017? I would submit to you it's helpful for a number of reasons. Number one, it shows the pattern of Lucas getting drugs from Mista. Was this Lucas' only source of supply? Probably not. I don't know who else he got heroin from or fentanyl or anything else, nor is that my burden. But I do know that the Facebook records and the series of events show there were multiple times that Lucas was seeking out drugs from Mista. Nick had testified that they were together, that they went in to get heroin or that Lucas was trying to get it and that he did get it. And you heard from his testimony that Mista was a source of supply of heroin for Lucas. But you also don't have to take Nick's word for it. Lucas, 10/21/17, how much you got? Nick said, I got 50. Lucas responds, all right. Mista is selling tickets. These are the Facebook records that are included in that same Government exhibit that contains the messages between Lucas and Mista on November 19th. Remember, where you've got to read them from this side up. Hmu. Yo. what's up wya. Selma McDonald's wbu. And then they go on and Lucas says, I'm here. 10/23 at 1:01:49 UTC, because you've got to subtract five hours from that because it was daylight savings time, Chris Nesbitt responds, how

was it? But this shows the pattern between Lucas and Mista or Chris Nesbitt about getting or seeking drugs. Well, who is Mista? You've seen these Facebook records. We've talked a lot about it. And this is from Government's Exhibit 53 that you see the first and last name is Chris Nesbitt and it's attached to both of the names Mista and the name Shamel Nesbitt. You see from Government's Exhibit 55 that the drug business is something that Chris Nesbitt engages in. I'm sorry, you'll see on this exhibit that he goes by both Mista and by Pepsi. Do you remember Nicholas Johnson is the one that said I knew him by Pepsi but I heard Lucas refer to him as Mista. You've seen the pictures that were on Chris Nesbitt's Facebook page that helped Detective Wheeler identify who this was. And you see that this business of engaging in drug sales is not new. Looking for some smoke. Chris Nesbitt, I just ran out. What you need? Do you know where to get some percs? Nope. Let me get a birthday blunt. More to the point, Chris Nesbitt says, do you know anyone that needs some food? What do you now know food to be? You heard both Michael Horrall and Nicholas Johnson talk about there were a number of things they called heroin. One of them was food. They also called it boy. They called it molly. A gram for ten. How would Nicholas Johnson say that they would normally order heroin, by grams. Okay, give me a

minute. Bellamy, U straight yet?
Chris Nesbitt, nope, in two more days. Notice this is 10/19/2017. What happened in two more days? Lucas and Nicholas Johnson overdosed in Selma at the Wendy's parking lot. You can see these pictures side by side. The Kangaroo gas station and the still shot of Shamel Nesbitt in February of 2018 after he was arrested.

I would submit to you that it would be helpful to focus on the drugs in this case. Where does this lab report come from? Look at Government's Exhibit 10. Do you remember the big canister that the DEA chemist testified to. And those were drugs that were that were found on Robert Pernicaro on November 19th of 2017 in the hospital parking lot. So after Lucas and Rob arrived at the hospital, Rob was treated, regained consciousness and left against medical advice. And when he was in the parking lot they suspected he was trying to break into that red Ford Explorer so law enforcement responded. When they got there they asked him a number of questions including, do you have any drugs on you or any drug paraphernalia, and he voluntarily gave some over. And what he gave over were drugs I would submit to you there is evidence to believe that these are the drugs they were taking on November the 19th of 2017 that led to their death. You've heard a lot about heroin, how it works, so to speak, and you know that

if somebody had a bindle of heroin they weren't saving it for days and days. Also compare the drugs that are in the sample that the DEA lab tested to what was in Lucas Urbina's system when he presented to the hospital. There is one that's a little bit off that's not in there. And we just don't have evidence about whether or not it present in levels that the Office of the Chief Medical Examiner of Toxicology screened for or if it was just not present at all in that system. But to have cyclopropylfentanyl and heroin and to have the metabolite for heroin and cyclopropylfentanyl is substantial evidence that this substance is the same as what ended up killing Lucas Urbina.

Also consider the evidence that was found in this Defendant's home and in his car. You had the opportunity to see the weight for the scale that's used to calibrate weights that Detective Wheeler talked about as a way of getting accurate measurements. You saw the boxes, the three boxes of the glassine bindles stored right above the nitrile gloves. Why is that important? Because it's a way of protecting yourself. Detective Wheeler talked about how he never handled controlled substances without using those gloves because of the risk of exposure. Is it a coincidence that they literally are right under packaging material for heroin? Probably not. And then you've seen

what these bindles look like. We talked a lot about them in this courtroom, wax bags, glassine baggies and you have now had an opportunity to see them. And you've seen them because they are the bindles that were seized from Lucas Urbina's car. You can also look at them compared to the bindles that are on the outside of that plastic jug that the actual fentanyl is in. They are the same in color, shape, the weight. And the blood. I would ask that you focus on the blood. He had clonazepam, morphine, and cyclopropylfentanyl. And you have had an opportunity to hear Dr. Bishop-Freeman who certifies thousands of cases a year who testified that cyclopropylfentanyl was present in a level that was consistent with other individuals who had died of a toxic dose of cyclopropylfentanyl. And everybody agreed the level of clonazepam was a therapeutic level and in and of itself could not have killed you. Everybody agreed the level of the morphine was not a lethal or even toxic level. They would call it a therapeutic level but for the fact that it's an illicit drug. And that that standing alone would not have killed him. But Dr. Bishop-Freeman and Dr. Radisch were very clear that even if no other drugs had been present the level of cyclopropylfentanyl would have been a toxic, lethal, fatal amount for Lucas Urbina. And in fact even the morphine is reported in a less than amount, definitely not lethal.

You've also heard about cyclopropylfentanyl because it is a potent and toxic substance, that it's more potent than morphine, that it's very toxic and Dr. Radisch said it was the primary cause of death.  Could it have been accentuated by the clonazepam, yes.  And that does not go against the Government's burden of proof, but she was also clear that even if it had been alone it would have led to Lucas Urbina's death.

The Government has five elements to prove its case before you.  First, the Defendant knowingly and intentionally distributed a controlled substance.  Second, the Defendant knew that the substance distributed was a controlled substance analogue.  Third, that the substance had a chemical structure substantially similar to the chemical structure of a controlled substance classified in Schedule I or Schedule II.  Fourth, that the substance has an actual or intends to have a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than such effects produced by a Schedule I or Schedule II controlled substance and, fifth, that the substance was intended for human consumption.  So if you take those one at a time, first, that he knowingly and intentionally distributed a controlled substance analogue.  I will not go back through all of the evidence I submitted to you during the trial.  I

will again submit that those messages, the video, the time line of all of those events, this was not a mistake that this was given to Lucas. This was not an accident that it was given to him. This was knowing conduct. This was intentional conduct. And you know based on the records and the linking of Shamel Nesbitt that it was Shamel Nesbitt that distributed those drugs.

What's up with this guy Jordan? You've heard a little bit about him. You saw his name on the text messages. Could it be that Jordan is another source of supply of narcotics or was a source for Lucas? Maybe. But I didn't see Jordan on the Kangaroo video. Maybe, but I didn't see a bunch of Facebook messages on November 19th to Jordan. Maybe he was, but there is no evidence in front of you to support that on November the 19th of 2017, the day that we're here to decide, that Jordan is the one that sold Lucas --

**MR. TARLTON:** Objection to burden shifting.

**THE COURT:** Overruled.

**MR. TARLTON:** No evidence to support.

**THE COURT:** Of what?

**MR. TARLTON:** Burden shifting, shifting the burden of proof, Your Honor.

**THE COURT:** Disregard that. Go ahead. Go ahead with your closing.

**MS. WILSON:** Thank you, Judge.

Second, the Defendant, Shamel Nesbitt distributed what was a controlled substance analogue. There are a number of ways that the Government can prove it. So you're going to hear a jury instruction that talks about all the ways we can prove it. One of the ways is he knew he was distributing a controlled substance. Another way is that he knew what the effects of this drug were. And the Government would submit that when he is surreptitiously selling narcotics so this was not an open business that he was advertising. This was something that was done surreptitiously. He knew this behavior was illegal. This was something that was not done out in the open. This was not done in front of a lot of people. There is not one person who could say, well, I saw the drugs shift from Shamel Nesbitt to Lucas Urbina. That's intentional. Nobody wants that to be out in the open. And that is one of the way that you can prove or the Government can prove that he knew that this was a dangerous and deadly drug, that it had the effects that were similar or greater to the drugs he was selling or that he believed that to be a controlled substance. You can also consider the way it was packaged, packaged like heroin. The gloves at his home for personal protection.

Third, the chemical substance, the substance of a

chemical structure substantially similar to a controlled substance under Schedule I or Schedule II. Carlos Diaz from DEA testified about the chemical structure and that fentanyl is a Schedule II controlled substance. Dr. Bishop-Freeman has testified that the only molecular difference between cyclopropylfentanyl and pharmaceutical fentanyl was it was off by one carbon. And she said it is similar to cyclopropylfentanyl. And I would submit to you that when they are off by one carbon that this is a substantial similarity to fentanyl. She also testified about how it impacts the body which goes to your next element. But Dr. Radisch also called it a slight change in the molecular structure between fentanyl and cyclopropylfentanyl. They both testified that as of today that cyclopropylfentanyl is an analogue of fentanyl, and they called it an analogue throughout the course of their testimony.

And, fourth, that the substance has an actual or intended effect to be or a claimed effect to be a depressant or hallucinogenic of the central nervous system that is substantially similar to or greater than such effects produced by a Schedule I or Schedule II controlled substance. Dr. Bishop-Freeman testified that it has a depressant effect on the central nervous system and that it is substantially similar to fentanyl.

You have heard some discussion about how many studies were in human beings. Not a lot. Why? Because it's fatal. Why? Because it has no medicinal use, and even Dr. Meggs had agreed with that.

And, fifth, that it was sold or that it was distributed and it was intended for human consumption. This was not something that was given to Lucas with the disclaimer, don't ingest this. It was clear what Lucas wanted. It was clear what he was looking for, and Mr. Nesbitt was happy to get it for him.

So if you find that Shamel Nesbitt distributed this controlled substance analogue then your next step is to determine whether or not it caused the death of Lucas Urbina. The Government does not have to prove that he knew it would cause death or serious bodily injury. The Government does not have to prove that he intended for it to cause death or serious bodily injury. In fact, he probably didn't want it to cause death because he had a client relationship with Lucas that would end upon his dead. There was no more getting money from Lucas if he was dead. To be clear, this is not a homicide. This is not a first degree murder case where we are seeking to prove premeditation and deliberation. He probably did not intend the death of Lucas. But we don't have to prove that. Also, we don't have to prove that it was directly

transferred to Lucas. And so if you believe that Shamel Nesbitt gave it to Richie Rojas who then gave it to Lucas, that's sufficient so long as you understand or that you are fully committed and entirely satisfied that the drug was distributed by Nesbitt eventually led to the death of Lucas Urbina. I believe that's what happened. I think the evidence supports that Mr. Urbina got out of his car, got into Mr. Nesbitt's car and a drug deal took place. But even if there was another prong in there, that would not negate the evidence that's before this jury. Does that mean that somebody else might be in trouble? Maybe. But that's not today. Might that be for another day? Maybe. But this trial is solely about Shamel Nesbitt and nobody else is on trial, even if somebody else should be.

What is the Government's burden of proof for cause of death. The Government does not have to prove that there is an independent, independently specific cause for Lucas' death, although I would submit to you that Dr. Bishop-Freeman and Dr. Radisch were really clear that these levels of cyclopropylfentanyl could independently have led to his death. The 3.3 nanograms per milliliter were comparable to other people that had overdosed and died from cyclopropylfentanyl. But we don't have to show that it's but for, which means would he have lived without that substance. We have to prove that without this substance

that that harm would not have occurred. So the question is could he have survived without the cyclopropylfentanyl or if he only had the other drugs in his system would he have survived. Both Dr. Bishop-Freeman and Dr. Radisch were very clear that the level of clonazepam and the level of morphine would not likely have been fatal, that it was the addition of the cyclopropylfentanyl that led to Lucas' death. Does it matter that 7-Aminoclonazepam was in his system and that clonazepam was in his system? Well, of course. It wasn't helpful, right? It could have put him over the edge. It could have been the additional factor that led to his death. But that alone would not have killed him. Those two things combined were still at a therapeutic level. Cyclopropylfentanyl that's highly toxic, no surprise that the testimony was 3.3 nanograms per milliliter. Even according to Dr. Meggs it was well within the range of people that had died after using this substance. And, morphine, again, it was reported in the less than .020 milligrams and would not have been fatal by itself. We have seen that he had a prescription for clonazepam. Should he have been taking it with opiods? Well, no, but he shouldn't have been taking opiods at all, right? But the question is not was this what sent him over the edge but what was the toxic and fatal drug, and that was cyclopropylfentanyl.

The Judge is going to instruct you that even if you find that that cyclopropylfentanyl combined with other drugs caused the death of Lucas, you may still conclude that the cyclopropylfentanyl is a but for cause of death as long as you find the other drugs alone could not have caused his death.

Ladies and gentlemen, I would submit to you that every element of our case has been met beyond a reasonable doubt. And I would ask that when you go back and deliberate that you find him guilty of the distribution of cyclopropylfentanyl and you find that it led to the death of Lucas Urbina. Thank you.

**THE COURT:** The jury can be with the Defendant for closing argument.

**MR. TARLTON:** Thank you, Your Honor.

CLOSING ARGUMENT BY MR. TARLTON

I heard from the Government's closing words and phrases like within the realm of possibility, probably, things of that nature. That can never convict anyone in our country. Probably, maybe, of any crime. The governing principle, the high standard of law is proof beyond a reasonable doubt as to every single element that they've shown you that they have to prove, and every single element the Court will tell you they have to prove beyond a reasonable doubt. Possibilities and maybes do not rule out

other reasons and logical points that cast doubt on the guilt of anyone here. Because, again, you're not asked to go so far as to declare innocence. You're asked to determine have they proven their case beyond a reasonable doubt as to everything they have to prove. And it's something that's a high burden, incredibly high burden and has served our country really, really well, and it works properly for so long. It differentiates our country from tyrannies and dictatorships and other less advanced societies. It's what protects innocent people from wrongful conviction. I can't thank you enough and everyone else in this courtroom can't thank you enough for taking the time out of your lives to come in here and listen carefully to everything that has been presented and listen carefully to all the arguments. You were selected because we knew that you would do that.

I said at the beginning of this case it's incredibly tragic. What happened to Lucas Urbina is absolutely a tragedy. His death is a loss to the community. But what's equally tragic, and I said this before, is that your peers and people around his age and his life are living absolutely fast and loose, and you heard it from them on the stand. They're living fast and loose with drugs. It consumed their lives. That's what they were pursuing, chasing whatever they could to get on it. And the

Government has not shown or proven, especially not beyond a reasonable doubt that what the people who testified and the people referenced by the people who testified who are part of the drug consuming and drug distributing world that they were in had clear lines between dealer and seller, addict and supplier. That an addict can supply and a supplier can be an addict. In other words, there's a big picture to think about when you think about all the details in the cases you've heard. Why is it that Michael Horrall couldn't have sold or distributed? Why is it that Robert Pernicaro couldn't have sold or distributed that night, that day. Why is it that Richie Rojas could not have sold or distributed? Why is it that Jordan Dickerson could not have sold or distributed? What have they done to rule out logical, reasonable possibilities that as to the one, the only charge that Shamel is on trial for is distributing this cyclopropylfentanyl on November 19th. It's a single count. Why is it that of all the drugs being discussed is that there's only, that they're saying the only conclusion that can be reached is it had to be Shamel. It could have been anyone else. Everything you heard. He's not -- and we said this at the beginning, he was caught with marijuana months later. And frankly he was selling marijuana. The messages show marijuana transactions, things of that nature. He's not on trial here for marijuana. And you

heard that Lucas and his friends and peers were marijuana users as well.

Our system we have no burden to prove anything. And I know it's an emotionally charged case, but ever if you guys in your deliberations have the temptation to say, well, if the defendant had just shown me this or proven that, you can't go there. Our system doesn't allow for it. That's part of your oath as a juror. The only place where you can look for evidence to answer your questions is this table, the prosecution. And so take a step back. Another logical point of that, that the defense has no burden of proof in a criminal trial in our country is also the constitutionally sacred right that someone on trial, anyone on trial does not have to testify. It cannot be held against them if they do not go on the stand and testify about the accusation. No burden of proof on the defense and the sacred right of anyone who is accused of a crime in our country to not testify. These are things you have to honor in your deliberations even though it is a weird concept. I mean proof beyond a reasonable doubt, that's not how we go about making the most important decisions in our life nor to resolve the most important disputes that we encounter in life. And what I mean by that is like when you think about the big things in life like are you going to start working a trade or job after high school or are you going to go to

college, you don't think about like beyond a reasonable doubt is that something I want to do. When you get out of school what kind of career you might want to pursue, you don't think about that beyond a reasonable doubt. Whether to get married or not, whether to have kids or not. You know, none of the major decisions we make outside the courtroom really have that concept. And also when we think of disputes and things we have to resolve in every day life we think of -- like we want to hear from everybody too, every side of the story. In our courtroom to protect liberty only the prosecution can be looked to for providing the evidence that you want to see to resolve the questions, to see in your deliberations that they have proven everything by proof, in this case the distribution of a particular substance on a particular day beyond a reasonable doubt. Again, I can't state enough how important it is if there is any temptation to say the defense should have shown this or proven this, you can't go there.

This is also a case where the Government is allowed to try to pursue and convict somebody only on a circumstantial evidence case. This is a case where they don't have direct evidence. A sobering thing to think about in a circumstantial case, and this is why you've got to carefully weigh everything and it's so important. It's the

only kind of case they can try in the country where in theory every witness can get on that stand and tell the truth and yet an innocent person could still be convicted.

**MS. WILSON:** Objection.

**THE COURT:** Overruled.

**MR. TARLTON:** Direct evidence, that's where somebody comes in and says as to the crime charged, I know that person -- this is an example of direct evidence. I know that person, I was there, I saw it happen, I saw him do it. That's not in this case. We know that. The Government is absolutely entitled to try to pursue a conviction without direct evidence. They can try to convict on circumstantial evidence and you'll likely hear jury instructions on that. But think about, just think about how careful you have to be in reaching your ultimate decision in this case as to what my client, what Shamel is charged with. Going back, Michael Horrall and Nick Johnson were the two people that were closest to being, you know, eyewitnesses, and you heard from them. They did not identify Shamel as the person who distributed a substance right before or soon before Lucas went to the hospital on November 19th. They didn't do it. And frankly, they explained why, and it was absolutely believable. They were loaded on too many drugs to really know what was going on. And so from there what Detective Wheeler understandably did, he tried to find

ways, other ways, to figure out if they could identify a dealer or a person who was distributing this substance, this cyclopropylfentanyl soon before Lucas went to the hospital I think around, on November the 19th around 9:00, it was around 9:40 p.m.. And, again, it's the Government's burden to show you the time line in this case, and you've got to think about things like when they had other messages that are UTC time before daylight savings time subtracting five hours and things like that. That's, again, their burden to present to you to prove a coherent time line in order to even attempt to meet their burden to get a conviction in this case. But, the point being, they showed a video, a video that frankly was so blurry. I mean you guys are the sole deciders or triers of the facts in this courtroom. A red Explorer or a car or SUV is in this video. The detective didn't -- knew there was a problem with the time stamp in the video. They didn't call to the witness stand to explain how the system works or the problems with it from the store. Again, an inference you can draw on why didn't they do that? Because the testimony wouldn't have been good for them. This is a low quality video. It was a video that only captured -- a video of a video that only captured certain parts of the scenes, not all of the scenes. In other words, there were nine -- at points there were nine camera screens. They only zeroed in

on certain parts and not record the other parts. And part of their problem is waiting that long. They knew about the camera situation, and they waited more than a week to try to begin to secure it. That's a substandard investigation, frankly. And it cuts into their case and what they're seeking to do here in the courtroom.

But the point being too, no one is clearly identified in that video. That's just reality. And, frankly, it didn't detail -- the black gentleman that appears on the screen, frankly appeared to be much more broad shouldered that my client. But beyond that, that other kind of techniques they have today to say that somebody is at a location at a time. We talked a little through questioning about this. Cell phone records they can put somebody in the vicinity or, you know, through GPS in the cell phone they know a location within meters of a specific place. None of those efforts were made here to do that and say, okay, we have an African-American gentleman in the gas station. This time stamp period. Let's go ahead and figure out from the cell phone location records. Is this person, when we look at his cell phone records, are they there? They don't make that effort, because, why? One inference is it would have resulted in some information that would have undermined their investigation into a particular suspect and may have led elsewhere. Does that

resonate -- oh, one more point on the video, too. Again, it is absolutely speculation that the other car next to this SUV is clearly a black car. I mean you're allowed to look at the exhibits. The light on the hood reflects has a reddish hue. I can't say it's a red car, but that's not my job. The point is they've got to rule out that it is any kind of car other than what they said believed to be a black car because a month later, February of 2018 stopped my client in what they said to be a black Dodge Dart. And I believe, again, your memory controls, not what the lawyers say, that a black Dodge Dart was a registered car that my client regularly drove anything like that but the point being, you cannot, absolutely not connect some other car in that video to my client, absolutely not. Then we go -- this idea that for them to carry their burden and get the conviction that they seek in this case, the prosecution, that it just couldn't have been any other person they saw or got in this truck. And what have they done to rule out that my client really was involved in something far more (inaudible) and as to this particular charge beyond, say, marijuana. We know that Michael Horrall and Nicholas Johnson testified about just in general having their own supplier. They never said that Shamel was one of their particular suppliers. They never, the police never got their phone records to see exactly who

people like Michael Horrall or Richie Rojas or Robert Pernicaro or any other people mentioned who they're dealing with or whether they're dealing themselves. Jordan Dickerson was especially illuminating because he or at least this same Jordan appears on two key dates so far in this case that they tried to put on my client, the actual charge date of November 19th. Jordan is then in the flip phone again a week later that they only did screen shots of it, not an actual full extraction, Jordan is in that. And they don't even interview him. Jordan is also in Facebook messages that Detective Wheeler confirmed and under cross-examination from the other date of an overdose that they made a lot of hay about which was when Lucas overdosed on October 21st that Jordan is actually somebody that the messages appeared to show that Lucas is trying to meet up with even closer in period of time to when Lucas and Nick overdosed. Again, to not even talk to Jordan Dickerson, what is going on? I think we heard some illusions to that from Nick Johnson who said, I had a hard time buying because I'm white and I'm not -- I'm from a good family, things of that nature. We're talking about a small community and, you know, people are related, they're connected. The kids of parents who matter in the community are being investigated for essentially drug homicides, death by distribution, that's going to be very upsetting.

It's going to be very tumultuous. It's going to be very chaotic for a small community. You know, investigators are humans. It appears to be that there was a hesitancy to investigate people. You can decide the motive as to why people weren't investigated. But if there is a sub-theme of this that essentially everyone is entitled to equal protection of the law in the courtroom in that no one is above the law and no one is beneath it. And that this, the reality is this was not and was far from a thorough investigation of all -- to other people that very well could be responsible, could be the person that distributed exactly what my client is charged with distributing. That under all their evidence it's still consistent that my client dealt in nothing more than marijuana in this time frame. And I think it is also important Detective Wheeler noted that Lucas' mom, when he met with her, again about a week after Lucas' death, that she gave him other -- not just Jordan's name as someone that should be talked to, but also Lucas' ex-girlfriend, Danielle Reed, that she would know a lot about what's going on and who the suppliers might be. That's the inference. That's what they were trying to find out. And there were no signs that she was talked to, for example.

And then we have to think about, you know, a lot of evidence that they used to try to tie Lucas to Shamel dealt

with Facebook and that Lucas was messaging with other people on Facebook. Even then it was important evidence to get Lucas' phone. But what became apparent was Lucas was not using that flip phone to actually communicate with people with Facebook Messenger app. And the communications clearly that that's not in the comfort of a home. It's out and about on the town in different places and things like that. In other words, Lucas was certainly using another device. They never explained why they weren't -- whoever -- you know, find that device and everything that's on it from all the people that were in Lucas' life to wherever that device might be. Again, clear signs that there is some other device out there. No explanation for what efforts they wanted to do to pin that down. That is another woefully inadequate aspect of the investigation that, again, it leaves way too many possibilities that somebody else supplied specifically that's the only issue at trial in this case.

Now, it's a natural understanding for why when you start thinking about the calls and that analysis and that issue, why they didn't apparently do testing for marijuana use by Lucas. But that's important to rule out my client as a marijuana dealer, wouldn't you think, especially when witnesses are saying that they all still use marijuana. If you want to rule out a marijuana dealer as that being a

explanation for why he might have had interactions with Lucas during this 2017 time frame. Wouldn't you want to confirm that this is the person we spoke to who is the subject of an indictment for a death didn't have any marijuana in his system. If he did have marijuana in his system, that might have actually showed that that was the interaction between him and otherwise the person known to have sold marijuana. Again, think about the lack of corroboration as to actual heroin and fentanyl in this case. They didn't send in -- they had the ability to wire informants and try to do a drug buy off a suspected dealer. They talked about that. They didn't do that in this case. They had months to try to investigate. They didn't do that. If they wired someone and try to get him to buy heroin off of him, that might help corroborate their claim that my client sells heroin and fentanyl. He didn't do that. Again, one wonders if they didn't want to know the answer, so they didn't try.

Then in the car when they pulled it over they find marijuana. No signs of any big amount of cash or anything like that. They search his house and what do they find, scales. They don't test it for residue to if it was heroin or fentanyl or anything like that. The bags that they tried to claim could only be related to heroin, nothing else, or gloves, that sort of same thing. No testing for

residue to see what kind of drug it comes back to. They find marijuana in the house. Again, this is an absolute -- you know, there were plenty of opportunities to try to further corroborate this idea that he is more than a marijuana dealer and he sold a specific drug or an analogue drug or, you know, this exotic thing on November 19th.

You know, another thing -- so we get into the toxicology report. One thing I would point out too is you did not hear any evidence, nor could you have, I don't think that the drugs in Lucas' system, that the blood test showed exactly when they entered the system. They didn't say that the Klonopin was taken at the same time as the morphine or heroin or the same time as this fentanyl. In other words, they don't know exactly -- he could have gotten from one source heroin and ingested that earlier in the day, at some other point he ingested the Klonopin and then later the fentanyl. Again, suggesting that there could be multiple suppliers in play here, not just, again, the prosecution theory requires you to ignore a lot of possibilities of other suppliers involved with Lucas even on that day alone. And then, again, cause of death. I think in some of their slides they were saying ultimately seeking out, that under the -- and you'll hear from the Court, sort of the demanding standards under the law for proving causation for that special verdict form to find the

second question, whether or not you find him guilty -- let's assume you get to the first question, you get to the second question whether or not the legal cause of death was just fentanyl. And a big point that they tried to make was, well, the fentanyl alone killed him. Well, the actual cause of death certificate that's entered that they put on the slide show didn't say that. It said combination of the fentanyl with the clonazepam toxicity. Which actually went pretty well with what Dr. Meggs told you about black box warning from the FDA, highest level of warning in the -- that they can give, which is if you mix even therapeutic or non lethal amounts of opiates with fentanyl or heroin or codeine and other opiates that were discussed, with even an otherwise non lethal amount with any amount of benzodiazepine, you have a risk. It's a synergy. It's like they can combine and the combination creates a toxicity that otherwise wouldn't exist. The point being is even the Klonopin wouldn't have killed him on its own, when used and taken with any opiate, even a therapeutic amount, that can kill you. And so even if you take fentanyl out of the equation, there's morphine or heroin in his system. The heroin is an opiate and combined with the Klonopin that alone can be toxic. And, again, we don't have to prove that the fentanyl did not cause his death. They have to prove under the demanding high standard of law beyond a

reasonable doubt that it did. And Dr. Meggs alone, someone who works in a hospital and teaches in the field of toxicology, adequately explained enough to cast any doubt, a reasonable doubt, a logical doubt on the causation in this case, that the studies rely on everything cast doubt on this idea that the fentanyl taken here definitely would have killed him. In fact, Dr. Meggs was saying -- the point is we don't have to prove that the fentanyl -- we have no burden of proof. It's just that Dr. Meggs' testimony alone injects reasonable doubt, actually throughout their causation and death acts of the (inaudible) that they are seeking here.

This is -- they have a right to reply. I don't have a legal right, a legal law to come back up here and have one last word. It doesn't work that way. This is the last moments I have to speak to you, so I just want to leave you with this. There is no actual definition of beyond a reasonable doubt in the Federal court system. All I can say is if you -- by analogy the Government's case is something like a boat where if you want to take it on the open water you absolutely want something reliable that's not going to sink. What they're asking you to do is take a paper voyage to a conviction. And what I want to say is when you think carefully about everything, all the other possibilities based on logic and everything they haven't

ruled out, there are holes below a reasonable doubt below the water line in this ship, this boat that they are trying to get you guys to go on. And we don't convict in America on anything less than beyond a reasonable doubt despite any emotional temptation in a highly tragic case like this. I ask you to acquit Shamel Nesbitt. Thank you.

**THE COURT:** All right. The jury can now be with the Government for rebuttal.

REBUTTAL BY MS. WILSON

Thank you, Your Honor, may it please the Court. Circumstantial evidence. You're going to hear actually a jury instruction from His Honor that talks about there is no difference between direct and circumstantial evidence in terms of the weight it is to be given. There are hundreds of cases that are proven by circumstantial evidence. Imagine a bank robbery where somebody is wearing a mask. There can never be somebody that can stand up in court and say, that's the man that robbed the bank. In that case they can go on circumstantial evidence. Circumstantial evidence is a set or a series of facts that when you put one together over another proving a case. And that's what we've done here, from the Facebook messages to the video where they met to the testimony of the witnesses that were there that day and had interaction with the other people that were involved in this. What do you make of Michael

Horrall. He came in and testified. You had an opportunity to see him. You saw how he behaved on the stand. You saw how he answered my questions. The question is, do you find him credible? Do you think that he was giving you accurate, factual information. The Judge is also going to instruct you that with any witness, whether it's law enforcement, experts or lay witnesses you can believe some, all or none of what they have to say. But what Michael Horrall said lined up with the likes of the evidence. It lined up with that they were four men together seeking to use heroin, that they found heroin that night. That it was Lucas' connect that came through. That they didn't deal with Lucas' connects. That heroin or what they believed to be heroin was distributed among the four of them. They were all sharing it and that all of them overdosed. Now Michael said that Richie was not using. Maybe it's because he's the only other person in that car that's still alive. Because as you've heard, Robert Pernicaro is dead. You know from the course of this trial that Lucas has died. And Richie is the only one that remained out there. It would be difficult to believe that Richie Rojas sat there for upwards of an hour watching his friends overdose. Is everything that he said to you credible? I don't know. You can be the deciders of that. But substantially what he was saying to you supports the other evidence in this case.

The only person that Lucas was focused on that night after he got in touch with this Defendant was this Defendant. The only person that he was texting and messaging over and over that reflects the desperate nature of how badly he wanted to get in touch with Mista is reflected in all those messages that go back and forth.

There's nothing wrong with circumstantial evidence and in fact that's as good as it gets in a lot of cases. Surprisingly enough not a lot of drug deals happen in front of a group of nuns who can come in and say, well, that's the guy that did it, and I have perfect recollection because I was not impaired that day. I don't have a criminal history. It should not be stunning that these are not the witnesses that are on the stand. The Government doesn't get to pick the witnesses. Detective Wheeler doesn't get to pick the witnesses. The Defendant picks them. The Defendant picks them by who he deals with and who is around at the time.

I understand that the video and the camera was blurry. I understand that that's just how it is. It's not by virtue of how Detective Wheeler videoed it or tried to preserve it that made it blurry. You can see on the screen it was just a blurry video. The video is not designed to capture every single thing that happens. It's designed to help make it safer. And when Detective Wheeler began to

worry that that piece of evidence was going to disappear forever, he did the best that he could. Is it the case cracker, no. Is it a part of this case that builds upon other cases that leads to the determination that we have proven our case beyond a reasonable doubt, yes, it is. Detective Wheeler has been under attack a little bit about how he conducted his investigation. He didn't even learn that Lucas had died until the 27th. Lucas passed away on the 22nd and while he knew his death was inevitable, he didn't really know that that had happened until the 27th. And so already he's struggling to make up time during the course of that. Detective Wheeler also testified that when he arrested Mr. Nesbitt he gave him an opportunity to make a statement to him. And at first there was in fact denial of selling Lucas anything. And then later conversation after Mr. Nesbitt said I want to take to you, he continued to make statements. And what did he say? Was it the only black guy that was there? Well, how would he know he was there? How would he know there was only one black guy there unless he was there. When he said later when he admitted to seeing Lucas that day but not selling to him, that's also inconsistent with his earlier statements.

I want to talk about a couple of things that the Government does not have to prove. Why did the others live? If everybody took the same substance, why did they

live? I don't know. I don't know, and that's not my burden of proof. I have to show you that this is the man who distributed cyclopropylfentanyl, that it's an analogue and that it led to Lucas' death. Did Lucas get drugs from other people, probably. I'm sure he had multiple sources of supply. The question is are you thoroughly convinced and entirely satisfied that on November 19th of 2017 it was this Defendant who he was getting drugs from and not Jordan or anybody else. Did he get them from other people on a different day? Probably, but that's not my burden. My burden is to show you what happened on November 19th of 2017. Who were those people? I don't know. Again, not my burden of proof. The question is, has the Government convinced you beyond a reasonable doubt that on November 19th of 2017 the drugs that killed Shamel Nesbitt or killed Lucas Urbina came from Shamel Nesbitt. Who else might Rob have been calling to get drugs. I have no idea. Again, not my burden. You have to be convinced that Shamel Nesbitt distributed the drugs to Lucas that killed him but if Rob was calling other people, that's not my burden of proof.

Then there's this whole question about addiction. The defense attorney called it like running fast and loose. Do I have to prove to you is that a choice or is that an illness? I don't. I think reasonable people can disagree

about addiction, where it starts, where it leads, how you can get it under control. Again, not my burden.

You've heard a lot about, well, surely they could have done controlled buys. Well, you heard Detective Wheeler answer that. And he said, I would have loved to have found somebody that could do it. I don't have to prove that he's the biggest drug dealer in Smithfield. I don't have to prove that he was selling to 800 people a day. I only have to prove that he sold the cyclopropylfentanyl to Lucas Urbina on November 19th of 2017.

So what about lingering questions about Lucas? He was an addict. He was seeking out drugs, and he struggled with that for a long time. And some of you may be sitting there thinking, I don't know, Ms. Wilson, I don't know if we hold people responsible when somebody overdoses. And it's not my burden to change your mind about that, and I'm not going to try it. But you've taken an oath to follow the law as His Honor is giving it to you. And so when you stand by the oath then this question about do I think that this law is wise can be left for another day. The evidence in this case supports every element of the burden of proof. Dr. Meggs has testified in a way that was not inconsistent with Dr. Bishop-Freeman or Dr. Radisch. He testified in his opinion that Lucas died from a combination of cyclopropylfentanyl and colazepam, clonazepam. And that's

not inconsistent with what Dr. Radisch or Dr. Bishop-Freeman said. But they were really clear that but for the cyclopropylfentanyl, Lucas would have likely lived, that the other drugs were not in sufficient quantities to kill him. It doesn't have to be the only drug. It doesn't even have to be the only drug that leads to his death. It just has to be the but/for drug. And if he had just had a low level of morphine in his system even combined with the clonazepam he likely would have survived. Does Lucas bear responsibility? Of course. But he got the death penalty. Follow the law. Find him guilty.

## JURY CHARGE

Ladies and gentlemen, now that you've heard all the evidence as well as the arguments by the lawyers, it's my duty to give you instructions on the law. In a jury trial there are in effect two judges. I'm one of the judges. The other is the jury. It's my duty to preside over the trial and to determine what testimony and evidence is admissible under the rules. It's also my duty to give you instructions on the rules of law at the end of the case.

You are the judge of the facts. In determining what actually happened in this case in reaching your decision as to the facts, it's your sworn duty to follow the law as the Court advises you. You must follow all the instructions. You have no right to disregard the law or pay special

attention to one phase of it. You must not substitute your own opinion of what the law is or ought to be. It's your duty to apply the law as the Court presents it. It's also your duty to base your verdict solely upon the testimony and the evidence in the case without any prejudice or sympathy. That's the promise you made and the oath that you took before you were accepted as a juror in this case. As stated earlier, it's your duty to determine the facts and in so doing you must consider only the evidence that's been admitted in the case. The term evidence includes the sworn testimony of witnesses and any exhibits that are admitted into the record or other visible evidence. You will recall that the statements, objections and arguments made by the lawyers are not the evidence in the case. The lawyers have an important duty to point out those things that are most significant or helpful to their opinion or side in the case and in so doing to call your attention to certain facts or inferences. In the final analysis it's your own recollection and your interpretation of the evidence that controls. What the lawyers say is not binding on you. If during the course of the trial I occasionally made any comment or asked any question you are not to assume from that that I have any opinion as to the outcome of the case. I don't. Except for my instructions to you on the law you should disregard anything I may have

said in arriving at your finding as to the facts.

In so doing you may consider all the evidence in the case. You are permitted to draw such reasonable inferences from the testimony and exhibits that you feel are justified in the light of your experience. You can make such deductions and reach such conclusions that your reason and your common sense leads you to draw from the facts that have been established by the testimony and the evidence in the case.

You may consider both the direct and the circumstantial evidence. Direct evidence is the testimony of someone who asserts an actual knowledge of some fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating either the guilt or the innocence of the defendant. The law does not make a distinction between the weight to be given to either direct or circumstantial evidence. It requires only that you weigh all of the evidence and that you be convinced of a defendant's guilt beyond a reasonable doubt before that person can be convicted.

Now I have said that you must consider all of the evidence. This does not mean that you must accept all the evidence as true or as accurate. You're the sole judge of the credibility or believability of each witness and the

weight or importance that you wish to place on a witness' testimony. In weighing the testimony of a witness you may consider that person's relationship to one side or the other in the case, the interest the person has, if any, in the outcome of the case, a person's manner of testifying, a person's opportunity to observe and acquire knowledge about the facts that the witness testifies to. A witness' candor, fairness and intelligence and the extent to which what the witness tells you is either supported by or contradicted by other believable evidence in the case. You are permitted to accept or reject the testimony of any witness in whole or in part.

A witness may be discredited or impeached by contradictory evidence or by showing that the witness testified falsely concerning an important matter or by evidence that at some other time the witness has said or done something or has failed to say or do something which is inconsistent with the witness' present testimony.

You're here to determine the guilt or innocence of the defendant from the evidence in this case. The defendant is not on trial for any other act or conduct or offense not alleged in the indictment. The matter of punishment that the law allows that is provided for any offense charged in the indictment is a matter left within the authority of the Court and should not be considered by you in any way in

arriving at your impartial verdict as to guilt or innocence.

The term knowingly as that term is used in the instructions means that an act is done voluntarily and intentionally and not because of mistake or accident.

The indictment or charge against the defendant is not evidence of guilt. The defendant is presumed by the law to be innocent. The law does not require a defendant to prove his innocence or to produce any evidence at all. The Government has the burden of proving a person guilty beyond a reasonable doubt and if it fails to do so, you must find the person not guilty. While the Government's burden of proof is a strict or heavy burden, it is not necessary that a defendant's guilt be proved beyond all possible doubt. What is required by the Government's proof is that it exclude any reasonable doubt concerning a defendant's guilt. If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, it would be your duty to say that. On the other hand, if you are not so convinced, it would be your duty to say that.

Every defendant before the Court in a criminal case has the right to refrain from giving testimony of his own. The law does not compel a defendant in a criminal case to take the witness stand or to testify. If a defendant elects to exercise that right it is your absolute

obligation to draw no inference of any sort from the fact the defendant has not testified. You are not to speculate why a defendant did not testify or about what the defendant may have said if he had testified. You are to confine your deliberations exclusively to the question of whether or not on the evidence actually before you the government has established beyond a reasonable doubt the guilt of the defendant. I repeat, you must not permit the defendant's decision not to testify to influence you in any way. The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence. That burden is with the Government throughout the trial.

I told you a few minutes ago in the trial that the verdict form says, We, the jury find the Defendant Nesbitt as to the indictment (A) of distribution of cyclopropylfentanyl on or about November 19th, 2017 and a line for not guilty or a line for guilty.

And then (B) that the cyclopropylfentanyl caused the death of LU, the victim in this case. And a line for not guilty or guilty. When you've reached your unanimous verdict, you will fill in those questions, and that will be your verdict.

The indictment charges that on November 19, 2017 in this District the Defendant, Mr. Nesbitt, knowingly and

intentionally distributed a mixture and substance containing cyclopropylfentanyl, a fentanyl analogue, a Schedule I controlled substance and serious bodily injury and death of a person resulted from the use of that cyclopropylfentanyl in violation of Title 21, United States Code, Section 841. That law makes it unlawful for any person knowingly or intentionally to distribute a controlled substance.

In order for the Government to sustain its proof for the crime of distribution of a controlled substance analogue as charged in the indictment, the Government has to prove the following five essentials beyond a reasonable doubt: First, that the Defendant knowingly and intentionally distributed the controlled substance analogue as alleged in the indictment. And, second, that at the time of distribution the defendant knew that the substance distributed was a controlled substance analogue and, third, that the substance has a chemical structure substantially similar to the chemical structure of a controlled substance classified under Schedule I or Schedule II. And, fourth, that the substance has an actual, intended or claimed stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than such effect produced by a Schedule I or Schedule II controlled substance. And, fifth, that the

substance was intended for human consumption.

To distribute means to deliver or transfer or attempt to deliver or transfer. The term deliver includes the sale of something by one person to another.

It's not necessary that the Government prove that the Defendant knew the precise nature of the controlled substance that was distributed. The Government must prove beyond a reasonable doubt that the defendant did know that some type of controlled substance was distributed. The Government may show a defendant has knowledge the substance was a controlled substance under the Controlled Substance Act or the Analogue Act in any of the following ways. First, that a defendant has knowledge that a substance is an analogue when the defendant knows that the substance was controlled under the Controlled Substances Act and Analogue Act even if the defendant does not know the identity of the substance. Second, a defendant also has knowledge if the Defendant knows the specific analogue with which he was dealing even if he did not know its legal status as an analogue. The defendant knows the specific analogue with which he is dealing when the defendant possesses a substance with knowledge that the substance has a substantially similar chemical structure to a controlled substance and that it produces substantially similar effects on the user of the controlled substance. The

Government need not show that the defendant had knowledge of the existence of the Analogue Act to find that the defendant possessed the requisite knowledge.

The law provides in part that distributing a controlled substance is more serious if death or serious bodily injury results from the use of the substance. The term serious bodily injury as used means bodily injury that involves a risk of death, a substantial risk of death, protracted and obvious disfigurement or protracted loss or impairment of a function of the bodily member, an organ or mental faculty.

The indictment charges that death or serious bodily injury resulted from the use of the controlled substance distributed or caused to be distributed. I have defined for you the elements of the indictment. If you determine that the defendant did distribute the cyclopropylfentanyl in violation of the law then you must determine whether the Government has proved beyond a possible doubt that the death resulted from the use of the cyclopropylfentanyl as alleged in the indictment. A special verdict form has been provided to you to answer this question. You may select answer yes to only one of two options in the special interrogatory. The Government need not prove that the defendant knew his distribution of the controlled substance could result in death of another or serious bodily injury

to another. The Government need not prove that the defendant intended to cause death or serious bodily injury knowingly risked these consequences or that these consequences were reasonably foreseeable.

The Government need not prove that the defendant intentionally transferred cyclopropylfentanyl directly to Lucas Urbina so long as the prosecution proves beyond a reasonable doubt that the cyclopropylfentanyl transferred by the defendant is the same substance that later resulted in the death of Lucas Urbina.

For you to find that a death resulted from the use of the cyclopropylfentanyl as alleged in the indictment, the Government need not prove that the cyclopropylfentanyl distributed by the defendant was an independently sufficient cause of Lucas Urbina's death. Instead the Government must prove beyond a reasonable doubt that the cyclopropylfentanyl distributed by the defendant was a but for cause of Lucas Urbina's death. But for causation requires proof that the harm would not have occurred in the absence of defendant's conduct. In other words, the Government must prove beyond a reasonable doubt that if Lucas Urbina had not used the cyclopropylfentanyl distributed to him by the defendant he would not have died on November 22nd, 2017. In this regard even if you find that the cyclopropylfentanyl combined with other drugs to

cause the death of Lucas Urbina you may still conclude that the cyclopropylfentanyl is a but for cause of the death as long as you find that the other drugs alone would not have caused the death. In other words, even if you find that the other drugs played a part in bringing about the death, you must still conclude that the cyclopropylfentanyl is a but for cause of the death so long as without the incremental effect of the cyclopropylfentanyl Lucas Urbina would have lived.

Upon retiring to your jury room select one of your group to be your foreperson. That person will preside over your deliberations and will be your spokesperson in court. Your verdict must represent the collective judgment of each of you. In order to return a verdict, it is necessary that each juror agree to it. Your verdict has to be unanimous. It's your duty as jurors to consult with each other and to deliberate with each other with a view towards reaching an agreement if you can do so without compromise to your individual judgment. Each of you have to decide the case for himself or herself, but you are to do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations you're allowed to re-examine your own views and change your opinion if you are convinced it is in error. However, you are not required to surrender your honest conviction solely

because of the opinion of a fellow juror or for the mere purpose of thereby being able to return a unanimous verdict. You will remember at all times that you're not partisans. You don't have a stake in the case. You are the judge of the facts. Your sole interest is to seek the truth from the evidence received during trial.

I'll see the lawyers up here.

(Bench conference)

**THE COURT:** Any objections.

**MS. WILSON:** Not from the Government.

**MR. TARLTON:** I would just like to note the earlier objections.

**THE COURT:** All right. I'll take those under advisement.

**MR. TARLTON:** Thank you.

(Bench conference concluded)

**THE COURT:** All right. Ladies and gentlemen, you'll have the indictment and the verdict form, and you can retire to your jury room now and select a foreperson and begin your deliberations. Thank you.

(Jury out to begin deliberations at 4:33 p.m.)

**THE COURT:** The Court will be in recess.

(Recess at 4:33 - 5:07 p.m..)

**THE COURT:** The jury wants to go home for the night and begin tomorrow morning.

(Jury in)

**THE COURT:** Ladies and gentlemen, I understand that you are ready to go home for today, and you've done a lot of work in two days. This has been a very well managed case to get it to you in two days, so do not discuss it or do any research or form any opinions while you're away. When you come back at ten tomorrow morning you can resume your deliberations where you left off. So have a safe trip, and I'll excuse you now to come back tomorrow morning.

We'll be in recess.

(Court recess at 5:09 p.m..)

August 31, 2022, 9:58 a.m.

**DEPUTY CLERK:** This is the Eastern District of North Carolina. This is the continuation of the jury trial. Court is in session. All twelve jurors are present for deliberation. The Court stands at ease.

JURY QUESTION

**THE COURT:** Did you see the note?

**MS. WILSON:** Yes, sir.

**THE COURT:** So here's my interpretation of where we stand now. I think the evidence is clear that the defendant, if he is proven to be the person, whoever the person was believed that they were distributing what would be in effect a controlled substance. Probably thought it was heroin, could have been heroin and fentanyl. Probably did not have a sophisticated understanding that there was an

analogue of fentanyl that could have been in the product. But the whole purpose was to achieve a narcotic effect, and I think that the jury would have to find beyond a reasonable doubt that the defendant distributed a substance that he knew or should have known beyond a reasonable doubt was either a controlled substance in Schedule I or II or the analogue of a controlled substance in any event. That's the way I see it. What do you say?

**MS. WILSON:** Judge, I did not bring the case downstairs with me, but there is a case that is directly on point to this.

**THE COURT:** From where?

**MS. WILSON:** I'm sorry?

**THE COURT:** From where?

**MS. WILSON:** Judge, I don't know. I didn't print it off. It was sent to me this morning. I apologize, Your Honor. I didn't know what this was the issue we were addressing right now. I thought it was just about this jury question.

**THE COURT:** Well, it is the jury question. The jury question is: Ask for a copy of the points of burden of proof. Okay. You think that's a different question?

**MS. WILSON:** Well, Judge, I thought that we were here to address whether or not like a closing argument could be given to the jury or whether or not jury instructions could be given to them. But what I will say to Your Honor is

that there is a case that talks about the Government's burden of proof can be met with circumstantial evidence if this defendant believed he was giving a controlled substance or a controlled substance analogue if he knew the various properties of it. And you can do that through circumstantial evidence like the clandestine way in which it's given, having a knowledge of the effects. And we would argue that circumstantially we have been able to do that, and it's a jury question.

**THE COURT:** Okay. So --

**MR. TARLTON:** Your Honor, I think the instruction for the Court is to read the McFadden --

**THE COURT:** I've looked at all of that. Don't get me off track.

**MR. TARLTON:** Yes, Your Honor.

**THE COURT:** Your Instruction Number 34, do you have that? Do you know what I'm talking about. It's the list of five things.

**MS. WILSON:** Yes, sir.

**THE COURT:** Why don't I just instruct them again on that?

**MS. WILSON:** That's fine with the Government, Judge. I think that's perfect.

**THE COURT:** I think that is probably, without getting into a dialogue with the jury, that's probably what they mean in terms of points of burden of proof.

**MS. WILSON:** And, Judge, the Government does not have any objection to the jury instructions just being sent back to the jury.

**THE COURT:** Well, that's not the way I do jury instructions. They're never the same twice. So what they heard in the courtroom may not be that. I might send this page back though and strike the Government proposed jury instruction Number 34 on it. I can just cut it off.

You're comfortable or confident about the correctness of this Number 34?

**MS. WILSON:** Yes, sir.

**THE COURT:** And you'll have to rely on that.

**MS. WILSON:** Yes, sir.

**THE COURT:** Madam Clerk, do you have scissors by any chance?

(Discussion regarding locating a pair of scissors.

**THE COURT:** And you can bring the jury back in. Lawyers, come up here to my bench.

(Bench conference)

**THE COURT:** This is what I'm going to give to them to take back with them.

**MS. WILSON:** Yes, sir. That's satisfactory for the Government.

**MR. TARLTON:** For the defense, I'm fine with that going back. I would just note for the record my previous

arguments for a different instruction, slightly different.

**THE COURT:** That will be denied.

**MR. TARLTON:** Yes, sir.

(End of bench conference)

(Jury seated in the jury box)

**THE COURT:** Ladies and gentlemen, I interpret your question, ask for a copy of points of burden of proof. I'm going to give you the typed out sheet which I instructed you on the essential elements of the offense and what they are. And it says that the Government must prove these beyond a reasonable doubt, and hopefully that will be of assistance in answering this particular question. So I'll let you go back with this document and continue your efforts at reaching a verdict.

Who is the foreperson?

(Ms. Simmons indicates she is the foreperson)

**THE COURT:** Is that all right?

**FOREPERSON:** Yes.

**THE COURT:** Okay. Thank you. I'll excuse the jury.

(Jury out)

**THE COURT:** All right. We'll be in recess.

(Off the record 10:45 a.m.)

JURY QUESTION - 1:19 P.M.

**THE COURT:** Have you seen the note?

**MR. TARLTON:** Yes, Your Honor.

**MS. WILSON:** Yes, sir.

**THE COURT:** I'm going to bring the jury back in and tell them that they should do their earnest best to try to consider the case and the issues in the case and the burden of proof and reach a verdict if they can, if they can be unanimous. And if they can't then the case will be mistried. Do you have any problem with that?

**MS. WILSON:** Not from the Government, Judge.

**THE COURT:** Okay. Bring the jury back in. I'm going to ask them to go back and consider whether they can continue to profitably make a decision, deliberate.

(Jury in 1:19.)

I have your note and thank you. I think I told you that in order to have a verdict in the case you must be unanimous. Each of you has to consider the case for himself or herself, but you are to give attention to the opinions of each other. You've been deliberating now into a full day. I'd like you to go back and see if you think your deliberations will be fruitful to proceed, to continue. If you do not reach a unanimous verdict and that is your conclusion, then the case will be mistried, and the Government may proceed with it in front of another jury at another time. But as far as the issues in this case go, the Government has to prove the elements beyond a reasonable doubt, and it's your duty to decide whether or

not they've done that. And if you can do that with unanimity, then there will be a verdict. If you can't then the case will be mistried. Do you understand that?

**FOREPERSON:** Yes, sir.

**THE COURT:** So can you go back and continue at least for some time to see if you can reach agreement on the case?

**FOREPERSON:** Yes, sir.

**THE COURT:** I'll let you return.

(Jury out to deliberate 1:24 p.m.)

**THE COURT:** We'll be at ease.

(Off the record at 1:24 p.m.) (Jury in 2:09 p.m.)

<u>JURY VERDICT</u>

**THE COURT:** Ms. Simmons, does the jury have a unanimous verdict?

**FOREPERSON:** Yes, sir.

**THE COURT:** All right. If you'll give that to the bailiff, he'll give it to me.

The verdict of the jury is, we find the Defendant, Shamel Nesbitt, as to the distribution of cyclopropylfentanyl on or about November 19th, 2017, guilty and that the cyclopropylfentanyl caused the death of LU, guilty.

Thank you, ladies and gentlemen, for your service. It's been a fairly long case, and I appreciate your willingness to be a juror and the duty that you have

fulfilled. So you are now excused.

**MR. TARLTON:** Your Honor, permission to poll the jury.

**THE COURT:** You want to poll the jury?

**MR. TARLTON:** Yes, Your Honor.

**THE COURT:** A jury poll is when the Court asks each juror separately if that's your verdict and do you still agree to it to determine the unanimity of the jury. And that's what I'll do at this time. So I'll ask each one of you, is this your verdict and do you still assent to it. If you say, yes, then I go to the next person.

Mr. Hurdle, the verdict of the jury is guilty on both counts. Is that your verdict and do you still assent to it?

**MR. HURDLE:** Yes, sir.

**THE COURT:** Ms. Gibson, the verdict of the jury is guilty on both items. Is that your verdict and do you still assent to it?

**MS. GIBSON:** Yes, sir.

**THE COURT:** Ms. Jones, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MS. JONES:** Yes, sir.

**THE COURT:** Mr. Martin, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MR. MARTIN:** Yes, sir.

**THE COURT:** Mr. Davidson, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MR. DAVIDSON:** Yes, sir.

**THE COURT:** Ms. Walden, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MS. WALDEN:** Yes, sir.

**THE COURT:** Mr. Coston, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MR. COSTON:** Yes.

**THE COURT:** Ms. Morgan, the verdict of the jury is guilty as to each of the issues. Is that your verdict and do you still assent to it?

**MS. MORGAN:** Yes.

**THE COURT:** Ma'am?

**MS. MORGAN:** Yes, sir.

**THE COURT:** Mr. Horton, the verdict of the jury is guilty as to each of the issues. Is that your verdict and do you still assent to it?

**MR. HORTON:** Yes, sir.

**THE COURT:** Ms. Ward, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still

assent to it?

**MS. WARD:** Yes, sir.

**THE COURT:** Ms. Simmons, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MS. SIMMONS:** Yes, sir.

**THE COURT:** And, Ms. Powers, the verdict of the jury is guilty as to both issues. Is that your verdict and do you still assent to it?

**MS. POWERS:** Yes, sir.

**THE COURT:** Okay. Thank you very much. Now you're excused.

(Jury out 4:33)

A presentence report will be prepared. Sentencing hearing set for the week of November 28th. He's on conditions of release. You probably object to that.

**MS. WILSON:** Judge, we did object when Your Honor released him initially. Given the jury's verdict we would ask that he be detained.

**MR. TARLTON:** He has been otherwise confined Your Honor, as a cancer survivor. We ask -- he's got (inaudible) rights. There's other issues. We ask that you continue him on release, Your Honor.

**THE COURT:** How has his performance been heretofore?

**MR. TARLTON:** Other than obviously I think his mom -- his

uncle, her brother died on Monday. That delayed him getting to court. Other than that one hiccup it is my understanding he has been in compliance. He's worked a job. He's working as a medical transport.

**THE COURT:** I'll allow him to continue on conditions of release imposed heretofore as long as he is in compliance with them.

**MR. TARLTON:** Yes, Your Honor.

**THE COURT:** Thank you all for your effort. The Court will be in recess.

(Court recessed at 2:15 p.m.)

STATE OF NORTH CAROLINA )
) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS )

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Sandra A. Graham, CVR-M* — *11/15/2022*

Sandra A. Graham, CVR-M — November 15, 2022
Court Reporter & Notary Public
Notary Public Number: 19940140086